**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| INTERNATIONAL CODE COUNCIL, INC., | Civil Action No. 1:17-cv-6261-VM-DCF |
| Plaintiff, | **ECF Case** |
| v. | Hon. Victor Marrero |
| UPCODES, INC.; GARRETT REYNOLDS; and SCOTT REYNOLDS, | Courtroom: 11B |
| Defendants. | |
| UPCODES, INC., | |
| Counterclaim-Plaintiff, | |
| v. | |
| INTERNATIONAL CODE COUNCIL, INC., | |
| Counterclaim-Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS UPCODES, INC., GARRETT REYNOLDS, AND SCOTT REYNOLDS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

**PUBLIC VERSION OF DOCUMENT FILED UNDER SEAL**

**TABLE OF CONTENTS**

                                                                                    Page

I.    INTRODUCTION ...................................................................................... 1

II.   FACTUAL BACKGROUND ..................................................................... 3

      A. UpCodes publishes the law on its website. ....................................... 3

      B. ICC coordinates the development of model building codes for state and local
         governments to enact into law. ...................................................... 5

            1.    ICC was founded by regional standards developing organizations,
                  and inherited their copyrights. ...................................... 5

            2.    ICC coordinates the development of model building codes, and
                  they still contain content from ICC predecessor SBCCI's model
                  codes. ........................................................................ 6

      C. ICC invites and actively works to persuade state and local governments to enact
         ICC's model codes into law. ......................................................... 7

      D. State and local governments enact ICC's model codes into law. ........... 8

      E. ICC extends its copyright over the model codes to exclude others, even the
         enacting governments, from speaking the law. ................................ 9

III.  LEGAL STANDARD ............................................................................... 10

IV.   ARGUMENT .......................................................................................... 11

      A. ICC cannot copyright the law. ..................................................... 11

            1.    *Veeck* correctly held that the law is uncopyrightable. .............. 12

            2.    This case is on all fours with *Veeck*. ................................ 15

            3.    Because there is only one way to express a legal rule, copyright's
                  merger doctrine bars Plaintiffs' claim. ............................. 16

            4.    *Veeck* is consistent with Constitutional requirements. ............. 20

                  a.    *Veeck* correctly noted that private copyright to the law
                        presents due process concerns. .............................. 20

                  b.    Upholding the public's right to speak the law furthers
                        important First Amendment interests. ..................... 23

i

5.      The *CCC* decision does not lead to a different result. ............................. 24

     a.     The work at issue in *CCC* did not provide mandatory rules governing conduct. ........................................................................... 25

     b.     The *CCC* court's concerns about the Takings Clause are not present here. ............................................................................... 26

6.      The *County of Suffolk* decision does not lead to a contrary result. ............ 28

     a.     The tax maps at issue in *County of Suffolk* did not constitute "the law." ......................................................................... 29

     b.     Because the issue was presented on a motion to dismiss, the court did not apply and could not have applied the merger doctrine. ......................................................................................... 30

7.      The law of the Ninth Circuit is not to the contrary. .................................... 31

B. To the extent there may remain some actionable copyright interest in the text of the law, UpCodes' publication of building codes is protected by fair use. ................. 33

1.      The purpose and character of UpCodes' use weighs in favor of a finding of fair use. ...................................................................................... 35

     a.     The use is transformative because it uses the authentic text of the law as the law, not as a model code. ...................................... 35

     b.     UpCodes makes the law available for free, and its use is thus largely noncommercial. .......................................................... 38

2.      The nature of the copyrighted work weighs heavily in favor of a finding of fair use, since the text used is the binding law. ......................... 39

3.      UpCodes uses no more of the model codes than is necessary. ........... 40

4.      UpCodes' use has no effect on any market cognizable under the Copyright Act. ............................................................................................. 42

C. ICC is collaterally estopped from relitigating the issue of whether the republication of enacted building codes can infringe copyright. .................................................. 44

1.      ICC is in privity with SBCCI. ................................................................... 45

2.      The identical issue was raised in *Veeck*. .................................................. 47

3.      The issue was actually litigated and decided in *Veeck*. ............................ 47

4.      ICC's predecessor-in-interest had a full and fair opportunity to litigate the issue in *Veeck*. .......................................................... 48

5.      The resolution of the issue was necessary to support a valid and final judgment on the merits in *Veeck*. ....................................... 49

V.    CONCLUSION ............................................................................................ 49

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Geophysical Union v. Texaco Inc.*,
   60 F.3d 913 (2d Cir. 1994)..............................................................................38, 42

*Am. Soc'y for Testing & Materials, et al. v. Public.Resource.Org, Inc.*,
   896 F.3d 437 (D.C. Cir. 2018) ........................................................................ *passim*

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).......................................................................................10, 11

*Authors Guild, Inc. v. HathiTrust*,
   755 F.3d 87 (2d Cir. 2014)...................................................................................40

*Authors Guild v. Google, Inc.*,
   804 F.3d 202 (2d Cir. 2015)...........................................................................38, 40

*Banks & Bros. v. West Pub. Co.*,
   27 F. 50 (C.C.D. Minn. 1886)........................................................................20, 28

*Banks v. Manchester*,
   128 U.S. 244 (1888)........................................................................................ *passim*

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
   448 F.3d 605 (2d Cir. 2006).................................................................................40

*Bldg. Officials & Code Adm. v. Code Tech., Inc.*,
   628 F.2d 730 (1st Cir. 1980) .......................................................................... *passim*

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994)...........................................................................35, 39, 40, 42

*CCC Information Services, Inc. v. Maclean Hunter Mkt. Reports, Inc.*,
   44 F.3d 61 (2d Cir. 1994)............................................................................... *passim*

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)..............................................................................................10

*Clark v. Martinez*,
   543 U.S. 371 (2005)..............................................................................................23

*Code Revision Comm'n for Gen. Assembly of Georgia v. Public.Resource.Org,
   Inc.*, 906 F.3d 1229 (11th Cir. 2018) ............................................................. *passim*

iv

*Connolly v. Pension Ben. Guar. Corp.*,
  475 U.S. 211 (1986)........................................................................................27

*Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*,
  447 U.S. 102 (1980)........................................................................................17

*Conte v. Justice*,
  996 F.2d 1398 (2d Cir. 1993)..........................................................................44

*County of Suffolk v. First American Real Estate Solutions*,
  261 F.3d 179 (2d Cir. 2001).............................................................28, 29, 30, 31

*Cty. of Suffolk, N.Y. v. Experian Info. Sols., Inc.*,
  No. 99CIV.8735(JFK), 2000 WL 1010262 (S.D.N.Y. July 21, 2000)...................29

*Cty. of Suffolk, New York v. Experian Info. Sols., Inc.*,
  No. 99CIV.8735(JFK), 2000 WL 628731 (S.D.N.Y. May 15, 2000)....................29

*Davidson v. Wheelock*,
  27 F. 61 (C.C.D. Minn. 1866)..........................................................................20

*Eldred v. Ashcroft*,
  537 U.S. 186 (2003)........................................................................................23

*Evans v. Ottimo*,
  469 F.3d 278 (2d Cir. 2006)............................................................................47

*Frydman v, Akerman*,
  280 F. Supp. 3d 418 (S.D.N.Y. 2017)..............................................................47

*Garelick v. Sullivan*,
  987 F.2d 913 (2d Cir. 1993)............................................................................28

*Golan v. Holder*,
  565 U.S. 302 (2012)........................................................................................24

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
  471 U.S. 539 (1985)..................................................................................23, 43

*Hicks v. Baines*,
  593 F.3d 159 (2d Cir. 2010)............................................................................11

*Howard v. Town of Bethel*,
  481 F. Supp. 2d 295 (S.D.N.Y. 2007)....................................................45, 48, 49

*Howell v. Miller*,
  91 F. 129 (6th Cir. 1898) ................................................................................13

*Kregos v. Associated Press*,
  937 F.2d 700 (2d Cir. 1991)................................................................................16, 19, 30, 31

*Kulas v. Flores*,
  255 F.3d 780 (9th Cir. 2001) ...............................................................................................48

*Leasing Service Corp. v. Graham*,
  646 F. Supp. 1410 (S.D.N.Y. 1986).....................................................................................11

*Managed Pharmacy Care v. Sebelius*,
  716 F.3d 1235 (9th Cir. 2013) .............................................................................................28

*Mason v. Montgomery Data, Inc.*,
  967 F.2d 135 (5th Cir. 1992) ...............................................................................................31

*Nash v. Lathrop*,
  142 Mass. 29, 6 N.E. 559 (1886) ........................................................................................20

*Olin Corp. v. American Home Assur. Co.*,
  704 F.3d 89 (2d Cir. 2012)...................................................................................................48

*Penn Cent. Transp. Co. v. City of New York*,
  438 U.S. 104 (1978).............................................................................................................27

*People v. Russell Place Realty Co.*,
  957 N.Y.S.2d 266 (App. Term 2012) ..................................................................................26

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) .............................................................................................37

*Practice Mgmt. Information Corp. v. Am. Medical Ass'n*,
  121 F.3d (9th Cir. 1997), *amended*, 133 F.3d 1140 (9th Cir. 1998)..........................22, 31, 32

*Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank
  of New York Mellon*,
  775 F.3d 154 (2d Cir. 2014).................................................................................................17

*Ridinger v. Dow Jones & Co. Inc.*,
  651 F.3d 309 (2d Cir. 2011).................................................................................................11

*Ruckelshaus v. Monsanto Co.*,
  467 U.S. 986 (1984).........................................................................................................27, 28

*Swatch Group Management Services Ltd. v. Bloomberg L.P.*,
  756 F.3d 73 (2d Cir. 2014)............................................................................................. *passim*

*Tompkins v. Hunter*,
  149 N.Y. 117 43 N.E. 532 (1896)........................................................................................17

*U.S. Bank Nat. Ass'n v. Dexia Real Estate Capital Markets*,
    2014 WL 3368670 (S.D.N.Y. July 9, 2014), *rev'd on other grounds*, 643 Fed.
    App'x 48 (2d Cir. 2016)..................................................................................47

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
    562 F.3d 630 (4th Cir. 2009) ........................................................................37

*Veeck v. S. Bldg. Code Cong. Int'l, Inc.*,
    293 F.3d 791 (5th Cir. 2002) ................................................................. *passim*

*Veeck v. S. Bldg. Code Cong. Int'l, Inc.*,
    49 F. Supp. 2d 885 (E.D. Tex. 1999) ......................................................48, 49

*Veeck v. Southern Bldg. Code Cong. Int'l*,
    241 F.3d 398 (5th Cir. 2001) ....................................................................17, 48

*Weinberg v. Vill. of Clayton, New York*,
    No. 5:17-CV-00021(BKS/ATB), 2018 WL 4214363 (N.D.N.Y. Mar. 21,
    2018) ..............................................................................................................26

*Wheaton v. Peters*,
    33 U.S. (8 Pet.) 591 (1834)............................................................................12

*Wright v. Goord*,
    554 F.3d 255 (2d Cir. 2009)...........................................................................10

*Wyly v. Weiss*,
    697 F.3d 131 (2d Cir. 2012)...........................................................................44

**Statutes and Regulations**

17 U.S.C. § 102(b) ................................................................................................16, 34

17 U.S.C. § 107................................................................................................. *passim*

17 U.S.C. § 107(2) ......................................................................................................39

N.Y. Building Standards and Codes, 2017 Uniform Code Supplement, *available
    at* https://www.dos.ny.gov/dcea/pdf/2017%20Uniform%20Code%20
    Supplement-10-2017.pdf ............................................................................ *passim*

N.Y. Comp. Codes R. & Regs. tit. 19, § 1220.1 *et seq.*...................................... *passim*

N.Y. Exec. Law § 382(2) .............................................................................................26

N.Y. Real Prop. Tax Law § 503(1)(a) ..........................................................................30

Wyoming Dept. of Fire Prevention and Electrical Safety, Codes and Standards, *available at* http://wsfm.wyo.gov/plan-review/codes-and-standards (last visited May 29, 2019) ........................................................................................9, 15

**Rules**

Fed. R. Civ. P. 56(c) ...........................................................................................10

Fed. R. Civ. P. 56(g) ...........................................................................................11

**Other Authorities**

Brief of United States as Amicus Curiae on Invitation, *Southern Bldg. Code Cong. Int'l v. Veeck*, No. 02-355 (U.S. May 30, 2003), *available at* https://www.justice.gov/sites/default/files/osg/briefs/2002/01/01/2002-0355.pet.ami.inv.pdf ..............................................................................................25

18 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 4425 (3d ed. 2019 update) ....................................................................................47

Pierre N. Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105, 1110–11 (1990)....................................................................................................................34

## I.    INTRODUCTION

Everyone has the right to speak the law.  Nobody—not the government, and not a private party—can control who is permitted to speak the law, and nobody may charge fees for the privilege.

