```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK


INTERNATIONAL CODE COUNCIL,
INC., et al.,                     : Docket #17-cv-06261
                     Plaintiffs,  :

      -against-                   :

UPCODES, INC.,                    : New York, New York
                                    March 2, 2023
                     Defendant.

--------------------------------:

                     PROCEEDINGS BEFORE
              THE HONORABLE VALERIE FIGUEREDO
               UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:        MORGAN LEWIS & BOCKIUS LLP
                      BY:  JANE W. WISE, ESQ.
                      1111 Pennsylvania Ave, NW
                      Washington, DC 20004


                      DLA PIPER, LLP
                      BY:   J. KEVIN FEE, ESQ.
                      500 Eighth Street, NW
                      Washington, DC 20004


For Defendant:        MORRISON & FOERSTER, LLP
                      BY:  EUGENE NOVIKOV, ESQ.
                        MARK MARCISZEWSKI, ESQ.
                      425 Market Street
                      San Francisco, California 94105


Transcription Service: Marissa Mignano Transcription
                       Phone:  (631) 813-9335
                       E-mail:marissamignano@gmail.com


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

INDEX

E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None | | | | |

E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|-----|-----|-----------|
| None | | | | |

 1                THE DEPUTY CLERK:  This is the matter of

 2    International Code Council, et al. versus Upcodes,

 3    Inc., Case Number 17-cv-06261, the Honorable

 4    Valerie Figueredo presiding.

 5                Plaintiffs, can you please make your

 6    appearance for the record, plaintiffs' counsel.

 7                MS. WISE:  This is Jane Wise and I'm joined

 8    by Kevin Fee, for Plaintiffs International Code

 9    Council.

10                THE DEPUTY CLERK:  Defense counsel.

11                MR. NOVIKOV:  This is Gene Novikov from

12    Morrison & Foerster for Defendant Upcodes.  And with

13    me on the line -- although, I don't expect he'll be

14    addressing the Court -- is Garrett Reynolds, who is

15    one of the founders of Upcodes.

16                MR. MARCISZEWSKI:  And also on the line is

17    Mark Marciszewski from Morrison & Foerster.

18                THE DEPUTY CLERK:  Just hold on.

19                THE COURT:  Hi, everyone.  This is

20    Judge Figueredo.  Sorry about the -- I accidentally

21    got taken -- or got knocked off the call, but I

22    pretty much caught everyone's, I think, appearances.

23    And I have the letters beginning with ECF 147 for

24    February 1st.  So I've read them all.

25                I'm happy to hear from anyone who wants to

1    address any particular issue.  If not, I just had

2    some questions about one of the final submissions,

3    the examples submitted on February 13th.  But

4    otherwise, I'm happy to hear from either side.

5         MR. NOVIKOV:  Your Honor, this is

6    Gene Novikov from Morrison Foerster for Upcodes.

7    And I think it would help -- the parties have had

8    some discussions since the letter submission went in

9    and have actually resolved a number of the issues

10   and have, I think, substantially reduced the set of

11   disputes that may be made by motion if the Court is

12   inclined to hear a motion.  And so I think it would

13   help if I just briefly explained what those were.

14   And then I think Your Honor asking her questions

15   would be exactly the right way to proceed.

16        So I think the parties have made

17   substantial progress in resolving some of the issues

18   that have been raised.  We, as the movement, took on

19   board some of the concerns that were expressed about

20   scope and burden, and we've worked together to

21   narrow some of the requests.  We've narrowed the

22   time frame of the requested information to the time

23   frame after ICC's accuracy and completeness claims

24   were made.

25        We've narrowed the scope of the material

1    about which we're requesting information to ICC's

2    building codes, rather than third-party materials.

3    And we've clarified the scope of the request

4    concerning the particular advertising claims to make

5    clear that we're seeking information about those

6    specific claims and not something much broader than

7    that.  And so I think the parties are still

8    negotiating some of the details, but with the

9    progress we've been able to make, I think we expect

10   that our disputes concerning all of the requests,

11   with the exception of Request 28, to be resolved

12   without Court intervention.