Plaintiff International Code Council, Inc. ("ICC") claims that it owns copyright in hundreds of laws: the New York City Building Code, the New York City Plumbing Code, the New York City Fire Code, and others enacted in jurisdictions across the United States.  ICC makes that claim because those laws, which carry criminal penalties for their violation, are based on model codes that ICC published, and then successfully urged governments to adopt as binding law.  And ICC claims that by posting those laws on its website, Defendants UpCodes, Inc. ("UpCodes") and its founders, Garrett Reynolds and Scott Reynolds ("Defendants") have infringed ICC's copyrights.

ICC is wrong.  Court after court has reached the same conclusion: words that carry the force of law cannot be subject to any private party's copyright.  "The citizens are the authors of the law, and therefore its owners, regardless of who actually drafts the provisions, because the law derives its authority from the consent of the public, expressed through the democratic process."  *Bldg. Officials & Code Adm. v. Code Tech., Inc.*, 628 F.2d 730, 734–35 (1st Cir. 1980) ("*BOCA*").  "When the legislative or judicial chords are plucked it is in fact the People's voice that is heard.  Not surprisingly, then, for purposes of copyright law, this means that the People, as the constructive authors are also the owners of the law.  And in this way, any work of which the People are the constructive authors is intrinsically public domain material and is freely accessible to all so that no valid copyright can ever be held in it."  *Code Revision Comm'n for Gen. Assembly of Georgia v. Public.Resource.Org, Inc.*, 906 F.3d 1229, 1239–40 (11th Cir. 2018) ("*Code Revision Commission*"), *petition for cert. docketed sub nom.*, *Georgia, et al. v.*

*Public.Resource.Org, Inc.*, No. 18-1150 (U.S. March 5, 2019).  "[T]he authentic exposition and

interpretation of the law," which is "binding every citizen, is free for publication to all."  *Banks*

*v. Manchester*, 128 U.S. 244 (1888).  That is why "the express text of the law falls plainly

outside the realm of copyright protection."  *Am. Soc'y for Testing & Materials, et al. v.*

*Public.Resource.Org, Inc.*, 896 F.3d 437, 451 (D.C. Cir. 2018) ("*ASTM*").

      Indeed, the precise question here was decided by the Fifth Circuit:

> The issue in this *en banc* case is the extent to which a private
> organization may assert copyright protection for its model codes,
> after the models have been adopted by a legislative body and
> become "the law".  Specifically, may a code-writing organization
> prevent a website operator from posting the text of a model code
> where the code is identified simply as the building code of a city
> that enacted the model code as law? Our short answer is that
> as *law,* the model codes enter the public domain and are not
> subject to the copyright holder's exclusive prerogatives.

*Veeck v. S. Bldg. Code Cong. Int'l, Inc.*, 293 F.3d 791, 793 (5th Cir. 2002).  The Fifth Circuit

was right.  So was the First Circuit in *BOCA*, the Eleventh Circuit in *Code Revision Commission*,

the D.C. Circuit in *ASTM*, and the Supreme Court in *Banks*.  There is only one way to express

the law: using the text that has been enacted into law.  Summaries and paraphrases will not do; to

speak the law, one must speak the words that govern us, *in haec verba*.  Copyright does not stand

in the way of every citizen's right to speak the law.

      The UpCodes website, as it currently exists and has existed since late 2017, contains the

building codes enacted by a variety of jurisdictions, which are based on model codes published

ICC.  Defendants move for summary judgment that UpCodes does not infringe copyright by speaking those laws to the public.[1]

## II.   FACTUAL BACKGROUND

### A.   UpCodes publishes the law on its website.

Defendants Garrett and Scott Reynolds founded UpCodes in 2016.  Decl. of Garrett Reynolds in supp. of Mot. ("G. Reynolds Decl.") ¶ 2.   An architectural designer, Scott was frustrated by the lack of freely available, electronic copies of the state and local laws that governed his projects—i.e., state and local building codes.  Decl. of Scott Reynolds in supp. of Mot. ("S. Reynolds Decl.") ¶ 3.  He teamed up with his brother Garrett, a software engineer at a construction technology startup, to launch UpCodes.  S. Reynolds Decl. ¶ 4.  UpCodes publishes the building codes of 35 state and local jurisdictions for free, to make it easier for the public to learn about and comply with those laws.  Defendants UpCodes, Inc., Garrett Reynolds, and Scott Reynolds' Statement of Undisputed Material Facts Pursuant to L.R. 56.1 ("SUF") ¶ 1.

UpCodes posts only the building codes as enacted or adopted by state and local jurisdictions on its website.   SUF ¶ 3. On the UpCodes website, the laws are identified as the law of the particular state or local jurisdiction that enacted the law.   SUF ¶ 4.  The website also identifies the model code on which the state or local building code is based.  SUF ¶ 5.  Thus, UpCodes identifies the New York state building code as "Building Code 2015 of New York

---

[1] This Motion for Partial Summary Judgment is directed to UpCodes as it exists today, and has existed since late 2017.  Prior to late 2017, UpCodes displayed the ICC's model codes labeled as model codes, and noted what jurisdictions had adopted those codes.  In late 2017, in response to the ICC's allegations of copyright infringement, UpCodes changed its website to the current configuration.  Though UpCodes will dispute all of the ICC's claims of copyright infringement at trial or in a subsequent motion, this Motion does not seek summary adjudication of ICC's claims as to the UpCodes website prior to late 2017.

State," and specifies that this building code "ADOPTS WITH AMENDMENTS: International Building Code 2015 (IBC 2015)."  SUF ¶ 6.

As discussed further below, the ICC is a trade organization that coordinates the development of model building codes specifically for adoption into law by jurisdictions around the country.  UpCodes does not post any of ICC's model codes (or other content) except as adopted into law by specific jurisdictions.   SUF ¶ 7.  For example, ICC's 2015 International Building Code contains content that may not have the force of law, such as the cover page, copyright page, preface, instructions on the "Effective Use of the International Building Code," and a sample legislation page.  SUF ¶ 8.  UpCodes does not publish that content.   SUF ¶ 9. ICC's 2015 International Building Code also contains 13 appendices that contain "optional or supplemental criteria to the provisions in the main chapters" of the 2015 International Building Code.  SUF ¶ 10.  When a jurisdiction does not adopt an appendix from an ICC model code as law, UpCodes does not publish that appendix on the UpCodes website, because it is not part of that jurisdiction's building code.  SUF ¶ 11.  For example, New York State adopted only Appendices E, F, and I of the 2015 International Building Code, and composed its own Appendix N.  The UpCodes website includes the New York State Building Code as enacted, including Appendices E, F, and I (and no other IBC-based appendices) along with New York's own Appendix N.  *See* N.Y. Building Standards and Codes, 2017 Uniform Code Supplement ("2017 Uniform Code Supplement") at i, *available at* https://www.dos.ny.gov/dcea/pdf/2017%20Uniform%20Code%20Supplement-10-2017.pdf ("The Building Code consists of Chapters 1 through Chapter 35 and Appendices E, F, and I of

4

the 2015 IBC.")[2]; *id.* at 14 (listing Appendices E, F, and I as appendices that "have been adopted and are made part of the Uniform Code"); *id.* at 15 (listing Appendix N as among those that have "been adopted and are made part of the Uniform Code"); SUF ¶¶ 12, 13, 14.  In short, UpCodes publishes only the state and local building codes as adopted into law by the relevant jurisdictions, including any applicable additions, deletions, and modifications from the ICC's model codes. SUF ¶ 15.

UpCodes does not charge any money for accessing the law on its website, or generate any revenue from the mere publication of the law on its website.  All of the laws on its website are available for free and may be viewed without registering for an UpCodes account, and UpCodes does not display any third-party advertising on its website.  SUF ¶ 16.  UpCodes offers a paid product, UpCodes Premium, which gives users access to certain additional features that may further ease compliance with the law, such as bookmarking, advanced search, and project collaboration capabilities.  SUF ¶ 17.  The fees for UpCodes Premium are not for access to the law (which UpCodes makes available for free), but only for the additional technological functionality that UpCodes has created.

**B.    ICC coordinates the development of model building codes for state and local governments to enact into law.**

**1.    ICC was founded by regional standards developing organizations, and inherited their copyrights.**

In 1994, three regional code development organizations, the Southern Building Code

---

[2] The 2017 Uniform Code Supplement governs New York State's amendments to the ICC's 2015 International Building Code.  *See* N.Y. Comp. Codes R. & Regs. tit. 19, § 1221.1 ("For the purposes of applying the 2015 IBC in New York State, the 2015 IBC shall be deemed amended in the manner specified in the publication entitled 2017 Uniform Code Supplement, publication date July 2017[.]").

Congress International, Inc. ("SBCCI"), Building Officials and Code Administrators

International, Inc. ("BOCA"), and International Conference of Building Officials ("ICBO")

founded ICC.  SUF ¶ 18.  On May 1, 2003, SBCCI, BOCA, and ICBO consolidated with the

ICC.  SUF ¶ 19.  SBCCI donated all of its assets, including its copyrights in its model codes, to

ICC, and ICC assumed all of its liabilities.  SUF ¶ 20.

### 2.   ICC coordinates the development of model building codes, and they still contain content from ICC predecessor SBCCI's model codes.

ICC is an organization that coordinates the development of model building codes.  Every

three years, ICC publishes a new edition of each of its model codes.  Decl. of Joseph C. Gratz in

Supp. of Mot. ("Gratz Decl.") Ex. 6 (Johnson Dep.) at 80:5–10.  ICC does not write its model

codes; instead ████████████████████████████████████████████

████████████████████████████████████████████████████

███████   *Id.* Ex. 7 (Yerkes Dep.) at 87:2–12.  Members of the public submit proposed

changes to the previous edition of the model code, then the proposals proceed through a process

of committee review, hearings, and voting.  *Id.* Ex. 8 (Pfeiffer Dep.) at 24:3–26:20; *id.* Ex. 6 at

73:18–79:10.  At the end of this process, ICC staff incorporate the code changes that have been

approved and incorporate them into the next edition of the model code.  Gratz Decl. Ex. 8 at

59:20–61:14.  In this way, each edition of an ICC model code builds on the previous edition.

*Id.* at 84:6–87:12 ████████████████████████████████████████

██████

Before the regional code organizations SBCCI and BOCA donated their copyrights to

ICC and consolidated with the ICC, each published its own model codes.  SUF ¶ 21.  After

SBCCI and BOCA consolidated with ICC, the very first edition of ICC's International Building

Code incorporated content from SBCCI's model code (the Standard Building Code) and BOCA's model code (the National Building Code).  SUF ¶ 22.

### C.   ICC invites and actively works to persuade state and local governments to enact ICC's model codes into law.

One reason ICC develops its model codes is specifically so that state and local governments will use these model codes as the basis for their own building codes.  SUF ¶ 23. Simply opening up a copy of ICC's model codes is enough to see that ICC intends the model codes to be enacted into law.  The 2015 International Building Code includes "SAMPLE LEGISLATION FOR ADOPTION OF THE *INTERNATIONAL BUILDING CODE*."  SUF ¶ 24. ICC's sample legislation makes it easier for "[j]urisdictions wishing to adopt the 2015 *International Building Code* as an enforceable regulation" to do so.  SUF ¶ 25.  Indeed, ███████ ███████████████████████████████████████████████████████."  SUF ¶ 26.