13          28 is the request that asks for documents

14   and communications related to any errors in the

15   building code information provided on ICC's website,

16   or its electronic offerings, or its printed

17   publications.  And there, we continue to have a

18   dispute about what the right -- the appropriate

19   scope of that request is.  ICC seems to have

20   conceded that at least some category of its own

21   errors on its website are fair game in view of the

22   allegations in their complaint.  They think it ought

23   to be limited to OCR errors.  That doesn't -- and by

24   OCR, I apologize, I mean optical character

25   recognition.  That doesn't make a lot of sense to

1    us.  I'm happy to go into why, but I wanted to give

2    that update on sort of the state of play.

3         THE COURT:  And if ICC consents that it

4    should be limited to OCR errors, your position would

5    be that it's more than just OCR errors.  But what

6    type of errors are you thinking?

7         MR. NOVIKOV:  Well, so I think our position

8    is pretty simple.  They're suing us for making

9    claims about accuracy and completeness on the codes

10   of our site.  They've made similar claims

11   themselves.  They assert broadly that there are

12   errors on the Upcodes site that make our, in our

13   view, fairly anodyne claims into false advertising.

14   You know, instances where amendments were missed,

15   for example, accidentally, or the code otherwise was

16   not fully up to date for some reason.

17        Our letter exchange, I think, makes clear

18   that they have the same problem.  And so I think if

19   they have documents and communications that relate

20   to mistakes in the ICC codes that are published on

21   their site, you know, whether that's through an

22   internal audit or someone noticing that something's

23   incorrect or a customer writing in, we're entitled

24   to that.  And we're entitled to that, I think,

25   regardless of whether it is an error due to

1    character recognition.

2        I mean, there are a number of errors

3    identified in our Exhibit E to our original

4    submission that are true errors; errors where they

5    just got the text of the code wrong.  And there are

6    also instances where they just haven't kept the code

7    up to date.  And they say that they just don't have

8    a practice of doing that.  But I think in view of

9    their allegations, we're entitled to discovery into

10   why that isn't their practice and the extent to

11   which people think that that practice makes their

12   representations inaccurate.

13       THE COURT:  Ms. Wise, did you want to

14   respond?

15       MS. WISE:  Sure.  I'd love to.  I think the

16   last thing that Mr. Novikov said is sort of the

17   heart of the issue.  He said that ICC doesn't say

18   that it's going to keep the codes up to date.  And

19   that's true.

20       So our -- on the -- I think there are two

21   buckets of claims.  One are more substantive errors,

22   and then there's this other bucket of errors that

23   Upcode is taking issue with, purported errors in our

24   view.  And those are the post-publication changes by

25   the State that are not reflected on ICC's site.

1           The reason that we see these as different
2    is that ICC has not claimed that it keeps its
3    website up to date.  It claims that its publications
4    are up to date at the time of communication -- at
5    the time of publication.  But it doesn't, as Upcodes
6    purports to do, make all of the codes on -- up --
7    codes kept up to date on a rolling basis.  ICC
8    hasn't made that, you know, identical promise to
9    consumers.  So the expectation is just materially
10   different.  I think the other -- I'm sorry.
11           THE COURT:  No, no.  Sorry to interrupt.
12   I'm just curious, if I was a consumer on ICC's
13   website, when you say that you make the
14   representation that it's kept up to date on the date
15   of publication, is there like a date of publication
16   that I'd be able to see when I'm on the website that
17   shows when these codes were put on your website?
18           MS. WISE:  Definitely.  Every code version
19   has the date of publication.  It tells you what
20   addition of the code that you're looking at.  And,
21   you know, in certain circumstances, there will be a
22   supplement.  Any changes to the version would be
23   noted.
24           And I think as relevant here, one of the
25   statements that Upcodes has identified as claiming

1    that it thinks is a false statement is that ICC

2    makes every effort to provide current, accurate code

3    adoption information.  What Upcodes hasn't quoted in

4    the RFP is the second sentence that says, not all

5    jurisdictions notify ICC of adoptions.  To obtain

6    more detailed information about amendments and

7    changes to adopted codes, please contact the

8    jurisdiction.  So it's just fundamentally different

9    from everything on our website is always kept up to

10   date versus, you know, ICC's claims, which are just

11   different in kind.