After the model codes are developed, ICC vigorously advocates for their enactment into law.  In fact, ICC has an entire department devoted to that cause.  The Government Relations department ██████████████████████████████████████████████ ███████."  SUF ¶ 27.  █████████████████████████████ █████████████████████████.  SUF ¶ 28.  In 2018, the budget for the ICC Government Relations department was ██████████████████  SUF ¶ 29.  (By comparison, in 2018, ICC budgeted ██████████ for Code Development expenses.  SUF ¶ 30.)  The ICC's Government Relations employees ██████████████████████████████  SUF ¶ 31.

As Sara Yerkes, Senior Vice President of Government Relations, put it, ICC is ██████ ████████████████████████████████████████████

███████████████████████████████████████   SUF ¶ 32; Gratz Decl. Ex. 7 at 13:22–25.

And so, while it's ████████████████████████████████████████

███████████████████████████████████████.”  SUF ¶¶ 33–34.

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████   SUF ¶ 35.

### D.    State and local governments enact ICC's model codes into law.

Given ICC's efforts to encourage state and local jurisdictions to enact ICC's model codes into law, it is not surprising that many jurisdictions do exactly that.  On its "Advocacy" webpage, ICC maintains a chart called "Our Most Up to Date Adoption Chart: State Adoptions."  SUF ¶ 36.  State or local jurisdictions in all 50 states have enacted at least one ICC model code into law, with several jurisdictions enacting multiple model codes into law.  SUF ¶¶ 37–38.

There are multiple ways to enact a model code into law.  Some jurisdictions, such as New York State, incorporate the model code into their laws by reference.  For example, the New York State Uniform Fire Prevention and Building Code incorporates by reference the 2015 editions of eight ICC model codes:  the International Building Code, the International Residential Code, the International Plumbing Code, the International Mechanical Code, the International Fuel Gas Code, the International Fire Code, the International Property Maintenance Code, and the International Existing Building Code.  2017 Uniform Code Supplement; N.Y. Comp. Codes R. & Regs. tit. 19, §§ 1220.1; 1221.1; 1222.1, 1223.1, 1224.1, 1225.1, 1226.1, 1227.1.  For each of these model codes, the enacting statute states that the relevant model code "is incorporated herein by reference."  *Id.*

Jurisdictions may also amend the model codes by adding or removing text, rather than adopting their provisions in their entirety.  In New York State, for example, the "2015 IBC shall

8

be deemed amended in the manner specified in" the 2017 Uniform Code Supplement published by New York's Department of State.  N.Y. Comp. Codes R. & Regs. tit. 19, § 1221.1(b).  The 2017 Uniform Code Supplement sets forth amendments to each of the ICC model codes adopted by New York State.  *See generally* 2017 Uniform Code Supplement.  Other states, meanwhile, enact the model codes without making any amendments.  In Wyoming, for example, the Council on Fire Prevention and Electrical Safety in Buildings adopts and enforces the 2018 editions of the International Building Code, the International Existing Building Code, the International Fire Code, the International Mechanical Code, and the International Fuel Gas Code without making any amendments to the model codes.  Wyoming Dept. of Fire Prevention and Electrical Safety, Codes and Standards, *available at* http://wsfm.wyo.gov/plan-review/codes-and-standards (last visited May 29, 2019).

### E.    ICC extends its copyright over the model codes to exclude others, even the enacting governments, from speaking the law.

Consistent with its belief that a copyright in a model code allows it to control the publication of the law, ICC works to restrict who can publish an enacted building code.  It is willing to let governments publish their building codes—if the governments pay for that privilege.  For example, ███████████████████████████████████████

██████████████████████████████.  SUF ¶ 39.  ███████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████      SUF ¶¶ 39, 40.

Some governments have proposed to publish their building codes on government websites, but ICC has argued against those proposals.  For example, ████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████  SUF ¶ 41. ████████████████ ████████████████████████████████████████████████████ ████████████████████████████████  SUF ¶ 42.  The proposed legislation would have required "the North Carolina State Building Code and each amendment thereto" to be "printed and posted" to the North Carolina Building Code Council's website.  H.B. 583, 2015 Sess. Laws (N.C. Apr 2, 2015), *available at* https://www.ncleg.gov/Sessions/2015/Bills/House/ PDF/H583v0.pdf.  ICC also demanded that the town of ████████████, take down a copy of the ████████████████████████████ from the ████ ████ website.  SUF ¶ 43.

## III.   LEGAL STANDARD

A court must grant summary judgment if it determines that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment on the undisputed facts as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *see also* Fed. R. Civ. P. 56(c).  A movant has the burden to make an initial showing of the absence of any genuine issues of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If that burden is met, the movant is entitled to a judgment as a matter of law if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex,* 477 U.S. at 322.  The party opposing summary judgment "must set forth specific facts demonstrating that there is a genuine issue for trial."  *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quotations and citation omitted).  "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to

defeat summary judgment," *Ridinger v. Dow Jones & Co. Inc.*, 651 F.3d 309, 317 (2d Cir. 2011) (citation omitted), as is "mere speculation or conjecture as to the true nature of the facts." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (internal citations omitted).

A court is empowered to grant partial summary judgment, or to summarily adjudicate specific factual issues, if the summary judgment standard is met as to the issues on which adjudication is sought.  Fed. R. Civ. P. 56(g); *Leasing Service Corp. v. Graham*, 646 F. Supp. 1410, 1413, 1414-15 (S.D.N.Y. 1986).

## IV.     ARGUMENT

### A.     ICC cannot copyright the law.

This case should turn on a single legal question:  May ICC exercise copyright in the law as enacted by jurisdictions around the country?  As the Fifth Circuit held in *Veeck*, 293 F.3d at 793—a near-identical case litigated by ICC's predecessor—the answer is "no."  That holding is consistent with a line of cases that dates back to the 19th century, and establishes that no private actor may exercise copyright in either the law itself or its judicial interpretation.  This is so because the exclusivity and right to exclude afforded by copyright protection are inconsistent with two fundamental characteristics of the law in American jurisprudence:  the law belongs to the public as a matter of ownership, and the public must have unimpeded access to the law as a matter of fairness.  Because the Fifth Circuit's holding in *Veeck* is correct as a matter of copyright law as well as consistent with the constitutional considerations of due process and free expression, this Court should likewise find that the ICC may not enforce a copyright in its model codes ***as enacted into law*** against UpCodes.  And because UpCodes publishes only the law, that holding is dispositive.

ICC will rely on cases from the Second and Ninth Circuits that considered related but distinct questions:  for example, whether a reference work identified as an optional resource for use in complying with certain legal requirements may be copyrighted, or whether tax maps not having the force of law and constituting compilations of information in the public domain may be copyrighted.  These cases are not to the contrary because none of them addressed whether a copyright may be maintained not as to an optional incorporated reference work, and not as to a compilation of derivative material, but as to *the law itself*.  On *that* question, *Veeck* is clear, consistent with copyright precedent, in line with constitutional requirements, and uncontradicted. This Court should reach the same conclusion as the Fifth Circuit.

### 1.   *Veeck* correctly held that the law is uncopyrightable.

Since the Supreme Court's very first copyright ruling, it has been a fundamental principle that the law cannot be copyrighted.  The Court first applied this principle to judicial opinions, and subsequent jurisprudence has held that the same principle applies to statutory laws.

In *Wheaton v. Peters*, 33 U.S. (8 Pet.) 591 (1834), one of the Court's reporters claimed copyright in his annotated collections of the Court's opinions.  The Court rejected his assertion of copyright and held that "no reporter has or can have any copyright in the written opinions delivered by this Court." *Id.* at 668.  Similarly, in *Banks*, the Court rejected another court reporter's claim to have copyright in the opinions of a state supreme court.  *Banks* found that "[t]he question is one of public policy, and there has always been a judicial *consensus*, from the time of the decision in the case of [*Wheaton*], that no copyright should, under the statutes passed by congress, be secured in the products of the labor done by the judicial officers in the discharge of their judicial duties." *Banks*, 128 U.S. at 253.  The Court concluded that "[t]he whole work done by the judges constitutes the authentic exposition and interpretation of the law, which,

binding every citizen, is free for publication to all, whether it is a declaration of unwritten law, or

an interpretation of a constitution or a statute." *Id.*

In 1898, the Sixth Circuit applied the same principle to statutes, holding that it "cannot be

doubted" that "no one can obtain the exclusive right to publish the laws of a state in a book

prepared by him." *Howell v. Miller*, 91 F. 129, 137 (6th Cir. 1898) (Harlan, J.)  Instead, "any

person desiring to publish the statutes of a state may use any copy of such statutes to be found in

any printed book, whether such book be the property of the state or the property of an

individual." *Id.*  Just under a century later, the First Circuit followed suit in *BOCA*.  In *BOCA*,

the plaintiff code development organization obtained a preliminary injunction against a rival's

publication of the *Commonwealth of Massachusetts State Building Code*, which was

substantially based on the BOCA Basic Building Code.  *BOCA*, 628 F.2d at 732.  The First

Circuit vacated the injunction, finding that BOCA had failed to carry its burden of

distinguishing, for preliminary relief purposes, the Massachusetts building code from non-

copyrightable statutes and judicial opinions.  The court noted that:

> The citizens are the authors of the law, and therefore its owners,
> regardless of who actually drafts the provisions, because the law
> derives its authority from the consent of the public, expressed
> through the democratic process. . . .  [C]itizens must have free
> access to the laws which govern them.

*Id.* at 734.  The *BOCA* court further identified the paradox at the heart of any claim to own a

copyright in the law:

> [I]t is hard to see how the public's essential due process right of
> free access to the law (including a necessary right freely to copy
> and circulate all or part of a given law for various purposes), can
> be reconciled with the exclusivity afforded a private copyright
> holder . . . .

*Id.* at 736.

More than twenty years later, the Fifth Circuit decided the *Veeck* case.  The Fifth Circuit's opinion follows the above line of precedent almost to the letter.  In rejecting the SBCCI's copyright to its model codes, that the Court found that "'the law,' whether it has its source in judicial opinions or statutes, ordinances or regulations, is not subject to federal copyright law."  *Veeck*, 293 F.3d at 800.  This remained true even where the law was based on a model code—when "Veeck copied *only* 'the law' of Anna and Savoy, Texas, which he obtained from SBCCI's publication, and when he reprinted only 'the law' of those municipalities, he did not infringe SBCCI's copyrights in its model building codes."  *Id.*

More recently, in a case involving standards that had been incorporated by reference into federal agency regulations to varying degrees, the D.C. Circuit observed that "the express text of the law falls plainly outside the realm of copyright protection."  *ASTM*, 896 F.3d at 451.  And in *Code Revision Commission*, the Eleventh Circuit held that annotations in the Official Code of Georgia Annotated were not subject to copyright, in part because they had "legal significance" as "authoritative sources on the meaning of Georgia statutes," and were "an integral part of the official codification of Georgia's laws."  *Code Revision Commission,* 906 F.3d at 1255.  The Eleventh Circuit's decision was rooted in the "general rule that legislative codifications are uncopyrightable," which in turn "derives from an understanding of the nature of law and the basic idea that the People, as the reservoir of all sovereignty, are the source of our law."  *Id.* at 1232.  The Eleventh Circuit further noted that there is no difference between judicial opinions or law enacted by a legislature—they are equally uncopyrightable:

> For purposes of the Copyright Act, this means that the People are the constructive authors of those official legal promulgations of government that represent an exercise of sovereign authority. And because they are the authors, the People are the owners of these works, meaning that the works are intrinsically public domain material and, therefore, uncopyrightable.

14

> That the law itself, whether it takes the form of a legislative
> enactment or of a judicial opinion, is subject to the rule is clear and
> not contested. This is because these works represent the
> quintessential exercise of sovereign power. When a legislature
> enacts a law, or a court writes an opinion rendering an official
> interpretation of the law in a case or controversy, they are
> undisputedly speaking on behalf of the People, who are properly
> regarded as the author of the work.

*Id.*  In short, "all agree that a state's codification"—i.e., its law—"cannot be copyrighted because the authorship is ultimately attributable to the People." *Id.*

Thus, the law of the D.C. Circuit, the First Circuit, the Fifth Circuit, and the Eleventh Circuit is in accord: copyright law may not prevent anyone from speaking the law.