12          MR. NOVIKOV:  May I respond to that

13   briefly, Your Honor?

14          THE COURT:  Yes, go ahead.

15          MR. NOVIKOV:  Just a couple of quick

16   points.  First, we don't assert that the claims that

17   ICC is making are false advertising.  We don't think

18   that the claims we're making is false advertising.

19   And what we're trying to show is that ICC doesn't

20   think that either.

21          I think that the argument being made here

22   today that ICC doesn't make the same sorts of

23   promises that they have accused Upcodes of making is

24   really striking.  I mean, Exhibit A excerpts some of

25   the claims in question.  And, you know, I suppose we

1    may get factual disputes about whether it's the

2    complete claim or we're cherry-picking or whatever.

3    But if you just take a look -- we've made an effort

4    to be accurate about it -- ICC says that they

5    provide the most current building codes across the

6    US.  They say they have an up-to-date database.

7    They say never miss a code update.  I mean, if what

8    I'm hearing is a representation from the other side

9    that those sorts of promises are not promises, that

10   they're going to keep their codes up to date, then I

11   think this case is over.  But --

12          THE COURT:  I'm sorry.  Mr. Novikov, when

13   you said Exhibit A, the -- just because I have it

14   printed out.  And when you go on ECF, sometimes they

15   convert the exhibits to numbers.  So Exhibit A for

16   ECF 147 was the document request.  Are we looking --

17          MR. NOVIKOV:  Correct.

18          THE COURT:  Should I be looking at a

19   different Exhibit A?

20          MR. NOVIKOV:  No, that's correct.  147-2.

21   And I'm in particular referring to the request

22   called out as Requests 2021, 22, 23, 24.

23          THE COURT:  And you were quoting language.

24   And where should I go look to read what you were

25   quoting?

1          MR. NOVIKOV:  So it's a little bit

2     imperfect and, you know, in part because, of course,

3     this is all coming up in the discovery context, but

4     I am quoting our own requests which refer to claims

5     that ICC has made and provide a link.

6          THE COURT:  So you're saying that they

7     represent their codes as being an up-to-date

8     database, which, I guess, at least colloquially

9     understood, would mean that it's not just the

10    version at the time of publication, but it's up to

11    date to the date you pull up the website.

12         MR. NOVIKOV:  Those are the arguments that

13    ICC has made about Upcode's own claims.  And you

14    know, what's good for the goose is good for the

15    gander, in this context, at least.

16         And I would just say, Your Honor -- I don't

17    know if this will make it easier, and I apologize

18    for shifting a little bit.  But I don't think

19    that -- like we're asking for documents and

20    communications relating to errors.  It seems like we

21    have a dispute about whether certain things are

22    errors.  That's fine, I think, for discovery

23    purposes.  I don't think it ought to be burdensome

24    for them to respond to this request.  Insofar as

25    they don't think, and no one else thinks, that

1    the -- they're not keeping the code up to date is an

2    error or makes their website inaccurate, then

3    presumably they're not going to have a lot of

4    documents talking about that.  And so I don't -- you

5    know, we can have the substantive fight later.  But

6    I'm not sure why we're getting such resistance to

7    producing documents to what's, I don't think, really

8    a terribly broad request on this ground.

9            THE COURT:  And Request Number 28 would

10   still be -- the one that you pointed me to that's

11   still in dispute, would still be limited by the time

12   frame the parties agreed to?

13           MR. NOVIKOV:  That's right.

14           MS. WISE:  So this is Jane.  The other

15   thing about this up-to-date issue, and I guess, in

16   some ways, it responds to what Gene was just saying,

17   I don't really think that Upcodes needs documents

18   from us because what we've talked about in our

19   submissions are the burden on ICC to search in and

20   among its employees and in its communications with

21   all of the jurisdictions, which is basically every

22   state, that it has on a daily basis about updating

23   these codes.  If Upcodes wants to make the point

24   that ICC made a statement that its codes are current

25   and it claims that that's -- you know, what's good

1    for the goose is good for the gander, it can do that

2    with what it's already identified.  It doesn't need

3    documents from ICC communicating back and forth

4    about particular changes, which I think we would

5    have to search through if -- you know, this is why

6    we've resisted this request.  We would have to

7    search those documents for those types of

8    communications.  And that is just not a proportional

9    burden, particularly when we've agreed to produce

10   documents sufficient to show our processes for

11   updating the website.