### 2.    This case is on all fours with *Veeck*.

*Veeck v. SBCCI* disposed of the exact same issues raised by ICC here, and the Fifth Circuit's reasoning decides this case as well.  Peter Veeck published the building codes of Anna, Texas, and Savoy, Texas on his website.  *Veeck*, 293 F.3d at 793.  Anna and Savoy's building codes incorporated by reference SBCCI's 1994 *Standard Building Code*, among other SBCCI model codes.  *Veeck*, 293 F.3d at 793.  SBCCI alleged that Veeck's publication of the laws of Anna and Savoy infringed on its copyrights in its model codes.  *Id.* at 794.  As discussed above, the Fifth Circuit unequivocally rejected that argument.

Like Veeck, UpCodes publishes only the law on its website, identified by the jurisdiction in which it is operative.  SUF ¶¶ 3, 4.  It does not post ICC's model codes except as adopted into law by specific jurisdictions.  SUF ¶ 7.  Some jurisdictions adopt ICC's model codes as the law without making any amendments to the text, and so the substance of jurisdictions' building codes may be identical to the ICC model codes that they incorporate by reference.  *See, e.g.*, Wyoming Dept. of Fire Prevention and Electrical Safety, Codes and Standards, *available at* http://wsfm.wyo.gov/plan-review/codes-and-standards (last visited May 29, 2019) (adopting five

of ICC's model codes without amendments).  And, as the SBCCI did in *Veeck*, the ICC actively

sought the codes' adoption into law.  There is no daylight between the material facts on this

motion and the material facts in *Veeck*.

      **3.**      **Because there is only one way to express a legal rule, copyright's merger doctrine bars Plaintiffs' claim.**

"[C]opyright protection does not extend to ideas; it protects only the means of expression

employed by the author."  *CCC Information Services, Inc. v. Maclean Hunter Mkt. Reports, Inc.*,

44 F.3d 61, 68 (2d Cir. 1994); *see also* 17 U.S.C. § 102(b) ("In no case does copyright protection

for an original work of authorship extend to any idea, procedure, process, system, method of

operation, concept, principle, or discovery, regardless of the form in which it is described,

explained, illustrated, or embodied in such work.").  Because "ideas are too important to the

advancement of knowledge to permit them to be under private ownership," and because "open

public debate, which is essential to a free democratic society, requires free access to the ideas to

be debated," ideas cannot be copyrighted.  *CCC,* 44 F.3d at 69.  Instead, "only the manner of [an

idea's] 'expression'" is copyrightable.  *Id.*  To ensure free access to ideas, courts have applied

the merger doctrine and § 102(b) such that "even expression is not protected in those instances

where there is only one or so few ways of expressing an idea that protection of the expression

would effectively accord protection to the idea itself."  *Kregos v. Associated Press*, 937 F.2d

700, 705 (2d Cir. 1991).  Courts in the Second Circuit apply the merger doctrine "in determining

whether actionable infringement has occurred, rather than whether a copyright is valid."  *Id.* at

705.  "Assessing merger in the context of alleged infringement will normally provide a more

detailed and realistic basis for evaluating the claim that protection of expression would inevitably

accord protection to an idea."  *Id*.

UpCodes publishes the building codes of 35 jurisdictions.  SUF ¶ 1.  These building codes are the law, and so they are "'facts' under copyright law.  They are the unique, unalterable expression of the 'idea' that constitutes local law."  *Veeck*, 293 F.3d at 801.  "The building codes . . . can be expressed in only one way; they are facts.  [UpCodes] placed those facts on [its] website in precisely the form in which they were adopted" by state and local jurisdictions.  *Id.*; SUF ¶ 3.  Courts have consistently emphasized the importance of the exact wording of the law. *See, e.g.*, *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980) ("[T]he starting point for interpreting a statute is the language of the statute itself."); *Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of New York Mellon*, 775 F.3d 154, 165 (2d Cir. 2014) ("The starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof.") (quotations and citations omitted); *Tompkins v. Hunter*, 149 N.Y. 117, 122–23 43 N.E. 532, 534 (1896) ("In construing statutes, it is a well-established rule that resort must be had to the natural signification of the words employed, and if they have a definite meaning, which involves no absurdity or contradiction, there is no room for construction, and courts have no right to add to or take away from that meaning."). There is no way to state the law other than to use the exact words of the law:  "An individual wishing to publish the text of a law cannot develop his own, unique version and still publish an authoritative copy."  *Veeck v. Southern Bldg. Code Cong. Int'l*, 241 F.3d 398, 416 (5th Cir. 2001) (Little, J., dissenting).  The "idea" or "fact" of the law has thus merged with its expression in the text of the law.

ICC will likely claim that merger does not apply, because the concepts expressed in its model building codes could have been expressed in "countless ways."  Gratz Decl. Ex. 15 at Response to Rog. 18.  However, this is a red herring.  To use a concrete example, N.Y. Comp.

17

Codes R. & Regs. tit. 19, § 1221.1 incorporates by reference the International Building Code 2015, published by ICC.  Section 1014.2 of the International Building Code 2015 thus governs the height of handrails in New York: "*Handrail* height, measured above *stair* tread *nosings*, or finish surface of *ramp* slope, shall be uniform, not less than 34 inches (864 mm) and not more than 38 inches (965 mm)."  Gratz Decl. Ex. 1 at ICC00008607.  During discovery, UpCodes served the following interrogatory:  "If you contend that Section 1014.2 of the 2015 New York State Building Code could be stated using different words to identical legal effect, state how."  SUF ¶ 45.  In response, ICC stated:

> ICC contends that at the time the International Building Code was developed, there were countless ways that the provision regarding handrail height could have been expressed. The committee that drafted the language in the International Building Code relating to handrail height debated and revised the specific language that was ultimately included in this provision and the language was carefully selected, negotiated, and voted upon. Additionally, New York State could have decided to express the concepts in its building code using language other than the specific language used by ICC in the International Building Code.

SUF ¶ 46.  ICC's response focuses on the wrong question.  It may be the case that the persons that drafted Section 1014.2 considered multiple ways to express how high above stair treads or ramp slopes a handrail should be, before ultimately settling on "*Handrail* height, measured above *stair* tread *nosings*, or finish surface of *ramp* slope, shall be uniform, not less than 34 inches (864 mm) and not more than 38 inches (965 mm)."  Gratz Decl. Ex. 1 at ICC00008607. It may be that New York State could have decided to regulate the height of handrails using language other than the language of Section 1014.2.  But it did not.  New York State adopted the International Building Code 2015 as part of New York's Uniform Fire Prevention and Building Code, and after that adoption, Section 1014.2 became the law of the state.  N.Y. Comp. Codes R. & Regs. tit. 19, § 1221.1 (incorporating by reference the "'International Building Code'

18

(Publication Date: May 30, 2014, Third Printing)").  The only way to accurately express the law of the state is to use the words of the law itself.  Put another way, there is no way to accurately express the law regarding handrail height in New York other than to say, "*Handrail* height, measured above *stair* tread *nosings*, or finish surface of *ramp* slope, shall be uniform, not less than 34 inches (864 mm) and not more than 38 inches (965 mm)."  Gratz Decl. Ex. 1 at ICC00008607.  If UpCodes attempted to express that law using other words, it would no longer be publishing the law of New York State.  The various expressive options that were available to the persons that drafted Section 1014.2 or to the New York legislature before it adopted the International Building Code 2015 are irrelevant in light of the wording that the New York legislature ultimately adopted and made law.  Situations like this one are precisely why the Second Circuit considers the merger doctrine in the context of the infringement inquiry, rather than as an abstract inquiry about *ex ante* copyrightability.  *See Kregos*, 937 F.2d at 705.

Similarly, the only way to express the building codes—the law—that UpCodes publishes is to use the words of the building codes themselves.  And where jurisdictions incorporate ICC's model codes by reference and turn them into the law, the words of the law will be identical to words in the model codes.  This is exactly what the Fifth Circuit found in *Veeck*:

> What SBCCI . . . ignore[s], however, is the graphic merger of its model building codes with "the law" as enacted by Anna and Savoy, Texas. Veeck copied from SBCCI's model codes, 1994 edition, because those codes were transformed into the "fact" and "idea" of the towns' building codes. Veeck could not express the enacted law in any other way.

*Veeck*, 293 F.3d at 802.  Here, because ICC's model codes are transformed into the 'fact" and "idea" of state and local jurisdictions' building codes, UpCodes cannot express the enacted law in any other way than to use the text of that law, verbatim.

### 4.     *Veeck* is consistent with Constitutional requirements.

#### a.     *Veeck* correctly noted that private copyright to the law presents due process concerns.

It is a longstanding principle of due process that presuming knowledge of the law requires ensuring free access to the law.  *Veeck*, along with the First Circuit in *BOCA*, correctly concluded that the maintenance of private copyright in large swaths of the law presents serious due process concerns.

Because "[e]very citizen is presumed to know the law," courts have long held that "justice requires" free public access to statutes as well as judicial opinions interpreting them. *Nash v. Lathrop*, 142 Mass. 29, 35, 6 N.E. 559, 560 (1886); *see also Banks & Bros. v. West Pub. Co.*, 27 F. 50, 57 (C.C.D. Minn. 1886); *Davidson v. Wheelock*, 27 F. 61, 62 (C.C.D. Minn. 1866) ("[Complainants] obtained no exclusive right to print and publish and sell the laws of the state of Minnesota, or any number of legislative acts.  The materials for such publication are open to the world. They are public records, subject to inspection by every one, under such rules and regulations as will secure their preservation.  They may be digested or compiled by any one, and it is true such compilation may be so original as to entitle the author to a copyright on account of the skill and judgment displayed in the combination and analysis; but such compiler could obtain no copyright for the publication of the laws only; neither could the legislature confer any such exclusive privilege upon him.").  As the First Circuit concluded in *BOCA*, a private copyright in the law contravenes this principle, because the right to exclude is fundamental to the very notion of copyright:

> Due process requires people to have notice of what the law requires of them so that they may obey it and avoid its sanctions. So long as the law is generally available for the public to examine, then everyone may be considered to have constructive notice of it; any failure to gain actual notice results from simple lack of diligence.  But if access to the law is limited, then the people will

> or may be unable to learn of its requirements and may be thereby
> deprived of the notice to which due process entitles them.  CT
> points out that the holder of a copyright has the right to refuse to
> publish the copyrighted material at all and may prevent anyone
> else from doing so, thereby preventing any public access to the
> material.  We cannot see how this aspect of copyright protection
> can be squared with the right of the public to know the law to
> which it is subject.

*BOCA*, 628 F.2d at 734–35 (citation omitted).

While the Fifth Circuit in *Veeck* declined to expressly evaluate the issue under the rubric of "due process," that Court nonetheless found it "difficult to reconcile the public's right to know the law with the statutory right of a copyright holder to exclude his work from any publication or dissemination."  *Veeck*, 293 F.3d at 799.  And it found unacceptable a state of affairs where "[f]ree availability of the law . . . has degenerated into availability as long as [the copyright holder] chooses not to file suit."  *Id.* at 799–800.  The *Veeck* Court noted that the behavior of SBCCI vis-à-vis publication of its model codes substantiated its concern:

> SBCCI does not permit governmental entities to publish its model
> codes when they are enacted.  Instead, it permits their adoption by
> reference and furnishes a copy of the adopted code to the entity.
> SBCCI also generously allows that if a governmental entity were
> to publish the building code on an Internet site to meet its due
> process obligation, that would be a fair use.  But when the North
> Carolina Building Officials were permitted to publish a model
> code on their non-public access website, SBCCI expressly reserved
> its rights.

*Id.* at 800 n.12.

The facts here are at least as troubling as those in *Veeck*.  ICC makes no concession that a government that adopts its codes may publish them on the government's website to fulfill due process requirements.  Instead, it charges handsomely for the privilege—seeking ███████ from

the city of ███████ for example.[3]  SUF ¶¶ 39, 40.  ████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████████.  SUF ¶ 41.  ICC also demanded that the town of ████

████████████████, take down a copy of the ███████████████████████████████

████████ from the ███████████ website.  SUF ¶ 43.  And while building codes may be viewed

for free on ICC's publicACCESS website, technical measures prevent them from being printed,

downloaded, or copy-and-pasted.  SUF ¶ 44.  And of course even this limited access remains

available purely at ICC's sufferance.