12        So they will learn in our processes that we

13   don't try and update the code to the minute with

14   every single update that a jurisdiction might put

15   out.  They will get discovery on that.  What they

16   won't get is, you know, 100,000 pages of

17   communications, which I think, even if the parties

18   agree to limit the time frame to the last

19   four years, it's still a large, large volume of

20   communication that we're talking about.  So that's

21   where we come out on the burden of this request.

22        THE COURT:  Ms. Wise, can I just ask you a

23   question about that burden --

24        MS. WISE:  Sure.

25        THE COURT:  -- specifically?  And if I'm

1    misunderstanding, folks should feel free to speak up
2    and correct me.  If they're looking for either
3    internal audits or customer complaints identifying
4    these types of non-OCR errors or, I guess, purported
5    errors, that would still be a voluminous -- a large
6    volume of communication?
7         MS. WISE:  I -- I think we would still need
8    to search for all communications with every state.
9    I do think it would still be a large volume of
10   communication, particularly if it's to show
11   something that they don't need those communications
12   to show.
13        THE COURT:  And do you mind -- I'm sorry if
14   you already explained this, but would you mind
15   explaining to me again why you don't think they need
16   these communications to show it?
17        MS. WISE:  Sure.  So attached to Upcodes'
18   submission, it purported to identify something like
19   400 errors or instances where ICC's code was not up
20   to date.  It did that entirely in advance of
21   discovery from us.  So if it wants to show that ICC
22   publishes, for example, the Building Code of
23   New York, and a month later, the New York
24   Legislature passes an amendment to the New York
25   Building Code, they're going to be able to show that

```
 1   ICC doesn't public integrate that particular
 2   amendment immediately because that's not ICC's
 3   process.  They don't need customer communications or
 4   communications between ICC and the State or between
 5   ICC and its internal people to show that ICC doesn't
 6   make that amendment.  They just don't.  The next
 7   time that ICC will do an update to the New York
 8   State Building Code is when ICC works with the
 9   New York State Building Code on the next edition of
10   the Building Code.
11           THE COURT:  I see.  And, Mr. Novikov, why
12   do you need more than what's already available to
13   you?
14           MR. NOVIKOV:  Sure.
15           THE COURT:  Yeah.
16           MR. NOVIKOV:  So what -- the Court may be
17   aware that this case was dismissed at the 12(b)(6)
18   stage and then went up on appeal and came back down.
19   One of the points that we made at the 12(b)(6) stage
20   and on appeal is that no one would expect, again,
21   anodyne comments that a website is up to date or its
22   database is up to date, to require the codes to be
23   instantaneously updated whenever any change is made.
24   And one of the arguments that ICC made on appeal in
25   its successful effort to get the dismissal renewed
```

1    and -- reversed and remanded was that there is a

2    factual issue of how long a lag a reasonable

3    customer would expect based on claims like that,

4    based on claims virtually identical to claims that

5    ICC has made.

6            So I think Your Honor, in asking Ms. Wise

7    about the kinds of documents that we were seeking,

8    was exactly right about what we were looking for:

9    Internal audits, comments about the impact of the

10   fact that the codes are not kept up to date

11   vis-à-vis customer perceptions and customer needs

12   and the claims that have been made, complaints from

13   customers about whether or not their failure to keep

14   the codes up to date makes their representations

15   false.  That's exactly what we're looking for.  And

16   the factual issue that Upcodes -- excuse me, that

17   ICC raised in front of the Second Circuit is exactly

18   what we're looking for discovery on.

19           I am not sure why we are hung up on

20   voluminous communications with State jurisdictions

21   about routine updates.  That's not the point, and

22   that's not what we're looking for.  What we're

23   looking for is exactly what Your Honor identified.

24   Things like internal audits of website accuracy,

25   things like customer feedback about the extent to

1    which the ICC website is or isn't up to date.  And

2    that goes directly to the question of what a

3    reasonable customer would expect based on the kinds

4    of claims that both sides in this case are making.