These facts distinguish this case from *Practice Management*, which found no due process

issue where the regulatory body received a "non-exclusive, royalty free, and irrevocable license

to use, copy, publish and distribute" the code in question, and where the Court found that the

AMA had "no incentive to limit or forgo publication."  *Practice Mgmt. Information Corp. v. Am.

Medical Ass'n*, 121 F.3d at 517, 519 (9th Cir. 1997), *amended*, 133 F.3d 1140 (9th Cir. 1998).

Here, ICC does not give the adopting government entity a free license to publish the law; to the

contrary, it chases after unlicensed municipalities brandishing takedown notices.  ICC further

limits publication by making the only unlicensed avenue of access—via ICC's limited-function

website—cumbersome at best.

This Court should follow the Fifth and First Circuits' lead in finding that enforcing

copyrights in the law presents grave due process concerns.  The Court can avoid that difficult

constitutional question by holding that publishing the text of the law cannot infringe copyright.

---

[3] █████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

SUF ¶ 39, 40.

*See Clark v. Martinez*, 543 U.S. 371, 381 (2005) (discussing the canon of constitutional avoidance).

>    **b.    Upholding the public's right to speak the law furthers important First Amendment interests.**

Upholding the right of all citizens to speak the law is also consistent with the First Amendment's constraints on copyright law.  While copyright law inherently imposes restrictions on speech, copyright's restrictions are made compatible with the First Amendment by two "built-in First Amendment accommodations."  *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003).  Both of those accommodations provide avenues for the Court to grant summary judgment to UpCodes here.

The first of these two accommodations is the idea/expression dichotomy, discussed above in section IV.A.3.  "[C]opyright's idea/expression dichotomy 'strikes a definitional balance between the First Amendment and the Copyright Act'" by providing that "no author may copyright his ideas or the facts he narrates."  *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 556 (1985) (citation omitted).  As discussed above, that accommodation here means that ICC may not claim a monopoly on the law itself—which, being a fact, can be expressed only one way.

The second of these two accommodations is the fair-use doctrine, discussed below in section IV.B.  Fair use steps in where copyrightable expression is taken—that is, even where a fact or idea can be expressed in more than one way, and the particular mode of expression is copied even if a different mode of expression was available.  This "traditional contour[]" of copyright protection, when properly applied, ensures that the application of copyright law is "compatible with free speech principles."  *Eldred*, 537 U.S. at 219, 220.

These "speech-protective purposes and safeguards embraced by copyright law" are the only reason that there is not "heightened review" of the free-speech consequences of copyright restrictions under the First Amendment. *Golan v. Holder*, 565 U.S. 302, 329 (2012). But if those safeguards were read so narrowly as to permit a monopoly on the ability to speak the law, such a holding would raise the kinds of free-speech concerns that were not present in previous cases.

The First Amendment thus provides further reason to read the idea/expression dichotomy and the fair-use doctrine so as to avoid that serious constitutional question.

### 5. The *CCC* decision does not lead to a different result.

In *CCC*, 44 F.3d at 74, the Second Circuit addressed a different but related question to the one presented in the *Veeck* line of cases: whether a work that did not itself have the force of law, but which the law identified as one of several possible references that could be used in order to comply with the law, was therefore in the public domain. The case concerned a valuation guide for used cars known as the "Red Book." *Id.* at 63–65. A number of state statutes made reference to the "Red Book" as one approved reference guide that could be used by an insurer to determine the amount to be paid to an insured when a car was totaled. *Id.* at 73, 73 n.29. The use of the "Red Book" was one among several alternative valuation methods. For example, under N.J. Admin. Code 11:3–10.4 (1988), an insurer could determine the value of a totaled car either by getting a price quote from a used-car dealer in the insured's area *or* by relying on the average of the valuations in the "Red Book" and its competitor, the "Blue Book." There was no requirement that any insurer use the "Red Book"—let alone any requirement that anyone abide by rules set forth in the "Red Book" as though they were set forth in the statute *in haec verba*. *See CCC*, 44 F.3d at 73 (recognizing that "the insurance statutes or regulations of several states establish Red Book values as an ***alternative*** standard, *i.e.,* by requiring that insurance payments

24

for total losses be at least equal either to Red Book value or to an average of Red Book and Bluebook values (***unless another approved valuation method is employed***)") (emphasis added).

The Second Circuit provided three reasons why it believed the "Red Book" could properly be subject to copyright.  As discussed below, none is applicable here, and *CCC* does not affect the analysis in this case.

### a.  The work at issue in *CCC* did not provide mandatory rules governing conduct.

The first reason that the Second Circuit provided for permitting copyright in the "Red Book" was that the court was "not prepared to hold that a state's reference to a copyrighted work as a legal standard for valuation results in loss of the copyright."  *CCC*, 44 F.3d at 74.  But that is not the situation here.  This case would present a different question had the copyright claim at issue concerned, say, a privately-published general contractor's reference guide to construction site safety measures that was referenced in a statute as providing one appropriate measure for complying with its safety requirements.  Instead, this case concerns the mandatory words that bind the conduct of citizens.  And the copyrightability of the mandatory text of the law was not a question that the *CCC* Court purported to address.

This ground for distinguishing *CCC* was recognized in the Solicitor General's invitation brief recommending denial of certiorari in *Veeck*.  Brief of the United States as Amicus Curiae at 1, *Southern Bldg. Code Cong. Int'l v. Veeck*, No. 02-355 (U.S. May 30, 2003), *available at* https://www.justice.gov/sites/default/files/osg/briefs/2002/01/01/2002-0355.pet.ami.inv.pdf. That brief observed that the codes in *Veeck*, "comprehensively govern[ed] a very broad range of primary conduct—*i.e.*, they regulate[d] everyday conduct by private businesses and ordinary citizens."  *Id*. at 11.  Indeed, unlike the "Red Book," the Solicitor General observed that the codes in *Veeck* "carr[ied] criminal penalties for their violation."  *Id.*  The same is true here.  *See,*

25

*e.g.*, N.Y. Exec. Law § 382(2) (McKinney) (failure to comply with an order to remedy a violation of the New York State Uniform Fire Prevention and Building Code shall be punishable by a fine, imprisonment, or both); *Weinberg v. Vill. of Clayton, New York*, No. 5:17-CV-00021(BKS/ATB), 2018 WL 4214363, at *6 (N.D.N.Y. Mar. 21, 2018) (describing criminal prosecution for failure to comply with the New York State Uniform Fire Prevention and Building Code, which incorporates by reference multiple ICC model codes, *see supra* at II.D); *People v. Russell Place Realty Co.*, 957 N.Y.S.2d 266 (App. Term 2012) (upholding imposition of a fine for violation of the New York State Property Maintenance Code, which incorporates by reference the 2015 International Property Maintenance Code, *see* N.Y. Comp. Codes R. & Regs. tit. 19, § 1226.1).

That fact addresses the Second Circuit's concern in *CCC* that denying copyright to the "Red Book" would lead to denial of copyright in books assigned as part of a mandatory school curriculum. *CCC*, 44 F.3d at 74. That hypothetical does not present a problem for *Veeck* or for this case. When a state or local education system mandates that a book shall be part of its curriculum, that does not turn the book into the law. The book itself does not impose any obligations on its readers, or govern their conduct. There are no criminal penalties for failing to comply with the text of the book. In contrast, as discussed above, the building codes that UpCodes publishes are enacted into law by state and local governments; they govern conduct, and there are criminal penalties for failure to comply. SUF ¶¶ 1, 3; *supra* at IV.A.5.a.

### b.   The *CCC* court's concerns about the Takings Clause are not present here.

The *CCC* court also suggested that if the adoption of a reference work by a state legislature or administrative body deprived the copyright owner of its property, this would "raise very substantial problems under the Takings Clause of the Constitution." *CCC*, 44 F.3d at 74.

Even if the Court was correct that the facts of *CCC* created Takings Clause concerns, such concerns are not present here because—like the owner of the building codes in *Veeck*, but unlike the owner of the Red Book in *CCC*—ICC actively sought the adoption of its model codes into statute in various jurisdictions.  ICC's Senior Vice President of Government Relations testified that ███████████████████████████████████████████████████████████████ ███████████████████, and the materials ICC distributed to municipalities contains instructions, and sample legislation, for legislating the codes into law.  *See supra* at II.C.

      This matters because a property owner's voluntary and knowing participation in the activity that results in the supposed "taking" means that the property owner can have no viable takings claim.  Indeed, *Veeck* noted that "[t]his is not . . . a 'takings' case, not least because SBCCI urged localities to adopt its model codes."  *Veeck*, 293 F.3d at 803.  While *Veeck* did not analyze the question in detail, its conclusion is clearly correct as a matter of Takings Clause law.  Among important factors to consider in deciding whether a deprivation of personal property by governmental regulation constitutes a "taking" is whether the deprivation interferes with reasonable "investment-backed expectations" of the claimant.  *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104–05, 124–25, (1978); *Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 225–27 (1986).  "A reasonable investment-backed expectation must be more than a unilateral expectation or an abstract need."  *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984) (quotations and citations omitted).  Where a claimant was on notice that taking a particular action with respect to its property—e.g., submitting its confidential data to the government—created the possibility that the property will be devalued by subsequent governmental action, no reasonable expectation, and thus no takings claim, exists.  *Id.* at 1006.  Analogously, an individual has no Takings Clause claim when she voluntarily engages with the

government to provide a service, and thereby accepts certain restrictions.  *Managed Pharmacy Care v. Sebelius*, 716 F.3d 1235, 1252 (9th Cir. 2013); *Garelick v. Sullivan*, 987 F.2d 913, 916 (2d Cir. 1993).

Just as in *Ruckelshaus* Monsanto was on notice of the consequences of submitting its confidential information to the EPA, here the ICC knew full well the potential consequences of encouraging jurisdictions around the country to give its building codes the force of law.  *Veeck* was decided in 2002, twenty-two years after the First Circuit enunciated due process concerns with the copyrightability of materials incorporated into the state laws.  *Veeck*, 293 F.3d 791; *BOCA*, 628 F.2d at 734–35.  The importance of the principle of public access to laws has been enunciated loudly and clearly by federal courts since the nineteenth century.  *Banks & Bros.*, 27 F. 50 at 57 ("[I]t is a maxim of universal application that every man is presumed to know the law, and it would seem inherent that freedom of access to the laws, or the official interpretation of those laws, should be co-extensive with the sweep of the maxim.").  Having "come to the nuisance" by urging the enactment of its model codes into the law, ICC should not be heard to complain that it will suffer the foreseeable consequences of that enactment.

In sum, the Second Circuit's holding in *CCC* is not in conflict with *Veeck*, or with a grant of summary judgment here.

### 6. The *County of Suffolk* decision does not lead to a contrary result.

The Second Circuit also addressed a related (but distinct) issue, in a very different procedural posture, in *County of Suffolk v. First American Real Estate Solutions*, 261 F.3d 179 (2d Cir. 2001).  In that case, a county created "a series of original maps ('tax maps') and an index system reflecting the ownership, size, and location of real property in each of Suffolk County's political subdivisions."  *Id.* at 184.  The defendant published copies of those maps.  *Id.* The county sued for copyright infringement, and the defendant moved to dismiss, arguing both

(1) that the New York Freedom of Information Law (FOIL) barred assertion of copyright by counties and (2) that the county's copyrights were not valid, and that the tax maps were therefore in the public domain, because the tax maps were analogous to the judicial opinions at issue in *Banks v. Manchester*. *Cty of Suffolk*, 261 F.3d at 184–85. The district court held that while FOIL barred enforcement of the copyrights, the tax maps were not in the public domain, on the ground that "the due process and democratic process rationales for the rule that judicial opinions and statutes are in the public domain do not apply to county tax maps." *Cty. of Suffolk, New York v. Experian Info. Sols., Inc.*, No. 99CIV.8735(JFK), 2000 WL 628731, at *4 (S.D.N.Y. May 15, 2000); *see also Cty. of Suffolk, N.Y. v. Experian Info. Sols., Inc.*, No. 99CIV.8735(JFK), 2000 WL 1010262, at *5 (S.D.N.Y. July 21, 2000) (granting reconsideration and holding that FOIL barred copyright enforcement).