5         MS. WISE:  And I can just respond because I

6    think I have two points about that.  One, from the

7    beginning, Upcodes has said that this is relevant to

8    their unclean hands defense, not -- as Gene said at

9    the beginning of this, they didn't bring a false

10   advertising claim.  They want to show that their

11   conduct, which ICC alleged constitutes false

12   advertising, is excused by the doctrine of unclean

13   hands because ICC is making the same statements.

14        The second point there is that ICC is not

15   making the same statements in the way that I think

16   we talked about at the beginning.  There's a

17   material difference between saying that all the

18   codes on Upcodes' website are kept up to date versus

19   ICC provides the most current version of the codes.

20   Those are just two different claims.

21        THE COURT:  Isn't there a factual issue as

22   to what the consumer would understand you to be

23   claiming?

24        MS. WISE:  I think the problem for us, and

25   where we keep tying this into the burden, is that I

1   don't see how we could identify communications with

2   states about the errors without reviewing all of

3   those communications.  I think if we got -- let's

4   say that ICC received an email from a consumer about

5   an error on the website.  I don't know that that is

6   really any evidence of what they think about the

7   claim.  The way that you would test that would be

8   through a consumer survey.

9        So, again, I just don't know what the

10  digging into ICC's emails is going to help them to

11  show about either what consumers think or about

12  whether or not ICC updates its codes to keep them up

13  to date in the same way that Upcodes claims to do.

14       THE COURT:  Presumably you get an email

15  from a customer complaining that something may not

16  be accurate, and they've, I guess, looked at your

17  website and seen whatever representation you're

18  making about accuracy, wouldn't that at least

19  indicate that the consumer at least is interpreting

20  or would accept a different interpretation of what

21  up to date means than what ICC seems to be claiming?

22       MS. WISE:  I don't think so.  You know, I

23  think ICC gets questions from consumers all the time

24  about what the code means or what -- you know, about

25  particular provisions.  ICC is in the code

1   development business, so they get a lot of questions

2   about, should this provision be written this way or

3   should it not be?  You know, consumers are

4   approaching ICC from all sorts of directions.  And I

5   think it would be exceptionally rare for them to

6   say, "Hey, we saw on your website that you endeavor

7   to provide the most accurate version of the codes,

8   but I saw this one provision missing."

9           I would also say that we have agreed to

10  search for the types of errors that Gene mentioned

11  before that are optical character recognition-type

12  errors that may be injected into the code in the

13  process of putting them on the website.  So we've

14  already agreed to search for some communications

15  regarding errors.  It's just whether or not we open

16  that up to these broader categories that we don't

17  think are necessary and are burdensome.

18          THE COURT:  If we're just looking at

19  searching for customer inquiries or customer emails,

20  particularly identifying potential errors, do you

21  have a sense of what the volume of those emails

22  might be?  I guess not with communications with

23  states, just the customer reaching out to ICC.

24          MS. WISE:  Okay.  I don't.  I'm not

25  entirely certain that what one consumer says would

1    ultimately be admissible, but I don't have a sense

2    of that volume if we were just talking about

3    non-state consumers.

4            THE COURT:  And what about your internal

5    audits of the website's accuracy?  Do you have a

6    sense of what the volume of that is?

7            MS. WISE:  I think that probably depends --

8    as long as when we're talking about internal audit,

9    it's not talking about, like, the quality control

10   procedures.  I think we've agreed to produce

11   documents sufficient to show what our quality

12   control procedures are.  But, you know, I think we

13   have -- as long as that's not considered an audit, I

14   don't think internal audits would be burdensome

15   either.

16           THE COURT:  So if I misheard -- it's sounds

17   like you maybe might have suggested that internal

18   audits of the website accuracy, as long as we're not

19   talking about quality control, might not be

20   burdensome?

21           MS. WISE:  Right.

22           THE COURT:  Okay.  So at least as to that,

23   can a search be conducted and, you know, unless

24   something changes --

25           MS. WISE:  Yeah.

1              THE COURT:  -- it sounds like that one we

2    can at least reach agreement on?