On appeal, the Second Circuit vacated the district court's order and remanded. With respect to the copyright validity question, the Second Circuit held that "at least on the record before us, that Suffolk County's official tax maps cannot, as a matter of law, be deemed to be in the public domain since their inception." *Cty. of Suffolk*, 261 F.3d at 195. That holding does not conflict with *Veeck*—or with a grant of summary judgment to UpCodes in this case—for the following reasons.

> ### a. The tax maps at issue in *County of Suffolk* did not constitute "the law."

One reason that the court in *County of Suffolk* held that the tax maps were not necessarily in the public domain was that the tax maps were not "the law." The court observed that "the tax maps themselves do not create the legal obligation to pay property taxes but are merely a means by which the government assesses a pre-existing obligation." *Cty. of Suffolk*, 261 F.3d at 195. That observation was consistent with the county's view: it argued on appeal that the case was

29

different from *BOCA*, which it characterized as holding that "since every citizen is presumed to know the law, access must be freely given."  Reply Brief for Plaintiff-Appellant-Cross-Appellee at 13, *Cty. of Suffolk,* Nos. 00-9011(L), 00-9169(XAP), 2001 WL 34113785 (2d Cir. Jan. 12, 2001).  By contrast, the county argued, "[i]n this case, the public does not require access or knowledge of every tax map in the County."  *Id.*  The tax maps were created pursuant to a law— N.Y. Real Prop. Tax Law § 503(1)(a)—but were not themselves the law, and did not impose any legal obligations on Suffolk County residents.  *Cty. of Suffolk*, 261 F.3d at 184, 196.

> **b.  Because the issue was presented on a motion to dismiss, the court did not apply and could not have applied the merger doctrine.**

The analysis and outcome in *County of Suffolk* do not affect the analysis here for another, somewhat subtler reason.  The *County of Suffolk* appeal arose on a motion to dismiss, and presented only the question whether the tax maps were "deemed to be in the public domain ***since their inception***."  *Cty. of Suffolk*, 261 F.3d at 195 (emphasis added).  But this case is not solely, or primarily, about whether model codes are in the public domain *ab initio*.  As discussed above in Section IV.A.3, once provisions are enacted into law, there is no longer any other way to express them as law, and copyright's merger doctrine bars enforcement in such situations.  But the court in *County of Suffolk* did not apply, and could not have applied, the merger doctrine at the pleadings stage in determining whether the plaintiff "sufficiently alleged that it possesse[d] a valid copyright in its tax maps," *Cty. of Suffolk*, 261 F.3d at 187—because the Second Circuit applies the merger doctrine "in determining whether actionable infringement has occurred, rather than whether a copyright is valid."  *Kregos*, 937 F.2d at 705 ("Assessing merger in the context of alleged infringement will normally provide a more detailed and realistic basis for evaluating the

claim that protection of expression would inevitably accord protection to an idea.").[4]  For the same reason, the discussion of *Banks* in *County of Suffolk*, and its examination of economic incentives in the context of the question, "Are Suffolk County's Tax Maps **in the Public Domain from Inception**?," *Cty. of Suffolk*, 261 F.3d at 193 (emphasis added), does not bear on the inquiry here: whether the idea/expression dichotomy and its accompanying merger doctrine mean that, whether or not ICC retains some rights to prevent the copying of its model codes *as model codes*, all citizens are nonetheless free to speak the law.

That explains why the *County of Suffolk* court did not reach the question of merger, and why that opinion does not shed any light on the question of whether copying the law can constitute actionable copyright infringement.

### 7.    The law of the Ninth Circuit is not to the contrary.

Another related (but distinct) issue was addressed by the Ninth Circuit in *Practice Management*, 121 F.3d 516.  However, *Practice Management*, like *CCC* and *County of Suffolk*, addressed a different question than the one presented in the *Veeck* line of cases.  In *Practice Management*, the American Medical Association ("AMA") had created and copyrighted the Physician's Current Procedural Terminology ("CPT"), a coding system for identifying medical procedures.  *Practice Mgmt.*, 121 F.3d at 517.  The AMA licensed the CPT to the federal Health Care Financing Administration, which adopted regulations requiring applicants for Medicaid reimbursements to use the CPT.  *Id.* at 518.  The Health Care Financing Administration later

---

[4] This may leave the reader wondering why *Veeck* analyzed merger as part of the copyrightability analysis, rather than part of the infringement analysis.  This is because the Fifth Circuit, unlike the Second Circuit, applies the merger doctrine "to the question of copyrightability."  *Mason v. Montgomery Data, Inc.*, 967 F.2d 135, 138 n.5 (5th Cir. 1992).  Indeed, the Fifth Circuit cited *Kregos* and recognized that the two circuits analyze the question at different stages of the case: the Fifth Circuit as a question of copyrightability *ab initio*, and the Second Circuit in determining whether actionable infringement has occurred.  *Id.*

created its own coding system for Medicare and Medicaid claims, the Health Care Financing Administration common procedure coding system ("HCPCS"), which included the AMA code numbers and also included additional codes and information developed by the Health Care Financing Administration. *See Veeck*, 293 F.3d at 805 (discussing *CCC*) (quoting 50 Fed. Reg. 40895, 40897). Subsequently, Practice Management, a medical book publisher, sought a declaratory judgment that the AMA's copyright in the CPT was unenforceable, arguing that under *Banks v. Manchester*, the CPT "became uncopyrightable law" when the Health Care Financing Administration adopted the regulation mandating the use of the HCPCS (which incorporated CPT code numbers) in Medicaid reimbursement applications. *Practice Mgmt.*, 121 F.3d at 518. The Ninth Circuit distinguished *Banks* on two grounds: first, the Ninth Circuit found that the copyrightability of the CPT gave the AMA economic incentive to produce the CPT. *Id.* at 518. Second, the Ninth Circuit found that the due process requirement of free access to the law did not justify terminating the AMA's copyright due to lack of evidence that anyone who wanted to had difficulty obtaining access to the CPT. *Id.* at 519. (The Ninth Circuit ultimately did not enforce the AMA's copyright, finding that the AMA had misused it by setting improper terms in its license to HCFA. *Id.* at 520–21).

*Practice Management* does not govern this case. Practice Management sought to invalidate the copyright in the CPT (analogous to the ***model*** code in *Veeck*), not the government-enacted HCPCS (analogous to the ***enacted*** Building Codes of Anna and Savoy in *Veeck*). *Practice Mgmt.*, 121 F.3d at 518. The Health Care Financing Administration required doctors submitting Medicaid reimbursement applications to use the HCPCS, not the CPT. *Veeck*, 293 F.3d at 805 (discussing *CCC*) (citing 50 Fed. Reg. 40895, 40897). As the Fifth Circuit noted in *Veeck*, "[i]t is not clear how the Ninth Circuit would have decided the case if Practice

32

Management had published a copy of the HCPCS." *Veeck*, 293 F.3d at 805.  Here, by contrast, UpCodes publishes only the binding text of the law, not the model codes *as models*.  And although regulations required persons to refer to the codes in the HCPCS, there is no indication that either the CPT or the HCPCS was itself the law.  Here, in contrast, the building codes that UpCodes publishes are the law.  SUF ¶¶ 1, 3.  The CPT and HCPCS are therefore closer to the *CCC* court's example of required classroom reading than to the case at hand, which involves the text that governs the conduct of citizens.  *Supra* at IV.A.5.a.

**B.     To the extent there may remain some actionable copyright interest in the text of the law, UpCodes' publication of building codes is protected by fair use.**

This case should not turn on fair use, because the ability of citizens to speak the law should not depend on the outcome of a fact-intensive multi-factor analysis.  The rule is the one announced in *Veeck*: that "as law, the model codes . . . are not subject to the copyright holder's exclusive prerogatives." *Veeck*, 293 F.3d at 793.  That rule does not depend on the amount of the law that is used, or the effect on any market, or any of the other fair-use factors; copyright law simply does not grant anyone a monopoly on the law, of any scope.

Nor is *Veeck* alone in situating the analysis as one separate from fair use.  In *BOCA*, the court did not rely on fair use in denying a preliminary injunction against free publication of the Massachusetts building code; instead, it relied on the "metaphorical concept of citizen authorship" and "the very important and practical policy that citizens must have free access to the laws which govern them." *BOCA*, 628 F.2d at 734.  And in the *Code Revision Commission* case, the Eleventh Circuit held that it had "no occasion to address the parties' other arguments regarding . . . fair use" because the official statutory annotations at issue were "inherently public domain material and therefore uncopyrightable." *Code Revision Commission*, 906 F.3d at 1233.

That said, some courts have situated their analysis of related factual situations within a fair-use rubric.  In *ASTM*, the D.C. Circuit chose to focus on fair use rather than address what it saw as "a serious constitutional concern with permitting private ownership of standards essential to understanding legal obligations."  *ASTM*, 896 F.3d at 447.  To the extent the defendant there had used the standards at issue in that case "in a manner not encompassed by the fair use doctrine, thereby again raising the question of whether the authors of such works can maintain their copyright at all," *id.*, the court noted that it might need to resolve the broader question.  But by situating its analysis as one of fair use, the D.C. Circuit avoided what it saw as a constitutional question.[5]  To the extent this Court has similar reluctance to address the broader question, the fair-use doctrine provides an alternate avenue for the Court to rule that UpCodes does not infringe copyright by disseminating the building codes of various jurisdictions.

The non-exclusive statutory factors to be considered in making that determination are: (1) the purpose and character of the use, (2) the nature of the copyrighted work, (3) the amount and substantiality of the portion used, and (4) the effect of the use upon the potential market for or value of the copyrighted work.  17 U.S.C. § 107.  "The factors do not represent a score card that promises victory to the winner of the majority.  Rather, they direct courts to examine the issue from every pertinent corner and to ask in each case whether, and how powerfully, a finding of fair use would serve or disserve the objectives of copyright."  Pierre N. Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105, 1110–11 (1990).  That examination leads to the

---

[5] To be sure, as discussed above, whether copying "the law" could ever infringe copyright does not necessarily require resolution of a constitutional question; that result can be reached just as readily by applying the idea/expression dichotomy of § 102(b) and the merger doctrine, as the *Veeck* court did, or by holding that the citizenry is the "author" of the law and thus its owner under § 201(a), as the *Code Revision Commission* court did.  *Veeck*, 293 F.3d at 800-802; *Code Revision Commission*, 906 F.3d at 1239–40.

conclusion that even if some infringement claim directed to the text of the law could prevail under some other circumstance, UpCodes' dissemination of the law for free on its website here is fair use, and thus "not an infringement of copyright."  17 U.S.C. § 107.

      **1.**      **The purpose and character of UpCodes' use weighs in favor of a finding of fair use.**

The first factor looks to "the purpose and character of the use."  17 U.S.C. § 107.  Within that inquiry, courts in the Second Circuit look to the extent to which the use is transformative and the extent to which, if not transformative, "such use is of a commercial nature or is for nonprofit educational purposes."  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994); 17 U.S.C. § 107.

      **a.**      **The use is transformative because it uses the authentic text of the law as the law, not as a model code.**

UpCodes' use of ICC's works is highly transformative, for a simple reason: because the works are not used *as model codes*.  SUF ¶ 7.  The works at issue were not written and promulgated as the law; ICC lacks the power to announce the law.  Instead, they were written as model codes which could be adopted by governments.  SUF ¶ 23.  When it adopts a model code into law—with or without amendments—the government of a particular jurisdiction transforms the resulting text from a model code into a law.  UpCodes uses ICC's text only as transformed into law, and not as published as a model code.  SUF ¶¶ 3, 7.