3              MS. WISE:  Yes.

4              THE COURT:  Okay, great.  And then so, now,

5    that just leaves us the potential to show customer

6    complaints and the customer feedback that's not with

7    the communication with the states.

8              MS. WISE:  I think that's something -- my

9    hesitation is I don't know how those come in.  I

10   don't know -- if it's just limited to non-state

11   communications, I think that should be fine.  I

12   don't know how well aggregated those are, but I

13   still think that should be a much smaller universe

14   to look through.

15             THE COURT:  Mr. Novikov, does the

16   compromise of producing the customer complaints that

17   doesn't involve the State communications, do you

18   have an objection to that?

19             MR. NOVIKOV:  I don't.  I guess what I

20   would request, on top of sort of what's being mooted

21   right now that I don't think ought to be very

22   burdensome, is communications, whether internal or

23   with jurisdictions that are specifically about the

24   question of whether or not ICC's offerings are

25   accurate and up to date.  I think that can be done

1    relatively simply with search terms.  I don't need

2    voluminous back-and-forth about every update and

3    every change that is made.

4         What I'm looking for is people identifying

5    instances in which the website is not accurate and

6    up to date and speaking about it in those terms.  So

7    I think if we were to include that with the

8    understanding, again, that we don't want every

9    communication about every time some change needs to

10   be made on the website, I think that we would arrive

11   at a solution that works.

12        THE COURT:  Can I ask you a question?  If

13   we're talking about -- I had sort of, from the

14   discussion, thought that the relevant -- at least

15   the relevant individual or person or the state of

16   mind was people, not the state, but consumers is

17   looking at the website.  If you're talking about the

18   website not being accurate and up to date from the

19   state of you of the State or the legislature,

20   whoever provides the codes, that almost strikes me

21   differently because they're not the ones who are --

22   I mean, I would think the theory is that the false

23   advertisement or whatever that type of claim is, is

24   directed at the individuals who go to the website,

25   not the states who provide the codes.

1          MR. NOVIKOV:  Yeah, you know, I take that

2     point, Your Honor.  I think we can agree to exclude

3     communications with jurisdictions.  I do think that

4     purely internal communications do reflect.  I mean,

5     I think it is not just consumer state of mind.  I

6     think ICC's state of mind about what -- both ICC's

7     state of mind and just the fact of there being

8     errors on the site which might have been identified

9     internally are relevant.

10          So I would just ask in addition to just

11    formal internal audits, that a reasonable search be

12    conducted internally for communications and other

13    documents that talk about errors and lapses in

14    accuracy and instances of the site not being up to

15    date.  I think we can reach an agreement on the

16    scope of that search.

17          MS. WISE:  I would just say that that seems

18    to suffer from the same problem in that it's not

19    aimed at consumer perception at all.  The other

20    problem in terms of the burden is that there's a

21    huge volume of employees who deal with these issues

22    every day.  And if we're trying to find these, you

23    know, hypothetical communications about errors, I

24    just don't see how we can locate those without

25    collecting all emails from ICC for the past

1    four years, which is what we've been trying --

2    assuming the parties agree on, you know, that time

3    frame, that's what we've been trying to avoid with

4    this request from the get-go.

5            MR. NOVIKOV:  I would just say that the

6    requests that ICC has made of Upcodes are at least

7    that burdensome.  So I'm not sure why, you know,

8    searching ICC emails for the past four years is

9    being raised as a big burden problem.  We're being

10   asked to do the same thing and more.

11           MS. WISE:  I don't agree with that

12   characterization.  And I know, you know, Upcodes is

13   different in kind and the size of their employees.

14   I guess I don't have an up-to-date count of how many

15   employees you all had.  But at least for some of the

16   relevant time frame, it's Garrett and

17   Scott Reynolds.  And that's a much shorter list than

18   ICC and its swath of employees who are involved in

19   its primary business of code development.  And,

20   again, if you got those, it's not at all related to

21   consumer perception.