The key case here is *Swatch Group Management Services Ltd. v. Bloomberg L.P.*, 756 F.3d 73 (2d Cir. 2014).  In that case, the defendant reproduced the entirety of the plaintiff's copyrighted sound recording of an earnings call, without any additional commentary or analysis.  *Id*. at 84.  The Second Circuit held that reproducing facts with precision is a transformative purpose, even without any physical transformation of the material or any accompanying commentary or analysis.  That is because in the context of an earnings call, precise reproduction

35

of the entire sound recording was necessary to fully disseminate the news contained in that recording: "by disseminating not just a written transcript or article but an actual sound recording, Bloomberg was able to convey with precision not only the raw data of the Swatch Group executives' words, but also more subtle indications of meaning inferable from their hesitation, emphasis, tone of voice, and other such aspects of their delivery." *Id.* And so, the Second Circuit held, "[i]n the context of news reporting and analogous activities, moreover, the need to convey information to the public accurately may in some instances make it desirable and consonant with copyright law for a defendant to faithfully reproduce an original work without alteration." *Id.*

Disseminating the law is one of those "analogous activities." As discussed above in section IV.A.3, the text of the law cannot be accurately paraphrased. For that reason, the need to convey the law to the public accurately makes it desirable and consistent with copyright law for UpCodes to faithfully reproduce the text of the law without alteration. There is no better way to disseminate the law to the public than to provide the public with the law. Paraphrases, summaries, and descriptions do not capture the precision that is necessary to understand the legal obligations that governments impose and enforce. Just as Bloomberg could not accurately report the news without reproducing the earnings call verbatim, UpCodes cannot accurately disseminate the law without reproducing the text of the law verbatim.

The D.C. Circuit in *ASTM*, citing *Swatch*, adopted precisely this argument, in the slightly different context of a standard (rather than a code). "Where an incorporated standard provides information essential to comprehending one's legal duties, for example, [the first fair use] factor would weigh heavily in favor of permitting a nonprofit seeking to inform the public about the law to reproduce in full the relevant portions of that particular standard." *ASTM*, 896 F.3d at

450.  Here, of course, the text at issue is not a standard incorporated by reference, but the actual text that governs the primary conduct of citizens.  Even more strongly than in *ASTM*, the text at issue here provides information essential to comprehending one's legal duties, because the text at issue literally defines those duties.

The Second Circuit in *Swatch* recognized another situation in which "a secondary work can be transformative in function or purpose without altering or actually adding to the original work": where the two works have "different messages and purposes."  *Swatch*, 756 F.3d at 84–85.  For example, in *Swatch*, "while Swatch Group purported to convey true answers to the analysts' questions and to justify the propriety and reliability of its published earnings statement, Bloomberg made no representation one way or another as to whether the answers given by Swatch Group executives were true or reliable. . . .  Bloomberg's message—'This is what they said'—is a very different message from Swatch Group's—'This is what you should believe.'" *Id.* at 85.  The situation here is analogous.  While UpCodes conveys the authentic text of the law that binds citizens of particular jurisdictions, ICC's model codes convey the same text only as a model.  UpCodes' message—"this is the law"—is a very different message from ICC's—"this is a model building code you may wish to adopt."  While this view of transformative use is most clearly expressed in the Second Circuit's *Swatch* opinion, it is consistent with other circuits' broad view of the circumstances in which a change of purpose, without criticism or commentary, qualifies as transformative use.  *See, e.g.*, *A.V. ex rel. Vanderhye v. iParadigms, LL*C, 562 F.3d 630, 639 (4th Cir. 2009) (holding that making an exact digital copy of a student's thesis for the purpose of determining whether it included plagiarism is a fair use); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007) (holding that a search engine's publication of low-resolution, thumbnail copies of copyrighted images was "highly

transformative" because the thumbnails were "incorporat[ed] . . . into a new work, namely, an electronic reference tool").  It is also consistent with the recognition in *Veeck* that the defendant's case was bolstered because he had used the text at issue in the context of conveying "the building codes of Anna and Savoy, Texas," not conveying "the SBCCI model codes, as model codes"— even though the text he conveyed was the same as that of the model codes.  *Veeck*, 293 F.3d at 805.

> **b.    UpCodes makes the law available for free, and its use is thus largely noncommercial.**

As part of the first factor, courts consider whether the "use is of a commercial nature or is for nonprofit educational purposes."  17 U.S.C. § 107.  This inquiry does not look to the nature of the user, but to the nature of the use—since, of course, "[m]any of the most universally accepted forms of fair use, such as news reporting and commentary, quotation in historical or analytic books, reviews of books, and performances, as well as parody, are all normally done commercially for profit."  *Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015).  Instead, the inquiry looks to the extent to which the defendant takes for itself the economic rewards from public dissemination of the material, or instead makes a use that benefits the public more broadly in some way.  "The greater the private economic rewards reaped by the secondary user (to the exclusion of broader public benefits), the more likely the first factor will favor the copyright holder and the less likely the use will be considered fair."  *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 922 (2d Cir. 1994).

UpCodes made the text of building codes freely available on its website in order to make it easier for the public to learn about and comply with those laws.  It does not charge any money for access to the law.  All of the laws on the UpCodes website are available for free and may be viewed without registering for an UpCodes account.  SUF ¶¶ 1, 16.  Instead, UpCodes makes

money by charging for access to certain additional features that may further ease compliance with the law, such as bookmarking, advanced search capabilities, and project collaboration capabilities.  SUF ¶ 17.  In this way, UpCodes does not reap any private economic rewards from making the law available; instead, the economic rewards it reaps are solely related to the value of the functionality that UpCodes itself adds.  In other words, UpCodes reaps economic rewards only where it is fair for UpCodes to do so: when those rewards come from UpCodes' own innovative technology, not from making available the text of the law.  For that reason, the fact that UpCodes gains revenue in connection with its business does not weigh against a finding of fair use.

### 2. The nature of the copyrighted work weighs heavily in favor of a finding of fair use, since the text used is the binding law.

The second fair use factor, "the nature of the copyrighted work," 17 U.S.C. § 107(2), "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586.  The works here are as far from the core of intended copyright protection as can be, as discussed above in section IV.A, because—as the D.C. Circuit held in discussing the second fair-use factor—"the express text of the law falls plainly outside the realm of copyright protection." *ASTM*, 896 F.3d at 451.  "Given this," the D.C. Circuit held, "we think that standards incorporated by reference into law are, at best, at the outer edge of copyright's protective purposes." *Id.* (internal quotation and citation omitted). This is true with even greater force with respect to the express text of the law.  To the extent the Court regards the material at issue to fall in any respect within the realm of copyright protection, it is, at best, at the outer edge. *See also, e.g.*, *Swatch*, 756 F.3d at 89 ("In light of the thinness of Swatch's copyright, as well as Swatch Group's prior dissemination of its executives' expression,

we find that the second statutory factor favors fair use.").  For that reason, the second factor tilts very heavily in favor of a finding of fair use.

We recognize that, at least before the D.C. Circuit's 2018 opinion in *ASTM*, the second factor had "rarely played a significant role in the determination of a fair use dispute."  *Authors Guild v. Google, Inc.*, 804 F.3d at 202.  But that is because copyright cases have seldom involved works so far from the "core of intended copyright protection"—and where they have, as in *Veeck*, *BOCA*, and *Code Revision Commission*, the court ruled against enforcement of copyright before reaching the fair-use analysis.  The Court should do the same here—but if it reaches the fair-use question, the second factor should be at the forefront of the fair-use analysis, as it was in *ASTM*.

### 3.   UpCodes uses no more than of the model codes than is necessary.

The third factor looks to "the amount and substantiality of the portion used in relation to the copyrighted work as a whole, 17 U.S.C. § 107, asking whether the portion copied is "reasonable in relation to the purpose of the copying."  *Campbell*, 510 U.S. at 586.  "[T]he extent of permissible copying varies with the purpose and character of the use."  *Id.* at 586–87.  In a number of cases, the Second Circuit has held that "the copying of an entire work" was "necessary to make a fair use," and for that reason did not weigh against a finding of fair use.  *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613 (2d Cir. 2006) (use of entire poster was fair use).  *See also, e.g.*, *Swatch*, 756 F.3d at 90 ("Bloomberg's use of the entire recording was reasonable in light of its purpose of disseminating important financial information to investors and analysts."); *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87(2d Cir. 2014) ("Because it was reasonably necessary for the HDL to make use of the entirety of the works in order to enable the full-text search function, we do not believe the copying was excessive."); *Authors Guild v. Google, Inc.*, 804 F.3d at 221 ("As with *HathiTrust,* not only is the copying of

the totality of the original reasonably appropriate to Google's transformative purpose, it is literally necessary to achieve that purpose. If Google copied less than the totality of the originals, its search function could not advise searchers reliably whether their searched term appears in a book (or how many times).").

The same is true here.  Not only is the copying of the totality of the law reasonably appropriate to UpCodes' purpose of disseminating the law, it is literally necessary to that purpose.  If UpCodes copied less than the totality of the law, it could not inform citizens reliably what their legal obligations are.  There is no way to accurately express the law without expressing the whole of the law.  Summaries, quotations, or piecemeal snippets will not do.  Just as disseminating the entire earnings call was necessary to inform investors in *Swatch*, disseminating the entirety of the law is necessary to inform citizens here.

And UpCodes disseminates only those portions of the publications at issue that constitute *the law*: if one wishes to see the cover, or read the preface, or to read ICC's essay on "Effective Use of the International Building Code," one cannot do so via UpCodes.  SUF ¶ 8.  And with respect to each jurisdiction, UpCodes disseminates only those portions of the publications at issue that were actually adopted as the law.  SUF ¶¶ 7, 9, 11, 13.  For example, New York State adopted only three of the 13 appendices to the 2015 International Building Code, and UpCodes does not disseminate those other, unadopted appendices when it shows the New York State building code.  SUF ¶¶ 10, 11, 12, 13_.  UpCodes thus disseminates as little as possible while still disseminating the authentic text of the law.   Accordingly, the third factor does not weigh against a finding of fair use.

41

### 4. UpCodes' use has no effect on any market cognizable under the Copyright Act.

The fourth factor directs us to examine "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. But not all effects on the market are legally cognizable for purposes of the fourth factor. For example, "when a lethal parody, like a scathing theater review, kills demand for the original, it does not produce a harm cognizable under the Copyright Act." *Campbell*, 510 U.S. at 591–92. And when potential licensing revenues are at issue, "[o]nly an impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets should be legally cognizable when evaluating a secondary use's 'effect upon the potential market for or value of the copyrighted work.'" *Am. Geophysical Union,* 60 F.3d at 930.

Thus, in considering the fourth factor, the Court must distinguish between effects on the market that are cognizable under the Copyright Act, and those that are not. There are two possible markets for ICC's work. The first is the market for *model* codes. A jurisdiction seeking to review codes that it may wish to adopt as law might wish to review a variety of available model codes to help it decide what code to adopt. *See, e.g.*, Gratz Decl. Ex. 7 at 28:5–17 ███

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████. Or an individual might want to see what a *model* building code said about a particular matter, notwithstanding the provisions of the local building code applicable to the building in question. ICC's Senior Vice President of Technical Services, whose responsibilities involve oversight for the code development process, ██████████████████

████████████████████████████████████████████████████████████.

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███  .  ████████████████████████████████████████████."

SUF ¶ 48.  That may be a market cognizable under the Copyright Act—because the demand for

the work flows from its value *as a model*, not from its adoption as law.  But as to that market,

UpCodes does not provide a substitute.  A visitor to the UpCodes website can find only the *laws*

of particular jurisdictions, which adopt the model code to varying degrees, SUF ¶¶ 1, 3, 7; if a

visitor wants the *model* code, he or she must buy a copy from ICC.

The second possible market for ICC's work is the market *for the text of the law*.  This

market is not cognizable under the fourth factor, because copyright does not give anyone the

exclusive right to speak the law.  Stated differently, the question is whether the use affects a

market because it involves "exploitation of the copyrighted material without paying the

customary price."  *Harper & Row*, 471 U.S. at 562.  The customary price for the right to speak

the law is zero.  Because there is no cognizable market for the right to disseminate the law—just

as there is no cognizable market for the right to review a play, or the right to parody a song—

there is no cognizable market harm from UpCodes' use of the law *as the law*, rather than as a

model code.  To the extent people are buying copies of model codes from ICC *because there is*

*no other way to acquire a copy of the law*, ICC was never entitled to those revenues, because no

one has a monopoly on the law.  The potential for the loss of those undeserved revenues does not

weigh against a finding of fair use.