22           THE COURT:  I also wonder, apart from the

23   consumer perception issue, wouldn't some of it, or

24   maybe a wide swath of it, be captured by the

25   internal audits?  How frequently are the internal

1    audits conducted?

2              MS. WISE:  I don't know the answer to that.

3              THE COURT:  Ms. Wise, do you have a sense

4    of if we're -- so I'm going to just -- it sounds

5    like we've reached some consensus on internal audits

6    and customer inquiries, feedback complaints.  Not

7    state customers, but actual consumers.

8              MS. WISE:  Right.

9              THE COURT:  Would you be able -- if we're

10   talking about expanding that search to talk about

11   internal communications of ICC employees regarding

12   errors, do you have a sense of how many ICC

13   employees we're talking about?

14             MS. WISE:  Off my head, I'm thinking 20,

15   but I don't -- it's got to be dozens.  I just don't

16   have a specific number for you.

17             THE COURT:  Okay.  Is there potentially a

18   way that if we have agreement on those two

19   categories, is -- Mr. Novikov, once you get those

20   documents and review them, if there's potentially

21   issues that get flagged in those email

22   communicate -- in the emails from the consumers,

23   that then maybe you can specifically point to

24   something you'd want to see.  You know, if there

25   were other internal communications related to that

1    or around that time period when maybe potentially

2    lots of errors are being spotted, that might be a

3    way to narrow the request and address the burden

4    issue.

5           MR. NOVIKOV:  I am very open to that,

6    Your Honor.  I would think that it would go both

7    ways.  And that, of course, is not currently before

8    the Court, and it's something that may arise later.

9    But we would ask for the same consideration, the

10   same type of phasing to reduce the burden on us,

11   because, again, we think the issues are mirror

12   images of one another.  But that compromise seems

13   reasonable to me.

14          THE COURT:  Ms. Wise, what about that

15   compromise?

16          MS. WISE:  I think that makes sense here.

17   I think -- I'm not exactly sure what Gene is talking

18   about of the mirror images of the request.  I don't

19   think they're written the same way.

20          So, look, if we've asked for the identical

21   thing, of course, when we're asking for a burden, we

22   will take the same consideration.  And I think both

23   of the parties here have been working to reduce the

24   number of times that we have to be before Your Honor

25   and the disputes before the Court.  So we will

```
 1    certainly keep in mind the limitation on ICC and
 2    whether that makes our request more or less
 3    reasonable.  But I don't have a specific request
 4    that I understand is objectionable from Gene yet.
 5    So I don't want to agree in the abstract.
 6              MR. NOVIKOV:  Sure.  Nobody wants to agree
 7    in the abstract.  That sounds good.
 8              THE COURT:  Okay.  Well, it sounds like
 9    potentially we might have a compromise on 28.  And
10    if something else comes up on one of Upcodes'
11    request that Upcodes would like some potential
12    concession or some way to limit the scope of the
13    request that ICC has made of it, if the parties
14    can't reach a resolution, you can always send in a
15    letter.
16              MR. NOVIKOV:  Thank you, Your Honor.
17              MS. WISE:  Great.  Thank you, Your Honor.
18              THE COURT:  Is there any other request
19    that's still at issue?  Was that just it?
20              MR. NOVIKOV:  I think it -- we are working
21    through some issues on the other requests, you know,
22    as recently as yesterday.  I don't think we need the
23    Court's assistance.  I suspect we're going to end up
24    reaching a compromise and won't need to bother the
25    Court with it.  So I think that's it for today.
```

1              THE COURT:  Okay.  All right.  Well, thank
2    you, everyone.
3              MS. WISE:  Great.  Thank you very much.
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                 C E R T I F I C A T E

 2

 3      I, Marissa Mignano, certify that the foregoing

 4  transcript of proceedings in the case of

 5  INTERNATIONAL CODE COUNCIL, INC., et al. v.

 6  UPCODES, INC., Docket #1:17-CV-06261, was

 7  prepared using digital transcription software and is

 8  a true and accurate record of the proceedings.

 9

10

11  Signature  ___Marissa Mignano_____

12                  Marissa Mignano

13

14  Date:     March 27, 2023

15

16

17

18

19

20

21

22

23

24

25
```