Accordingly, because there is no reason to think that UpCodes' use has any effect on the

market for ICC's model codes *as model codes*, the fourth factor does not weigh against a finding

of fair use.

**C.     ICC is collaterally estopped from relitigating the issue of whether the republication of enacted building codes can infringe copyright.**

In *Veeck*, the Fifth Circuit held that posting the SBCCI's enacted model building codes on the Internet did not infringe copyright.  The ICC is the successor-in-interest to any copyrights the SBCCI may have held in those model codes, and the codes themselves are, in many cases, incorporated into the codes that the ICC disseminates.  SUF ¶¶ 19, 20, 22.  Because the ICC is bringing the same claims, for the same conduct and with respect to the same property, that were fully litigated and decided in *Veeck*, the ICC is collaterally estopped from pursuing them here.  As with fair use, this case should not turn on collateral estoppel, because the ability of citizens to speak the law should not depend on the identity of the plaintiff in a particular case.  But to the extent it is necessary for the court to reach beyond the merger doctrine, and beyond fair use, collateral estoppel provides an alternative ground for summary judgment here.

"The preclusive effect of a federal court's judgment issued pursuant to its federal-question jurisdiction is governed by the federal common law of preclusion."  *Wyly v. Weiss*, 697 F.3d 131, 140 (2d Cir. 2012).  Collateral estoppel, also known as "issue preclusion," "bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim."  *Id.*  (quotation omitted).  Issue preclusion applies when "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the part[ies] had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits."  *Id.* (quotation omitted).  Collateral estoppel can be asserted against a party to the earlier proceeding or a party in ***privity*** with a party to the earlier case.  *Conte v. Justice*, 996 F.2d 1398, 1400 (2d Cir. 1993).  Being a successor-in-interest to the property that was the subject of the earlier case

constitutes privity with the party that litigated the earlier action with respect to that property.

*Howard v. Town of Bethel*, 481 F. Supp. 2d 295, 301 (S.D.N.Y. 2007).

### 1.    ICC is in privity with SBCCI.

ICC was not a party to the *Veeck* case, but it is in privity with SBCCI, which was.  *Veeck* determined that SBCCI could not pursue a copyright claim against someone who published its model codes online.  *Veeck*, 293 F.3d at 806.  After the *Veeck* decision was issued, SBCCI transferred all of its copyright interests in the subject model codes to ICC.  SUF ¶ 20.  Indeed, much of the text of the subject ICC codes is identical to the codes litigated in *Veeck*.  To give one example, ICC alleges that UpCodes infringes on the 2015 edition of the International Building Code.  ECF No. 1 at ¶ 23, Ex. A.  Substantial portions of the 2015 International Building Code are the same as the 1994 Standard Building Code at issue in *Veeck*:

| **1994 Standard Building Code Text** | **2015 International Building Code Text** |
|---|---|
| "A projecting sign shall not be erected on the wall of any building so as to project above the roof or cornice wall or above the roof level where there is no cornice wall; except that a sign erected at a right angle to the building, the horizontal width of which sign is perpendicular to such a wall and does not exceed 18 inches (457 mm), is permitted to be erected to a height not exceeding 2 feet (610 mm) above the roof or cornice wall or above the roof level where there is no cornice wall. A sign attached to a corner of a building and parallel to the vertical line of such corner shall be deemed to be erected at a right angle to the building wall." 3108.4.4.5.  Gratz Decl. Ex. 16 at 661–62. | "A projecting sign shall not be erected on the wall of any building so as to project above the roof or cornice wall or above the roof level where there is no cornice wall; except that a sign erected at a right angle to the building, the horizontal width of which sign is perpendicular to such a wall and does not exceed 18 inches (457 mm), is permitted to be erected to a height not exceeding 2 feet (610 mm) above the roof or cornice wall or above the roof level where there is no cornice wall. A sign attached to a corner of a building and parallel to the vertical line of such corner shall be deemed to be erected at a right angle to the building wall." H112.4.  Gratz Decl. Ex. 1 at ICC00008981. |
| "An existing building shall not hereafter be increased in height or area unless it is of a type of construction permitted for new buildings within the fire district or is altered to comply | "An existing building shall not hereafter be increased in height or area unless it is of a type of construction permitted for new buildings within the fire district or is altered to comply |

| **1994 Standard Building Code Text** | **2015 International Building Code Text** |
|---|---|
| with the requirements for such type of construction. Nor shall any existing building be hereafter extended on any side, nor square footage or floors added within the existing building unless such modifications are of a type of construction permitted for new buildings within the fire district." F103.1.<br><br>*Id.* at 723. | with the requirements for such type of construction. Nor shall any existing building be hereafter extended on any side, nor square footage or floors added within the existing building unless such modifications are of a type of construction permitted for new buildings within the fire district." D103.1.<br><br>*Id.* at ICC00008962. |
| "Chains, cables, guys or steel rods used to support the live or dead load of projecting signs are permitted to be fastened to solid masonry walls with expansion bolts or by machine screws in iron supports, but such supports shall not be attached to an unbraced parapet wall. Where the supports must be fastened to walls made of wood, the supporting anchor bolts must go through the wall and be plated or fastened on the inside in a secure manner." 3108.4.4.4<br><br>*Id.* at 661. | "Chains, cables, guys or steel rods used to support the live or dead load of projecting signs are permitted to be fastened to solid masonry walls with expansion bolts or by machine screws in iron supports, but such supports shall not be attached to an unbraced parapet wall. Where the supports must be fastened to walls made of wood, the supporting anchor bolts must go through the wall and be plated or fastened on the inside in a secure manner." H112.3<br><br>*Id.* at ICC00008981. |
| "Any building located partially in the fire district shall be of a type of construction required for the fire district, unless the major portion of such building lies outside of the fire district and no part is more than 10 feet (3048 mm) inside the boundaries of the fire district." f104<br><br>*Id.* at 723. | "Any building located partially in the fire district shall be of a type of construction required for the fire district, unless the major portion of such building lies outside of the fire district and no part is more than 10 feet (3048 mm) inside the boundaries of the fire district." D104.1<br><br>*Id.* at ICC00008962. |
| "Structures, except aerial supports 12 feet (3658 mm) high or less, flagpoles, water tanks and cooling towers, placed above the roof of any building within the fire district shall be of noncombustible material and shall be supported by construction of noncombustible material." F102.2.9.<br><br>*Id.* at 722. | "Structures, except aerial supports 12 feet (3658 mm) high or less, flagpoles, water tanks and cooling towers, placed above the roof of any building within the fire district shall be of noncombustible material and shall be supported by construction of noncombustible material." D102.2.9<br><br>*Id.* at ICC00008962. |

In addition to identity of property, privity for collateral estoppel purposes also requires that the interests of the party to the current litigation have been adequately represented in the earlier case. *Frydman v. Akerman*, 280 F. Supp. 3d 418, 425 (S.D.N.Y. 2017). Put differently, the prior litigant must have had a similar interest and incentive to litigate the issues that were adjudged in the earlier action. *U.S. Bank Nat. Ass'n v. Dexia Real Estate Capital Markets*, 2014 WL 3368670, at *9 (S.D.N.Y. July 9, 2014), *rev'd on other grounds*, 643 Fed. App'x 48 (2d Cir. 2016). That condition is satisfied here. SBCCI litigated the same issues from an identical position: that of code drafter seeking to assert its copyright in model codes that had been adopted into statute, against someone who published the resulting statutes online. *Veeck*, 293 F.3d at 794.

### 2.    The identical issue was raised in *Veeck*.

This summary judgment motion presents the identical issue to that in *Veeck*: whether a private party may enforce its copyright in model codes when those codes have been enacted into law in a particular jurisdiction and are presented as the law of that jurisdiction. The fact that some of the content of the codes may have changed in the meantime does not affect the collateral estoppel inquiry, because any resulting differences are of no consequence to any of the issues to be decided here. *See* 18 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 4425 (3d ed. 2019 update) ("Preclusion ordinarily should apply if two cases present the same issue of law application. Identity of the issue is established by showing that the same general legal rules govern both cases and that the facts of both cases are indistinguishable as measured by those rules.").

### 3.    The issue was actually litigated and decided in *Veeck*.

In order to have been actually litigated, an issue "must have been properly raised by the pleadings or otherwise placed in issue and actually determined in the prior proceeding." *Evans*

*v. Ottimo*, 469 F.3d 278, 282 (2d Cir. 2006) (quotations and citations omitted).  *Veeck* was a declaratory judgment action seeking a ruling that Veeck did not commit copyright infringement by posting the building codes of various jurisdictions; SBCCI counterclaimed for copyright infringement.  *See Veeck*, 241 F.3d at 410.  The district court granted summary judgment to SBCCI, including a permanent injunction and damages.  *Id*. at 402.  The Fifth Circuit panel affirmed the grant of summary judgment, but the *en banc* Court reversed and remanded with instructions to dismiss SBCCI's copyright infringement claims.  *Veeck*, 293 F.3d at 806.  The reversal was precisely on the ground that is the subject of this motion:  whether the owner of the SBCCI's (now the ICC's) model codes could assert its copyright against a defendant who published the enacted codes online.  *Id.* at 793.

In short, this case presents neither of the obstacles to applying collateral estoppel that typically arise out of the "actually litigated and decided" requirement.  This is not a case in which the prior court did not purport to rule on the issue being raised here.  *Olin Corp. v. American Home Assur. Co.*, 704 F.3d 89, 98 (2d Cir. 2012).  Nor is this a case in which the legal context in which the earlier court considered the underlying facts was so different as to prevent a conclusion that the issue here was actually litigated.  *Kulas v. Flores*, 255 F.3d 780, 783–84 (9th Cir. 2001).  Rather, the *Veeck* court applied the law to a fully developed factual record and decided the very question the parties raise here.

### 4.     ICC's predecessor-in-interest had a full and fair opportunity to litigate the issue in *Veeck*.

SBCCI had a full and fair opportunity to "present[ its] arguments to a trial court of general jurisdiction, which issued a formal ruling." *Howard*, 481 F. Supp. 2d at 303.  SBCCI moved for, and won, summary judgment upholding its assertion of copyright against Veeck. *Veeck v. S. Bldg. Code Cong. Int'l, Inc.*, 49 F. Supp. 2d 885, 891 (E.D. Tex. 1999).  And the

district court's opinion, ultimately reversed by the *en banc* Fifth Circuit, provided "a clearly articulated ruling that was appealable as of right," as shown by the subsequent proceedings before the Fifth Circuit.  *Howard*, 481 F. Supp. 2d at 303; *Veeck*, 293 F.3d at 794–95.

> **5.      The resolution of the issue was necessary to support a valid and final judgment on the merits in *Veeck*.**

Resolving the issue presented here—whether the owner of ICC's model codes could assert its copyright against a defendant who published the enacted versions of those codes online—was unquestionably necessary to support a valid and final judgment on the merits in *Veeck*.  It was the focus of the district court's summary judgment ruling, 49 F. Supp. 2d at 891, and was the only issue addressed in the Fifth Circuit's *en banc* opinion disposing of the case. *Veeck*, 293 F.3d at 794–806.  The Fifth Circuit's answer to the issue presented here was in no way incidental or collateral to the outcome of the case against Veeck.

Because the ICC's predecessor-in-interest to the codes at issue here already lost on this exact issue, in this exact factual posture, before an *en banc* Fifth Circuit, it should be collaterally estopped from attempting to relitigate it here.

## V.      CONCLUSION

For the foregoing reasons, the Court should grant partial summary judgment to Defendants, holding that UpCodes does not infringe copyright by publishing the law that governs us.

Dated:  May 31, 2019                    DURIE TANGRI LLP


By: _____

RAGESH K. TANGRI (*Pro Hac Vice*)
rtangri@durietangri.com
JOSEPH C. GRATZ (*Pro Hac Vice*)
jgratz@durietangri.com
CATHERINE Y. KIM (*Pro Hac Vice*)
ckim@durietangri.com
217 Leidesdorff Street
San Francisco, CA 94111
Telephone: (415) 362-6666
Facsimile: (415) 236-6300

Attorneys for Defendant and Counterclaim-Plaintiff
UPCODES, INC., GARRETT REYNOLDS, and
SCOTT REYNOLDS