UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------:

INTERNATIONAL CODE COUNCIL,   : Case No.: 17-cv-6261

INC, et al.,                  :

                    Plaintiffs,:

     v.                       :

UPCODES, INC., et al.,        : New York, New York

               Defendants.: August 1, 2023

------------------------------:

TRANSCRIPT OF STATUS CONFERENCE HEARING

BEFORE THE HONORABLE VALERIE FIGUEREDO

UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

| | |
|---|---|
| For Plaintiff: | MORGAN LEWIS & BOCKIUS LLP<br>BY:  Jane W Wise, Esq.<br>1111 Pennsylvania Ave, NW<br>Washington, DC 20004 |
| For Plaintiff: | DLA PIPER LLP<br>BY:  J. Kevin Fee, Esq.<br>     Gabrielle Velkes, Esq.<br>500 Eighth Street, NW<br>Washington, DC 20004 |
| For Defendant: | MORRISON & FOERSTER LLP<br>BY:  Mark Marciszewski, Esq.<br>     Eugene Novikov, Esq.<br>707 Wilshire Boulevard<br>Suite 6000<br>Los Angeles, CA 90017 |


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

AMM TRANSCRIPTION SERVICE - 631.334.1445

1        THE DEPUTY CLERK:  This is the matter of

2    International Code Council, Inc., et al., versus

3    UpCodes, Inc., et al.; Case Number: 17-cv-6261.  The

4    Honorable Valerie Figueredo presiding.

5        Counsel, can you please give your

6    appearances for the record, starting with

7    plaintiffs' counsel.

8        MS. WISE:  Good morning.  My name is Jane

9    Wise, counsel on behalf of International Code

10   Council, or ICC, and I'm joined by Kevin Fee and

11   Gabby Velkes.

12        THE DEPUTY CLERK:  Defense?

13        MR. MARCISZEWSKI:  Hi.  This is Mark

14   Marciszewski on behalf of the defendant UpCodes, and

15   I'm joined by Gene Novikov.

16        THE COURT:  Good morning, everyone.  This

17   is Judge Figueredo.

18        So I have your two letters concerning the

19   discovery dispute, ECF 172 and 179.  I think it

20   probably makes sense to just walk through the

21   various RFPs that are at issue.  But before we do

22   that, I just -- you know, in reading the letters, I

23   was just a little confused as to what a reading room

24   is.  And I think this came up in ICC's letter, so,

25   Ms. Wise or Mr. Fee or Ms. Velkes, if you want to

1   just give me some context for what a reading room
2   is...
3                MS. WISE:  Sure.  I'd be happy to do
4   that.  This is Ms. Wise.
5                A reading room in this context is simply
6   ICC's website.  It's an area on ICC's website where
7   it makes all of its model building codes and various
8   standards available to view for free, but there are
9   limitations on what you can do from that website.
10  So if you have Internet of any kind, whether it's on
11  your cell phone, a tablet or on a traditional
12  computer, you can go to ICC, click on codes, and
13  then select from any of the 50 states that they have
14  codes available for and review, for example, the
15  Building Code of 2021 for a particular state.  And
16  you can do that by chapter and look at all of the
17  various code provisions that you want to.
18               One of the disputes between the parties
19  is, sort of, the functionality of that.  So UpCodes,
20  in its letter, talked about the ability to copy and
21  paste, so that's not something that you can do from
22  ICC's reading room.  So when we refer to it as a
23  "reading room," it's really the fact that it's free,
24  but it's in a read-only format, so it can't be
25  downloaded or copied and pasted into another

1    document.

2                    THE COURT:  Okay.  And this -- so -- and

3    this, I guess, is specific to Requests 2 and 3,

4    which offer the reading code available to the public

5    for free?

6                    MS. WISE:  I believe it's 2, 3 and 8.

7                    MR. MARCISZEWSKI:  Yes, that's correct,

8    2, 3 and 8.

9                    THE COURT:  And so number 2 seeks all

10   documents relating to this -- I guess, to this

11   ability to look at the code in the reading room for

12   free.

13                   MS. WISE:  Yeah.  It says, "The free

14   online services through which ICC's code can be

15   accessed."

16                   I think it's probably a little bit

17   broader than just ICC's reading room.  There may be,

18   you know, another read-only source where ICC links

19   for a particular jurisdiction.  But, yes, that's

20   essentially what Request 2 is talking about.

21                   THE COURT:  And so, Mr. Marciszewski --

22   did I -- I'm sure I'm butchering that.

23                   MR. MARCISZEWSKI:  Yeah, that's -- it's

24   fine.  It's Marciszewski.  Thank you.

25                   THE COURT:  I'm just trying to

1 understand.  You say you want, for example, feedback

2 from users concerning the practical effect of the

3 restrictions ICC puts on its access.

4    So is there, like, a comment board on

5 this reading room, or, I guess, you anticipate that

6 someone accessing this would send an e-mail and say,

7 I can't copy and paste this?

8    MR. MARCISZEWSKI:  Yes.  That's

9 essentially what RFP 8 is about.  And, yes, I think

10 it's mainly also fair that we can pick certain

11 custodians if there is certain -- an e-mail address

12 customers send complaints to if they come in and say

13 I can't copy and paste, or I can't do X and Y, and,

14 therefore, this code is completely unusable to me.

15 That's something that's relevant then to Upcodes'

16 due process arguments that if -- this free access is

17 not actually making the codes practically available

18 to the public.

19    MS. WISE:  And I'm happy to respond to

20 that.

21    THE COURT:  Sure.

22    MS. WISE:  I'm sorry.  I'm having a

23 little trouble hearing.  Did you say something,

24 Judge?

25    THE COURT:  No.  Yeah, yeah, yeah.  Go

1    ahead.

2              MS. WISE:  So I think there's a real

3    conflation of issues here on the sort of -- the

4    technical aspects of what users can do.  When

5    Mr. Marciszewski says that it's not "practically

6    available" to them, what he's saying is that you

7    can't copy and paste, you can't print out from the

8    website.  Those are not due process issues.  Due

9    process has to do with whether there's access to the

10   information.  And if they can read it, it's our

11   position that it's just -- the additional

12   functionality, which ICC does make available through

13   a licensed form, is really a different issue.

14              But more to the point, if they want to

15   make this argument that ICC limits the way that you

16   can access the codes because you can't copy and

17   paste, they can do that.  They don't need documents.

18   We are willing to stipulate that we make a free,

19   read-only version of the website.  We had this

20   information as a live issue in the first copyright

21   case.  The parties have already had a full dispute

22   through summary judgment in which ICC had the same

23   read-only access through its reading room to its

24   codes.  And they're welcome to make those arguments

25   again.

1            But what doesn't make sense to us is to

2    have ICC search for a really burdensome request that

3    is all documents and communications relating to

4    feedback, which is not time-limited or otherwise

5    limited, and would include requests like, gee, I

6    really wish your website had larger font.  Things

7    that are just wholly irrelevant to this case when

8    they don't need them to make the argument that

9    Mr. Marciszewski is advancing, that read-only access

10   is not enough, it needs to be searchable, or it

11   needs to be able to be copied and pasted.

12           MR. MARCISZEWSKI:  And real quick, if I

13   may respond to that, Your Honor, I just want to

14   point out that opposing counsel's description of

15   what the due process standard is saying just because

16   it's available to be read-only is enough.  That is

17   something that's a live dispute in this case, about

18   if just having it where you can read it is enough,

19   versus does it actually need to be, you know, like I

20   say, "practically available," or usable to the

21   general public.

22           THE COURT:  Because I guess I'm confused

23   as to why someone's, you know, potential complaint

24   about that would be information you need to make the

25   argument.

AMM TRANSCRIPTION SERVICE - 631.334.1445

1          MR. MARCISZEWSKI:  I think there's a

2     difference of, you know, if there's one person

3     making a claim versus if there is a series and it

4     shows, you know, in the documents we get that

5     everyone trying to use ICC free access, it's just

6     not usable in their practical -- you know, what they

7     use it for, their job.  I think that will then

8     become relevant to our argument saying, hey, this

9     free access is not usable by anyone.  Here's a long

10    litany of people saying they cannot use it.  And,

11    you know, that would be our argument.

12         MS. WISE:  I just don't -- you know, the

13    volume here is so large that that, to me, doesn't

14    really change the analysis.  They do not need the

15    search of comprehensive documents and communications

16    regarding all feedback whatsoever from users with

17    respect to our codes on our free website to make

18    this argument.  It seems much more like a broad

19    fishing expedition.

20         MR. MARCISZEWSKI:  And, Your Honor, we

21    are more than willing to also narrow this scope,

22    either by certain custodians at -- or certain e-mail

23    addresses, certain search terms.  We are willing to

24    narrow this.  It's just -- we have not gotten to

25    that point in meet and confer because of ICC's

1    position that it's not relevant, but we are more
2    than willing to really limit it to, I feel like,
3    actual customer communications.  You know, maybe
4    it's not so much the broad documents, but -- so
5    really what we're searching for is the actual
6    customer communications to ICC.
7              THE COURT:  Ms. Wise, you keep talking
8    about burden.  Do you -- how -- what is the volume
9    of documents?  Have you run, like, an initial search
10   to see how many potential consumer or customer
11   complaints there are?
12             MS. WISE:  We have not.  We have not
13   searched for this because, like I said, we haven't
14   seen any showing from the other side that it's
15   relevant.  But we have, in the context of our prior
16   dispute before Your Honor, gone back and started to
17   pull documents on consumer information, and we've
18   collected lots of data.  There are multiple e-mail
19   inboxes through which ICC receives communications.
20             And, like I said, I think it would be
21   very difficult to, you know, sort the wheat from the
22   chaff on this.  I don't know how we would get to, I
23   wish we could copy and paste -- which we're, again,
24   willing to concede that they can't -- from I wish
25   your font was bigger or I wish the format of the

```
 1    website was different.  Things like that.  I think
 2    we would have to review, you know, years of
 3    documents from consumers to find something that
 4    we're willing to stipulate they can't do.
 5               THE COURT:  Okay.
 6               MS. WISE:  And just for context, the
 7    consumer -- the customer databases that we've pulled
 8    have millions of documents in them.
 9               MR. MARCISZEWSKI:  And, Judge, just one
10    more point of relevance.  I mean, ICC has made the
11    assertions over and over in this case that not only
12    are the codes available on the website, but the fact
13    that they're easily accessible and anyone from the
14    public can easily access and use them in the format
15    they are in -- if ICC wants to continue making that
16    argument, particularly with due process, UpCodes'
17    position is that we're entitled to at least
18    something.  We can think about the narrowed scope of
19    it, but we are entitled to document, to test whether
20    that assertion is true or not.
21               MS. WISE:  I just don't see how that's
22    true.  You -- UpCodes has sought summary judgment on
23    this issue before without this information, so
24    you're certainly capable of making the due process
25    argument, and have made in the past the due process
```

```
 1    argument, based on the read-only component of our
 2    website.
 3            The ease of use, you know, if you want to
 4    walk the jury through our website and say, see how
 5    unfriendly it is, see how difficult it is to use our
 6    website, go for it.  If you want to get an expert or
 7    run a survey that says, their website is difficult
 8    for these reasons, go ahead.  But I don't think
 9    searching through, you know, a million documents is
10    proportional to the cost in this case, where there's
11    just no dispute that we don't make documents
12    searchable.
13            THE COURT:  Okay.  So I think on RFP 8,
14    I'm struggling to see why requiring these searches
15    is necessary, given that the information seems to be
16    something that you can easily stipulate to and is,
17    you know, available just by virtue of going to the
18    reading room.  And they don't dispute that there is
19    no ability to search or copy/paste or any of that.
20            MR. MARCISZEWSKI:  I guess our position,
21    the slight distinction is not just that what -- it's
22    not that we want to know what are the features.  We
23    know what the features are.  It's just that what is
24    the effect of the people that are actually using it
25    we find more relevant than if -- you know, if we
```

1    walk the jury through and the attorney's making the

2    argument and we have no backing of what ICC users

3    actually think about it.  I think that's really the

4    relevance of what we're looking for.

5            We can make that argument saying this

6    isn't usable, it's not usable, but it just begs the

7    question of, well, you say that, what do ICC users

8    actually think?  Can they use it?  And that's why --

9            MS. WISE:  Well --

10           MR. MARCISZEWSKI:  -- we wanted customer

11   feedback.

12           MS. WISE:  Go ahead.  I didn't mean to

13   interrupt.

14           And we did point this out in our letter,

15   that if, let's say, ten consumers in the last five

16   years have wrote in and said, you can't copy and

17   paste, they can't extrapolate that to a universe of

18   all ICC users having that complaint, even if we

19   produced those documents.

20           What they would need to run, like you do

21   in many, many trademark cases to prove consumer

22   beliefs is run a survey and find an appreciable

23   number of users that can be extrapolated to the

24   right universe of users.  And that's how you tell

25   what consumers are thinking.  It's not by

1    cherrypicking one-off e-mails about what a

2    particular consumer might want or wish or dream.

3          MR. MARCISZEWSKI:  And, Your Honor, just

4    the point is, I think there is a point of, if these

5    documents come back and there's only two, five, ten

6    e-mails, I think opposing counsel is right, that

7    that turns into very cherrypicking, and they have

8    every right to make that argument.  But I think it

9    just depends on the volume of complaints that come

10   back.  If it's hundreds and hundreds versus ten,

11   that changes the calculus.  But without even

12   searching the documents, we don't know -- at least

13   UpCodes does not know -- the volume of those

14   complaints or feedback.

15          THE COURT:  It sounded like, though, I

16   heard Ms. Wise say that there wasn't -- you know,

17   they have potentially, you know, a -- quite a

18   sizable volume of these e-mails, and there's no way

19   to limit the search accurately to just talk about

20   complaints about the usability.

21          Is that correct, Ms. Wise?

22          MS. WISE:  Yes.

23          MR. MARCISZEWSKI:  And that -- I would

24   just ask -- I mean, we can figure out search terms

25   of just the actual usability that we're looking for;

```
 1    either the words "copy/paste," the words "print," or
 2    something like that, that -- I don't know if -- we
 3    have not -- I don't believe ICC has run searches
 4    regarding maybe a narrow scope of certain inboxes
 5    for certain terms that highlight the functionality
 6    differences between ICC, a website and UpCodes'
 7    website that ICC has been pointing out.
 8              But I believe if we do something -- if we
 9    can agree to certain, you know, inboxes and certain
10    search terms -- I still could be wrong because I
11    don't know the inboxes, but it could narrow down
12    from -- it's not going to be millions anymore.
13              MS. WISE:  I still think that that's the
14    tail wagging the dog on its relevance, right?  You
15    know, if we have to search through these inboxes, I
16    think it's going to yield a high volume of hits.
17    Just from the searching that we've done in other
18    contexts, I really think that the volume is going to
19    be quite high.
20              But at the end of the day, they would
21    still need some expert analysis to say that the
22    number that we receive is meaningful in some way,
23    and they can do that with a survey without us
24    looking for a single document.
25              THE COURT:  All right.  Let's just keep
```

1    moving on.  There's still 2 and 3 in this section.

2              I think on number 8, for the reasons I've

3    indicated, I'm not entirely sure why this

4    information is not something that what you really

5    think just shouldn't be done through a consumer

6    survey.  But I'm going to just table this a second

7    because it does sound like there weren't any

8    searches done initially to try to understand the

9    volume that we were talking about, and it would be

10   on ICC's -- it is ICC's burden to show that this

11   would be unduly burdensome.

12             Although I am still struggling to see the

13   relevance, so I understand your argument, Ms. Wise.

14   But since 2 and 3 are in the same category, do we

15   want to discuss those?

16             MR. MARCISZEWSKI:  Yes, Your Honor.

17             Briefly, I just want to make the

18   distinction with 2 and 3.  The -- we've talked about

19   due process a lot with 8.  I think 2 and 3 are most

20   relevant, more so to the market harm analysis of the

21   fair use.  It's mainly whether ICC offering its

22   codes online for free, albeit with these certain

23   limitations that they've talked about, if they've

24   affected ICC's revenues or sales because it's ICC's

25   central argument that UpCodes offering the law for

1    free harms the market for ICC codes.  And if ICC's

2    offerings -- if there's documents out there that

3    says that has not affected their book sales or

4    revenues, that would be relevant, therefore, to

5    market harm.

6              And I know in the letters ICC has pointed

7    out these functionality differences, but I believe

8    getting these documents also will allow UpCodes to

9    test whether those distinctions were actually

10   considered when making these offerings.  For

11   example, if there's a document out there that says,

12   hey, it's on a read-only format, but anyone can hit

13   CTRL-P and print the page, are we concerned about

14   that; and says, no, that's fine if people start

15   printing it, it's not going to affect our book

16   revenues, that's relevant.

17             Or on the flip side, if all decisions end

18   to make the codes available for free, or after the

19   fact, when discussing in relation to their revenues,

20   that "copy, paste, print" never come up, then I

21   think UpCodes is entitled to test whether this has

22   been a consideration by ICC all along or if this is

23   a theory just by litigation to make a distinction

24   between UpCodes' and ICC's services that is a

25   distinction without a difference.

1            MS. WISE:  If that's -- if you're done,
2   Mr. Marciszewski, I'll go ahead and respond.
3            MR. MARCISZEWSKI:  Yes.
4            MS. WISE:  The notion that something that
5   happened several years before UpCodes existed was a
6   litigation strategy strikes me as untenable.  ICC,
7   long before UpCodes existed, made its documents
8   available in a read-only format for customers to go
9   to its website.  The decision-making process, as
10  Judge Freeman already ruled, is not relevant once
11  you know that we've made them available for free.
12  That's just the fact.  Whether ICC considered, you
13  know, how many views to give people for free, or
14  did -- you know, how -- should we track access or
15  not; those are all within the scope of the request.

16            And I think one thing that we haven't
17  really talked about is the narrowing that UpCodes is
18  doing now to copy and paste.  It didn't do so in the
19  meet and confer.  And so we haven't run search terms
20  to limit the scope to meet and confer because that's
21  not the scope of the request.  The request as
22  written, including number 8, requests all documents
23  concerning free online access to services, which is
24  number 2.  And that's much broader than it's being
25  painted here.

1          So our concern about the breadth of these

2    requests is this volume of consumer requests that we

3    get through these channels.  It's huge.  And UpCodes

4    has not shown that they're willing to limit them in

5    any way.  And, frankly, we don't think they need

6    them.  As Judge Freeman said, it -- ICC freely

7    admits that they make documents available for free

8    on their website, and we did throughout the entire

9    first copyright case.

10          A big portion of that case was fair use.

11   Notably, they never raised this argument the first

12   time they sought these documents, so they clearly

13   didn't think it was that important at that time.

14   But even Judge Marrero said that UpCodes' use is

15   different in kind.  We're not comparing apples and

16   apples.  We're comparing apples and oranges.  ICC

17   makes its documents available in a read-only format.

18   That means people cannot send them to their friend.

19   They can send the link to the website to their

20   friend.

21          From UpCodes, you can do exactly the

22   opposite.  You can copy language and you can put it

23   in an e-mail, you can copy entire code books.  And

24   that is substitutional to ICC's use.  And that's

25   right in Judge Marrero's opinion about the market

1   harm on Factor 4.  So if they were able to brief
2   summary judgment and make this argument without
3   these documents last time, we simply don't see why
4   ICC should undergo the burden of searching millions
5   of documents this time around when it seems entirely
6   unnecessary and disproportionate.
7            MR. MARCISZEWSKI:  And, Your Honor, just
8   a few clarifying things.
9            I think opposing counsel is right when we
10  talk about RFP 8, about limiting to the
11  functionalities of copy/paste.  But I think in 2 and
12  3, what we're -- what UpCodes is really more looking
13  for are more internal documents, you know.  And
14  we're willing to think about a universe of maybe
15  more formal documents or board presentations and
16  minutes, that we're really looking at the market
17  harm on that one more so than the distinguishing
18  features.  It's that offering the codes for free
19  online, has that affected ICC's revenues?  That is
20  really the question there.
21           And just a real point with Judge Freeman,
22  talked about the decision-making in the prior
23  hearing.  He said regarding due process, the
24  decision isn't really relevant to due process
25  because it was -- it's either available or it's not,

1    or the features are what they are.  That was his

2    logic.  He did not discuss regarding market harm,

3    which these really go to, are the potential market

4    harm because, it's -- you know, as opposing counsel

5    points out, their argument is going to be UpCodes

6    and ICC is apples-to-oranges comparison, you can't

7    make it.  And that's fine, that when, you know, we

8    get to a brief, then we can make that argument.  But

9    it does not mean that we're not entitled to at least

10   get these documents to say, hey, ICC's free offering

11   does not affect their revenues at all, if that is

12   true, if there's documents that say that.

13          And then, you know, it would be UpCodes'

14   then position and our argument that will say that

15   UpCodes' offering is similar enough to ICC's that it

16   would not affect the market.  Obviously, opposing

17   counsel will disagree with that position, but that

18   legal argument and that, that it was at summary

19   judgment last time and will probably be briefed

20   again, isn't a stop to allow UpCodes for some of

21   these documents in order to at least get that

22   information whether ICC's free offerings has

23   affected their revenues and sales.

24          THE COURT:  Ms. Wise, what about the --

25   since it sounds like the parties hadn't really

1    looked at narrowing the request, why is narrowing 2

2    and 3 to look at specifically any impact on revenues

3    or other income streams from offering it for free

4    online?  Would that not adequately address your

5    concern that this is potentially looking at, you

6    know, millions of irrelevant documents?

7            MS. WISE:  I think the best answer to

8    that is that they're getting those documents in

9    response to other requests.  So when Mr.

10   Marciszewski talks about getting data to compare, we

11   are producing documents responsive to views of ICC's

12   free website.  We're producing documents about how

13   that compares to our paid-license services.  So if

14   they want to say, you know, since the time that ICC

15   introduced the free online website -- they can

16   compare that to the paid version with the documents

17   that we're going to produce.

18            What we don't think are relevant are

19   individual employee e-mails about the decision back

20   in -- I don't know the exact time frame, but I'm

21   going to say 2012 because I believe it was live

22   in -- later than that.  So for just frame of

23   reference, in 2012 the documents that ICC considered

24   about whether to offer the access for free just

25   doesn't strike us as relevant.  And, you know, the

1    marketplace is how it exists now, not all the

2    options that ICC considered in making the decision

3    whether to offer it or not.

4           And I do think -- just to reframe a

5    little bit and respond to what Mr. Marciszewski was

6    saying about Judge Marrero's decision, our point is

7    not that these issues have been decided.  Our point

8    was that they had sought documents regarding this

9    decision making in the last case, the *Copyright 1*

10   case.  And this case is very similar in terms of the

11   issues that the parties disputed, and they didn't

12   get these documents because they were found to be

13   irrelevant.

14          We understand that last time they argued

15   due process and didn't choose to argue this fair

16   use, that's certainly their choice not to have

17   pursued it at that time, but they still made this

18   argument about our free offering impacting market

19   harm.  So if they're making that argument and

20   Judge Marrero just, you know, considered it, they

21   don't need these documents.

22          THE COURT:  Although it sounds like you

23   started off by saying they were already getting it

24   from other sources.

25          MS. WISE:  No.  They're getting the --

1    the documents that they're getting from other

2    sources are the data of the -- to make a comparison

3    between our free offering and our paid offering.

4    They don't need -- the documents that they don't

5    need are internal communications about decisions to

6    offer free access or internal communications about

7    how our website -- how our codes can be accessed.

8         MR. MARCISZEWSKI:  And, Your Honor, just

9    to put a point, clarify something I might have said

10   earlier is we're willing to, kind of, start

11   narrowing this because, again, we've had disputes

12   about more relevance.  We get that we're maybe

13   getting the data from somewhere else.  But what we

14   also think is relevant is not every single

15   employee's e-mail, but if things are -- you know,

16   were discussed at a board meeting, or if there was a

17   PowerPoint at a board presentation, or maybe e-mails

18   among executives about the free offerings, that

19   then -- that those free offerings -- you know, not

20   just so much the decision the first time, but

21   whether to continue doing it.

22        If it says, hey, is the free offering

23   hurting our sales?  No, it's not, let's continue

24   doing it.  Or this -- whatever they might say in

25   those documents, that's really what we are looking

1    for, is not just the raw data that maybe we can make

2    extrapolations from, but whether ICC itself has

3    noticed that this, you know, offering that it has

4    hasn't affected its book sales or isn't hurting its

5    revenue streams.  That is what really -- that's,

6    kind of, the fine point of what we're looking for.

7             THE COURT:  The free offering began in

8    2012, I think someone said.

9             MS. WISE:  I think discussions about the

10   free offering would have been around that time,

11   yeah.

12            THE COURT:  And when did UpCodes enter

13   the market?

14            MS. WISE:  Around 2017.  You all may know

15   better than I do, but the lawsuit was certainly

16   2017; so maybe shortly before that.

17            MR. MARCISZEWSKI:  That's correct.

18            THE COURT:  Okay.  So I guess, Ms. Wise,

19   I'm just -- it sounds like defense counsel has, at

20   least, substantially narrowed this request.  And

21   we're talking about -- it doesn't even seem like

22   this internal communication so much as, like, you

23   know, formal presentations or documents outlining

24   the potential, you know, loss in revenues of any or

25   market harm from offering the service for free.  And

1    I thought I heard you say that that would not be

2    information they would get from another request.

3              MS. WISE:  I --

4              THE COURT:  But it also doesn't seem like

5    this would be voluminous or burdensome.

6              MS. WISE:  I'm trying to think if it

7    would be in other requests.  I honestly don't -- I

8    hadn't considered that.  I think one of the

9    struggles that I'm having here is that there was a

10   long meet and confer process, and the motion that's

11   before Your Honor is on the request as written.

12   They have not, prior to now, offered to narrow.  And

13   so I could have investigated, you know, potential

14   narrowings before now.

15             I think the appropriate response would be

16   to deny the motion.  That -- the requests, as

17   written, are extremely overly broad, as Counsel has

18   showed by jumping to narrow it immediately.  As

19   written, they're just not relevant and are already

20   demonstrated by the access that ICC makes available.

21   I'm not sure what a board document from 2012 is

22   going to tell them about ICC's current marketplace

23   and the harm that UpCodes' substantially different

24   use is going to show.

25             THE COURT:  Okay.  Look, I hear the -- it

1   sounds like the motion potentially could have been

2   avoided, but we're here now.  I agree that, as

3   written, Requests 2 and 3 are too broad, but it

4   sounds like there's potentially a far narrower

5   request that can be considered.

6           And I -- you know, unless you want to

7   point me to specifically where this was already

8   considered before either Judge Freeman or Judge

9   Marrero, I'm happy to look at that, but it sounded

10  like maybe the request made then was also different

11  than the more narrow request we're talking about

12  now.

13          I sort of -- I do actually see his

14  argument on relevance for this far narrow request

15  when he's -- when we're looking at the decision to

16  have even offered this for free in the initial

17  instance, about whether it would have affected, you

18  know, their potential revenue sources.  But it does

19  sound like there's potentially some resolution here

20  that, at least, could be considered before -- you

21  know, before a final ruling on 2 and 3.

22          But -- so just to take a step back, as

23  written, I agree with you, 2 and 3 are too broad,

24  but Counsel has offered something far narrower, and

25  since that wasn't considered by the parties, I'd

1    like the parties to just, at least, go and figure

2    out whether this is -- whether, in fact, these

3    documents exist and whether they would be voluminous

4    or burdensome to search for.  Because it does sound

5    like he's looking -- he's no longer looking for

6    internal communications.

7          MS. WISE:  So, if possible, I think one

8    solution would be for UpCodes to serve a narrowed

9    request so that we can look at it and then start to

10   evaluate the request on its face.  Because I think

11   what's happened in the discussion process is I don't

12   have a, you know, actual request to look from.  I

13   can go with my understanding of how it's narrowed,

14   but then the parties are just going to have a

15   dispute about, you know, what exactly did we agree

16   to.  If UpCodes is willing to serve a narrowed

17   request, we'd be happy to look at it.

18          THE COURT:  Okay.  Sure.  Go ahead.

19          MR. MARCISZEWSKI:  Sorry, Your Honor.  I

20   just wanted to point out that during the meet and

21   confer process, although there was not any

22   formalized offers of narrowing, we -- UpCodes showed

23   the willingness -- I mean, particularly on 8 from my

24   notes, that, hey, we can have certain custodians, we

25   can limit this in time.  There was -- you know,

 1    offered up, but ICC really stood on the grounds that

 2    none of these are relevant whatsoever.

 3            And I think, even from Counsel's point

 4    that some of these documents seem to also -- being

 5    produced maybe in other requests, shows that there's

 6    at least -- you know, maybe they're a bit too far

 7    broad, but they are, at least, relevant.  And I

 8    think just having that to go back -- instead of

 9    coming up with new requests that we're going to try

10    and start this process all over, to have a

11    meaningful meet and confer about how this can be

12    narrowed in a way that alleviates burden would it be

13    helpful with the knowledge that, hey, these

14    documents are relevant now.  And it, kind of, would

15    push us through that impasse on the relevance

16    argument.

17            MS. WISE:  Is it -- my understanding

18    that -- I don't think -- Judge, did you say that you

19    thought Request 8 was relevant?  Because I don't

20    think limiting --

21            THE COURT:  No.  I wasn't speaking about

22    Request 8.  I was speaking specifically about 2 and

23    3.

24            MR. MARCISZEWSKI:  Yes.

25            THE COURT:  Right.

```
 1              MR. MARCISZEWSKI:  And I apologize.  I
 2    did not mean to queue it that way.
 3              THE COURT:  Sorry.  Sorry.  I just -- I'm
 4    just really talking about 2 and 3.  I get that this
 5    process seems to have been -- it's moving a little
 6    bit backwards, given that there wasn't, you know, a
 7    formal narrowed request served.
 8              I think what I was specifically talking
 9    about was this idea that there would be something
10    other than internal communication.  So formal
11    presentation is, I think, what Mr. Marciszewski had
12    indicated.  And at least once we get out of the
13    bucket of internal communications, there had been no
14    indication from Ms. Wise that these -- that there
15    would -- that this request would be unduly
16    burdensome when we're just looking at any analysis
17    that was done with regards to the -- with regards to
18    the impact of revenues from a free offering of the
19    codes, so...
20              MS. WISE:  I just don't know the answer
21    to that.  I do want to reserve the right to say that
22    it might be.  I just haven't -- we're so far down
23    the path of a different request than what this
24    motion to compel was initially about that I just
25    don't know.
```

```
 1              THE COURT:  Yeah, no, and I hear that,
 2     and so that's why I had suggested, you know, if the
 3     parties can go back and, sort of, figure out if this
 4     request can be narrowed in the way that's been
 5     indicated on the phone call and whether that would
 6     pose, you know, a voluminous -- would produce a
 7     voluminous amount of documents.
 8              If what you want is a -- you know, an
 9     updated formal request, I don't think that should be
10     something that's too hard to put together, since
11     it's -- it is, like -- we've, now, very much
12     substantively limited the request.
13              MR. MARCISZEWSKI:  That works for
14     UpCodes, Your Honor.
15              THE COURT:  Okay.  And then with regards
16     to 8, as I had indicated, you know, I still don't
17     see why this information is necessary, given that
18     they're willing to stipulate to it, and you would
19     otherwise have to use a survey to show, you know,
20     customer preferences or functionality or use and the
21     difficulties arising from the fact that you can't
22     copy and paste and the like.
23              But if you want to point me to a case or
24     something else that would -- that could potentially
25     change my mind, I'm happy to look at it, but as it
```

1    stands on number 8, I'm not -- I think, as written

2    in the motion, I'm going to deny -- I'm going to

3    deny the motion to compel on that one.

4            MR. MARCISZEWSKI:  Thank you, Your Honor.

5            THE COURT:  I think the next category is

6    15 and 17.

7            MR. MARCISZEWSKI:  Yes, Your Honor.  I

8    think it might also be easier just to take 17 by

9    itself because I believe ICC has written in their

10   response that they're willing to search for, I

11   believe, documents sufficient to show whether ICC

12   intended or encouraged jurisdictions to adopt codes

13   into law.

14           And I think this really stems from --

15   many courts consider, and I believe this Court in

16   its previous order has considered whether a

17   privately authored work becomes the law on

18   government adoption.  One of the factors that can be

19   considered is whether ICC intends or encouraged that

20   work to be adopted into law.

21           Our only position is -- we're okay --

22   that was -- the point of our original RFP was we

23   read it as whether ICC intended or encouraged

24   jurisdictions to adopt codes into law.  We would

25   just still push that we want the -- you know, all

1    documents, communications, related to that rather

2    than sufficient to show because it's, kind of, an

3    open question of whether ICC does that or not.  And

4    I feel like ICC might have a different position than

5    us.  So we would just then say we want all document

6    comms regarding whether ICC intended or encouraged

7    jurisdictions to adopt codes into law.

8              MS. WISE:  I'm sorry.  I'm at a little

9    bit of a loss.  I understood Request 7 to seek --

10   I'm sorry -- 17 to ask for "documents and

11   communications related to lobbying efforts,

12   including communications with lobbyists regarding

13   your adoption."

14             And in UpCodes' brief, they said that

15   that was because they wanted -- they believed that

16   those documents show whether ICC intended or

17   encouraged the work's adoption into law.  And in

18   response to that, we are willing to provide

19   documents sufficient to show whether ICC intended or

20   encouraged the work's adoption into law.

21             Those documents were provided in

22   *Copyright 1*.  In terms of Judge Marrero's decision,

23   he found there was no -- it's undisputed that ICC

24   encourages adoption of its codes, pointing to some

25   sample ordinances that ICC had produced.  We are

```
1    willing to produce similar documents for the
2    additional codes in this case.  And I don't think
3    the documents beyond that are necessary.  Certainly
4    not all documents and communications relating to
5    lobbying efforts, which is how the request, as
6    stated in the motion to compel was written.
7              THE COURT:  Ms. Wise, can I -- exactly
8    what are you willing -- what -- how would you be
9    willing to limit the request and produce documents?
10             MS. WISE:  We'd be willing to limit the
11   request to documents sufficient to show ICC's intent
12   or encouragement of the work's adoption into law.
13             THE COURT:  Would that not include,
14   potentially, lobbying efforts and communications
15   with lobbyists?
16             MS. WISE:  You know, I think "lobbying"
17   is, kind of, a vague term as to what it means, but
18   as it's written in the request, the lobbying efforts
19   are entirely unrelated to adoption.  So --
20             THE COURT:  But now if you're limiting it
21   to adoption, would it include, in your view,
22   lobbying efforts to try to get a code adopted into
23   law?
24             MS. WISE:  I don't -- I don't think so.
25   I think what we have, just for your context --
```

1            THE COURT:  So how would the lobbying

2     efforts not be something like -- why wouldn't that

3     come with an encouraged?

4            MS. WISE:  Because what we had asked was

5     sufficient to show.  So I don't think that what we

6     had in mind was sufficient to show was that we would

7     go through the vast number of people who deal with

8     jurisdictions on a daily basis and determine on a

9     document-by-document, e-mail-by-e-mail basis,

10    whether a particular document was encouraging

11    adoption.

12            What we do have are, at the start of each

13    code book, there is sample ordinances, sample

14    legislation, that is, you know, provided with ICC's

15    code book that says, this is how you can adopt our

16    code into law.

17            I don't know that they're going to get a

18    clearer example of ICC intent or encouragement of

19    adoption of its code book than a sample ordinance.

20    So does it need individual communications with 50

21    jurisdictions, with just states, and with every

22    locality that ICC, true to its word with the sample

23    ordinances is intending that they be adopted?

24            THE COURT:  And so for every code that

25    you have, you have this sample ordinance or

1   legislation that for each one provides how the

2   process could be done to adopt it into law?

3          MS. WISE:  I believe so, yeah.

4          THE COURT:  And just going back to

5   defense counsel, why is that not sufficient?

6          MR. MARCISZEWSKI:  I believe that might

7   be sufficient.  The issue that I had originally is

8   that it was just confusing to say "sufficient to

9   show" whether ICC does something or not.  It just

10  leaves open the question of if ICC is going to give

11  documents to show that it's not lobbying or

12  intenting, or if it was.

13         That was, kind of, the concern I had,

14  that it was confusing, the limitation, as it was

15  written.  That if -- really, if it comes to

16  documents, there -- I think we're willing to be okay

17  with that "sufficient to show" if it's truly --

18  these are documents that show they are encouraging

19  and they want to adopt into law, that's fine.  Or

20  even if ICC is willing to stipulate, saying, we

21  encourage every single one of our codes to be

22  adopted into law, that's really what we're trying to

23  get at.  And that's fine, too, that -- if ICC has

24  that type of position.

25         And last, I just want to point out,

1    Your Honor, I might be moving backward, but the

2    original RFP was talking about -- regarding adoption

3    of your codes.  So that's really that -- that point

4    of it because they're willing to stipulate to it.  I

5    don't think we really care about the internal

6    communications or the communications with

7    jurisdictions if that's just going to be duplicative

8    and not necessary.

9              THE COURT:  Let me just -- let me just

10   ask.

11             Even absent a stipulation, though, if

12   she's saying that they have these, basically a

13   how-to adopt this -- how -- a step-by-step guide or

14   some sample document that explains how it should

15   be -- how it can be adopted into law, that seems to

16   me to be sufficient to show that they're encouraging

17   that the code be adopted into law, even if

18   they're -- even if she's not going to agree to a

19   stipulation on this.

20             MR. MARCISZEWSKI:  Well, I mean,

21   that's -- that would be fine.  I think our concern

22   is if that's all we have and then we make the

23   argument later, and they come back and say, well,

24   just because we print that at the beginning, that

25   doesn't mean we're actually encouraging certain

1    jurisdictions to adopt it, and trying to gain --
2    trying to, you know, weave that path through, that
3    would be the issue.
4            But if -- what it sounds like -- at
5    least, from opposing counsel's representations --
6    that that's not likely to happen.  I think we're
7    okay with just the sample ordinances if it's not
8    going to come back later, that ICC's going to try to
9    make a distinction when we use that and say, look,
10   they're encouraging, intending all of their works to
11   be adopted into law.
12           THE COURT:  Ms. Wise, I just want to, I
13   guess, understand.  That -- is -- that doesn't sound
14   like an argument you'd be making later, but I guess
15   now would be the time to clear that up if that is
16   potentially something that would become an issue
17   later.
18           MS. WISE:  I -- so I don't think that
19   we're willing to stipulate, particularly without
20   conferring with our client.  And I don't -- I think
21   the words "adopted into law" have a really specific
22   meaning in this case.  I don't think we're trying to
23   hide the ball.  I don't think that we're trying to
24   be unclear about what we're offering to give to
25   them.

1           What we're more than happy to produce is

2    what Judge Marrero relied on in the first copyright

3    case, which are the sample ordinances that he

4    show -- said, I think, along with some additional

5    deposition testimony, was that it's undisputed that

6    ICC encourages adoption of its codes.  So I think

7    what we're giving -- or what we're willing to give

8    UpCodes has already been shown to be enough on this

9    point.  But I don't think I can go as far as a

10   stipulation; certainly not without conferring with

11   my client.

12           MR. MARCISZEWSKI:  Your Honor, I

13   completely understand about not wanting to stipulate

14   right now in this hearing.  I understand Counsel's

15   position there.

16           But I'll just say what was just said,

17   kind of, then starts begging the question of, are

18   those, you know, sample ordinances a beginning?  Is

19   that just saying, hey, jurisdictions -- the

20   argument -- jurisdictions, you can create laws like

21   this, or this is a sample to work off of.  Or

22   whether, you know -- and this may be where

23   communications come in -- someone tells a

24   jurisdiction, hey, you can adopt our codes as-is

25   into law, you know, and they can incorporate a

1    reference, or you adopt it by reference into law.

2    That would then become where communications may be

3    more relevant.

4            If we're starting to make that

5    distinction of what does "adopt into law" mean,

6    that, then, becomes a more trickier area if we're

7    just relying on the sample ordinance and have

8    nothing more versus if this is going to be a thinly

9    lined argument about what a document law means,

10   UpCodes would then want to see some of those

11   communications and see if that language is used by

12   ICC when communicating to jurisdictions.

13           THE COURT:  Well -- so I guess I just --

14   I'm -- you know, I just want to be clear on this.  I

15   had understood, I guess, Ms. Wise to be saying,

16   look, we have these sample ordinance, sample

17   legislation, it's provided for all our codes, and

18   previously Judge Marrero found that is -- you know,

19   it's undisputed that this is what encouraged the

20   jurisdictions that ICC -- this showed that ICC

21   encourages jurisdictions to adopt into law.

22           I think -- it sounds to me like what

23   they're willing to provide you should be sufficient,

24   absent some later argument that now quibbles over

25   what "adoption" means.  And so that's why I was

1      trying to ask, you know, not necessarily to a

2      stipulation, but if there's going to be an issue --

3      because maybe this didn't come up before

4      Judge Marrero before, but if there was going to be

5      an issue as to what "adoption" means, then I

6      thought, you know, potentially our compromise here

7      wouldn't necessarily make sense.  But it's -- I'm

8      not sure...

9              MS. WISE:  I think the sticking point --

10     and I'm sorry.  I may have just interrupted you.

11             THE COURT:  No.  Go ahead.

12             MS. WISE:  I think the sticking point is

13     not whether ICC encourages adoption.  It's the "into

14     law," right?  The parties have a big dispute about

15     whether ICC maintains its copyright when

16     jurisdictions incorporate their model codes and

17     standards by reference, whether that then becomes

18     the law.  And, you know, in our conversations with

19     UpCodes on their request, they've said, you know, we

20     might not respond in the exact words that you use in

21     your request because we don't want to have an

22     inherent admission about the larger issues in this

23     case.  And that's all we're saying.

24             We're willing to give the documents that

25     they want on this encouragement issue.  I think that

1   it's been shown that those documents are going to

2   be, you know, the ones that UpCodes intend to rely

3   on.  So I'm not really clear on why they're pushing

4   for this now when they've relied on them in the

5   past.  But I don't think we're trying to be cute

6   about it.  We just are not going to admit something

7   that has a bigger implication for the case.

8              THE COURT:  Okay.  Okay.  So then I think

9   as to 17, I get your position, Ms. Wise.  I think we

10  should -- as we've -- as you narrowed it in your

11  letter and as we've discussed, the sample ordinance,

12  sample legislation sufficient to show whether ICC

13  intended or encouraged the work's adoption into law,

14  it sounds like the parties have agreed on, at least,

15  that narrowed request, and defense counsel is

16  willing to accept that.

17             MR. MARCISZEWSKI:  Yes, Your Honor.

18             THE COURT:  Is there an issue as to 15

19  then?

20             MR. MARCISZEWSKI:  Yes.  It -- 15 is --

21  and I can -- it also probably relates a little

22  bit -- the arguments I'm going to make for 18 are

23  going to be pretty much the same.

24             The issues there are basically whether

25  testing if ICC's positions -- in this case, if

1    they're making litigation -- and what their past

2    positions are.  So there's really two issues.  It's

3    about willful infringement of UpCodes and also, if

4    nothing else, for impeachment purposes.  Really ICC

5    is making broad assertions of what the copyright is.

6    And to the extent that this position is contrary to

7    what positions ICC has taken before about the extent

8    of its copyrights, UpCodes is entitled to that.

9            And as well as for willful infringement,

10   ICC's belief to the extent of its copyright is

11   relevant to whether UpCodes' belief was reasonable,

12   whether it was, you know, willful infringement or

13   not.  For example, if there's documents out there

14   that ICC believe that, when codes are adopted,

15   they're the law and they can't be copyrighted, or

16   even if there's documents saying that, hey, it's

17   kind of unclear what this is, then that's relevant

18   to whether UpCodes' belief at the time, that this is

19   not copyrighted material, this is the law, and

20   how -- whether, objectively, that was reasonable or

21   not.  ICC's same belief as the copyright owner, who

22   should probably know even better, is then,

23   therefore, relevant to whether UpCodes' belief was

24   reasonable as to willful infringement.

25            THE COURT:  Ms. Wise?

1          MS. WISE:  I -- so first, I don't think
2     ICC's -- well, ICC's belief is that it owns the
3     copyright in all of these codes.  It would not have
4     brought a lawsuit in bad faith to begin with.  To
5     say that it doesn't have copyright privately and to
6     bring more than one copyright lawsuit, I think,
7     would be ludicrous.

8          But even setting that aside, ICC's
9     subjective views on copyright protection just are
10    irrelevant.  The Supreme Court has weighed in on
11    this, and they said that if you look at the purpose
12    and character of the use, which is what UpCodes has
13    said that this goes to in the fair-use analysis, the
14    Supreme Court said that is an objective inquiry.  So
15    whether the work has copyright or not, I think the
16    people to look to are the Copyright office, who has
17    again and again, registered ICC's works.

18         All of the inquiry about whether UpCodes'
19    beliefs are objectively reasonable go to what
20    UpCodes knew.  And UpCode didn't know anything about
21    ICC's internal subjective views when it made these
22    decisions.  The case that they point to, this
23    *Scanlon* case, I think, exemplifies that, right.

24         They have a copyright owner who provided
25    certain works for certain purposes, and there was

AMM TRANSCRIPTION SERVICE - 631.334.1445

1      ambiguity as to what defendants knew or didn't know

2      about the policy of the organization where those

3      images had been shared.  So the willfulness inquiry

4      in that case was really, you know, was defendant's

5      belief about what the copyright policy of the

6      organization was reasonable under the circumstances.

7               UpCodes didn't have any belief about

8      ICC's subjective views.  So I don't see how it

9      informs anything about UpCodes' willfulness.  The

10     objective facts that UpCodes was aware of when it

11     posted these new documents is that ICC had sued them

12     once for copyright infringement.  So their

13     reasonableness or not reasonableness should be

14     viewed in light of the circumstances when they chose

15     to post the additional works, not internal ICC

16     communication.

17               MR. MARCISZEWSKI:  And, Your Honor, just

18     really two quick points.  First was brought up about

19     the fair use being an objective test.  That is true.

20     It does not mean that any subjective views are

21     completely irrelevant, it's just that the test that

22     is used is an objective standard.

23               Moving really quick to the willful

24     infringement point, our argument is not that UpCodes

25     knew what ICC was thinking and, therefore, relied on

1    ICC.  The point being is that the fact that UpCodes,

2    at the time when making decisions, was equal if not

3    less than the information that ICC had.  And I'm not

4    trying to suggest ICC is bringing these litigations

5    in bad faith, that, you know -- that when they sue,

6    they believe they have copyright and there has been

7    copyright infringement.  But if there is documents

8    at some point when there was questions about it, or

9    they didn't believe, or there was ambiguity, or they

10   go, I'm not 100 percent sure, we need to figure this

11   out.  That ambiguity, as the copyright owner, who

12   should know more than anyone, can show that there's,

13   you know, gray lines here that doesn't show that

14   UpCodes was willfully infringing.

15          MS. WISE:  So I guess what I'm --

16          THE COURT:  Can I just ask you a question

17   on willful infringement, because just I -- the -- if

18   UpCodes was aware that ICC was putting this

19   information out under the color or cover of a

20   copyright, I'm confused as to why whether ICC

21   subjectively believed that maybe potentially its

22   copyright either wasn't as strong or as it, you

23   know, might have portrayed it to be, why that would

24   go to what -- to the willfulness of UpCodes' conduct

25   because UpCodes wouldn't have been aware of anything

1    ICC was thinking behind the scenes.  It just knew

2    that ICC had put this information out there and had

3    indicated that it was copyright.

4           MR. MARCISZEWSKI:  Right.  Your Honor, it

5    goes really to almost credibility of their argument

6    of saying that there was willful infringement.

7    Because UpCodes' position is that we are not copying

8    ICC's copyrighted material.  What we are posting is

9    what is the law.  And our position is that you

10   cannot copyright what's in the law.

11          And there is -- you know, we can have --

12   I don't want to devolve this into legal arguments

13   here, but if there is internal communications at ICC

14   saying, you know, once something's adopted into law,

15   I'm not sure what copyright might have if it's

16   identical to the law that might not be copyrighted.

17   Those type of questions can show that even if the

18   copyright owners think that there might be a

19   question, that it's reasonable for UpCodes to

20   believe that, if I'm posting the law, that is not

21   copyright infringement.  And that would be then

22   relevant to the willful infringement analysis.

23          THE COURT:  And wouldn't those

24   communications that you're potentially pointing

25   to -- it sounds like those should be almost -- could

1   potentially almost all be privileged.

2              MR. MARCISZEWSKI:  Right.  And I guess we

3   are, obviously, not looking for any privileged

4   documents.  And we're willing to work, too, you

5   know, if there's -- a privilege log might be another

6   burden.  If there's too many of that, then fine.

7   And if it's -- if all of them are privileged and

8   there's no documents -- the only time they've ever

9   had this discussion is with counsel then -- and I'll

10  have the position that it's an easy response to come

11  back and say there's no documents that aren't

12  privileged to it.

13             And that's the same for -- I guess that

14  also relates to 18, about that *NFPA v. UpCodes*

15  litigation.  If all of those communications end up

16  being privileged, then it's a fairly simple response

17  of "they're all privileged," and we can work out

18  whether a privilege log is necessary or not.

19             MS. WISE:  I think that, sort of, jumps

20  the preliminary hurdle.  If the question here is

21  whether these are relevant to willfulness,

22  willfulness is asking about UpCodes' state of mind.

23  I don't think anything UpCodes didn't know about

24  sheds light on UpCodes' state of mind.  So I don't

25  feel like we've cleared the initial hurdle.

1          Whether or not we have to produce a

2     privilege log, the burden of reviewing documents,

3     mainly between counsel, as Your Honor pointed out,

4     many of these are going to be privileged.  The

5     review of that doesn't lessen because we don't

6     produce a privilege log.

7          I think, additionally, what are we going

8     to search for?  Are we going to search for

9     copyright?  I mean, copyright appears on every

10    single ICC code.  It's just a voluminous way to get

11    at something that, at the end of the day, doesn't

12    move the needle on whether UpCodes was willful or

13    not because it didn't know what ICC's internal

14    communications were, so it can't have had any

15    bearing on their state of mind.

16          MR. MARCISZEWSKI:  Your Honor, real

17    quick, again, I mean, I'm not going to try to start

18    doing narrowing or suggesting certain search terms

19    live again, as I've done before.  I'll just stick to

20    the relevance issues.

21          Again, it's not that UpCodes relied on

22    it.  It's that if ICC is making the argument that

23    the fact that UpCodes knew, obviously, we're going

24    to argue that we believed it was not copyright

25    infringement, what we did.  Obviously, ICC is going

1   to argue that it was.

2            I think it is relevant that if UpCodes

3   can say, hey, you're arguing that what we did is

4   copyright infringement and we should have known

5   about it and, therefore, you were willful -- whether

6   there is internal documents and communications that

7   ICC at times had questions about whether, you know,

8   their copyright extended to what was adopted into

9   law, that is very relevant that if ICC had mixed

10   views on that.  Then they can't just sit here and

11   argue that, obviously, UpCodes should have known and

12   that it's obviously willful infringement if they

13   themselves, knowing even more information than

14   UpCodes, came to similar conclusions that UpCodes,

15   at least at certain points of times -- or were at

16   least ambiguous to it.

17            THE COURT:  Okay.  Is the last one number

18   19?  Do we want to just touch upon that one?

19            MR. MARCISZEWSKI:  Yes, Your Honor.  I

20   can do this quickly as well.

21            Just for an overview, what the request

22   seeks is the documents that are related to proposed

23   legislation that ICC and other similar organizations

24   have proposed, that basically vindicates their

25   position in this litigation, that code is being

1   incorporated by reference into law does not affect

2   their copyrightability so long as the publisher

3   makes them available for free for public viewing.

4          So to the extent there are non-privileged

5   documents about the way that proposed bill would

6   change the current law, that's relevant to the

7   merits of ICC's position under the current law.  And

8   even if ICC believed its copyright interest were

9   unaffected by being adopted into law, but just

10  wanted the bill to clear up the uncertainty about

11  the law, I would bring that back to the points

12  they're making about willful infringement.  Because

13  if the law is uncertain, then there's no argument

14  that UpCodes' infringement can be willful.

15          THE COURT:  Ms. Wise?

16          MS. WISE:  I thought UpCodes' prior

17  position was related to the impact on market harm.

18  I think our position on this is going to be

19  remarkably similar to our position on Request 8,

20  that ICC doesn't dispute that it makes its codes

21  available for free in a read-only format.  I don't

22  think anything in the proposed Pro Codes legislation

23  impacts that.

24          Whether -- there is legislation that's

25  being considered, but is not law, would require ICC

1    to do something that it does already.  I don't see

2    how that bears on the fair-use analysis.  I don't

3    know how, again, ICC's subjective views about

4    whether something will or will not become law at

5    some point bears on UpCodes' state of mind.

6            And I don't think looking for our

7    subjective opinions on that, again, really turn the

8    dial one way or the other.  ICC makes its reading

9    room available for free.  If the Pro Codes Act were

10   to pass, ICC would make its reading room available

11   for free.  So how that bears on this copyright case

12   is not particularly clear to me.

13           MR. MARCISZEWSKI:  Your Honor, real

14   quick, because opposing counsel is right, that we

15   made the point about *Markham* that I failed to

16   mention, so I just want to point that out in a very

17   succinct way that I think it does -- it is wrong.

18   Opposing counsel is right, but if the Pro Codes Act

19   passes, they won't have to change what they do

20   because it only talks about read-only access to

21   being available.

22           But in the process of lobbying for and

23   trying to get this bill passed, if there are

24   communications about why it should be only read only

25   and copy and paste shouldn't be allowed, or

1    downloading shouldn't be allowed, or if there's
2    communication saying, you know what, if the
3    Pro Codes Act passes, we're willing to -- if they
4    say you have to be able to print it, too, or
5    download it, that's fine with us, as long as there's
6    not copy/paste, or whatever, you know, different
7    iterations.
8              I could play the hypothetical game
9    forever about what these communications could or
10   couldn't say without looking at them.  But I think
11   the discussion with these features, in trying to
12   pass a bill, if they really are strictly -- only
13   wanted read-only or nothing, or if there's a
14   willingness to have other features without fear that
15   it might -- if we have to do this and it might
16   affect our other revenues in order to ensure
17   copyrightability, I think that is relevant then to
18   market harm because then it shows that -- again, the
19   arguments about the copy, paste, printing, downloads
20   might be -- distinguishes without a difference that
21   these -- UpCodes -- I mean, ICC would not intend it
22   to actually affect its revenues if it's not, you
23   know, always been gung ho about this or nothing.  If
24   it's willing to have those at some point in the
25   bill, but it never came to be, I think that would be

1    then relevant from our end.

2                   MS. WISE:  I --

3                   THE COURT:  But it sounds like -- I mean,

4    I -- it sounds like even now what you're really

5    keeping it for is just a very narrow subset of what

6    the request is asking for.  And I'm just wondering

7    now that we've talked about market harm in the

8    context of the potential revision to Requests -- I

9    think it was 2 and 3 -- if that wouldn't encompass

10   this idea that if you had to now change the

11   functionality, it would -- you know, whether they

12   did any analysis for a potential impact on the

13   revenue.

14                   MR. MARCISZEWSKI:  Right.  And,

15   Your Honor, I think that is correct, and it's one of

16   the reasons why when I first started talking about

17   this, I didn't bring up the market harm, because I

18   believe market harm -- some of these other requests

19   might address it a little bit better than this one.

20                   This one, again, is -- I would just

21   reemphasize some of those willful infringement and

22   as well as what ICC's position about its

23   copyrightability of its codes -- or its copyright

24   interest extend.

25                   MS. WISE:  And I think our position on

1    willfulness and copyrightability are the same as
2    they were before.  Copyrightability is objective and
3    UpCodes' state of mind with respect to willfulness
4    is not something that ICC's internal communications
5    or even communications with others are -- is going
6    to shed any light on.
7              THE COURT:  Okay.  At least as to Request
8    Number 19, I'm going to -- I think on that one as
9    the request is written and for all the reasons
10   Ms. Wise has indicated, I'm really struggling to see
11   why this is relevant.
12             I think the only other one that I owe you
13   an answer on was 15; is that correct?  Did I miss
14   any?
15             MS. WISE:  I think that's right.
16             MR. MARCISZEWSKI:  And I guess 15 and 18
17   are -- we kind of discussed them together.  So if
18   you want to flesh out the exact language of 18, we
19   can.
20             The only point I want to make with --
21   I'll just point out 18, the legal arguments I'm all
22   going to make are the same.  But just to point out
23   that that RFP that we served, ICC served pretty much
24   an identical RFP on us recently.  And just to point
25   out that UpCodes is willing to basically do the same

1    sort of production in a reciprocal manner, that

2    whatever Your Honor believes is right for RFP 18,

3    that's how we'll respond and produce the documents

4    of the identical one served onto us by ICC.

5              THE COURT:  Ms. Wise, did you guys serve

6    the same request as 18?

7              MS. WISE:  We did, but for a very

8    different reason.  So, as we said in our letter, ICC

9    is not a party to the *NFPA v. UpCodes* case, but

10   UpCodes is.  If UpCodes made a statement against

11   their interest in documents connected to the NFPA

12   case, then that is relevant.  If ICC had

13   communications regarding the NFPA case, it isn't.

14             THE COURT:  I see.  Okay.

15             And of -- and it, of course, has you --

16   okay.

17             So Mr. Marciszewski, I'm really -- I do

18   apologize.

19             MR. MARCISZEWSKI:  That's all right.

20             THE COURT:  Can you just say it one more

21   time just --

22             MR. MARCISZEWSKI:  Oh --

23             THE COURT:  -- maybe by the end of the

24   conference, I can get it right.

25             MR. MARCISZEWSKI:  Oh, Marciszewski.

```
 1                THE COURT:  Okay.  Why -- can you just --
 2     why, again, do you need the documents you seek in
 3     RFP 18?
 4                MR. MARCISZEWSKI:  Oh, I think it's for
 5     similar reasons that opposing counsel has talked --
 6     while ICC is not a party to the litigation, it is
 7     definitely very, very similar issues; namely, the
 8     question of whether the codes, when adopted, are the
 9     law or they're still subject to copyright.  And the
10     same way that opposing counsel says if we've made a
11     statement inconsistent, they would want that.  We'd
12     argue that if someone, you know, asks ICC about the
13     position, and if they make a claim, something that's
14     inconsistent, we'd want that as well.
15                And I just want to point, in our meet and
16     confers, I believe one of the biggest issues with 18
17     was about the privilege, you know, that there's a
18     lot of these documents that meet privilege.  And I
19     would just argue that, for UpCodes, the burden is
20     even higher.  Given that we are a party in the
21     litigation, there are a lot more privilege documents
22     that we would have and a lot more documents than
23     ICC.
24                So the burden is greater for us.  We're
25     seeking similar things, even if it's UpCodes as a
```

1     party versus it's the exact same issue, and does ICC

2     take different positions when in litigation or, you

3     know, their views on parallel litigation.  And we

4     are willing to make those productions and comply

5     with these RFPs in a reciprocal manner, as I said.

6            THE COURT:  But why is their view about a

7     litigation they're not even involved in relevant?

8            MR. MARCISZEWSKI:  It is because due to

9     the legal issues.  The legal issues are very

10    parallel.  And the one specifically that we're

11    looking at is whether they've had the position

12    that -- whether the codes, when adopted, are the

13    law.

14           If they have made inconsistent statements

15    regarding, say that NFPA, when they got their

16    preliminary injunction denied, if there was

17    questions like, well, maybe we don't have the

18    copyright in the law.  Or how can even expand it out

19    to just inconsistent positions, but maybe market

20    harm if there is -- that when the PI is denied,

21    there's internal communication saying, yeah, this is

22    going to really affect our market now, if we don't

23    have copyright interest in it, or the reverse side,

24    that they're not really worried about it, that can

25    be relevant.

1          It's really about not so much that it was
2     a party to this litigation, what it was doing, but
3     that there are communications about this litigation
4     that are very parallel issues.  That is what we're
5     searching for, to the extent that it's not
6     privileged.
7          MS. WISE:  I will just address the
8     privilege concern.  I find it hard to think of a
9     document in this context that would not be
10    privileged.  And, again, the parties' stipulation
11    that we don't have to produce a privilege log for
12    communications between outside counsel and the
13    parties is certainly something that they've agreed
14    to, to reduce the burden on themselves.  But it
15    doesn't mean that we should review all sorts of
16    documents that are going to be primarily, if not
17    exclusively, privileged.
18         UpCodes, in its motion, offered no
19    explanation for why it wanted these NFPA documents.
20    And the arguments that it has raised now are about
21    UpCodes' state of mind and copyrightability, neither
22    of which ICC's subjective beliefs shed any light on.
23    So I don't think that these are relevant.
24         If NFPA lost a preliminary injunction
25    based on its copyrighted works, that doesn't tell

1    you anything about the copyrightability of ICC's

2    works.  It just doesn't.  So I don't agree that that

3    information, even if that conversation was

4    happening, is relevant.

5             THE COURT:  Okay.  I think on 18, that

6    one might be the -- again, on this one, I think,

7    given the potential that all of these -- if not all,

8    a large number of these communications would be

9    privileged.  The burden of having to go through

10   them, review them, even without having to log them,

11   still seems disproportional to the (inaudible).  And

12   I -- even then, I'm still not clear as to why they

13   would be relevant to UpCodes' state of mind or to

14   any potential issue here.

15            So as to 18, I'm going to deny the

16   request.  I think the only one I owe you an answer

17   on is 15.  I just want to take a look at -- I have

18   the request in front of me, but I just want to take

19   a look at the 2020 decision, I guess, and what the

20   parties have been calling "Copyright 1."  And I will

21   just memo endorse the last letter, giving you a

22   decision on 15.

23            MS. WISE:  Okay.  Thank you, Your Honor.

24            THE COURT:  Is there anything --

25            MR. MARCISZEWSKI:  Thank you, Your Honor.

AMM TRANSCRIPTION SERVICE - 631.334.1445

1                    THE COURT:  Okay.  If there's nothing
2    else, then I'll issue that relatively shortly.
3    Thank you, everyone.
4
5                              0o0
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                    C E R T I F I C A T E

2

3        I, Adrienne M. Mignano, certify that the

4   foregoing transcript of proceedings in the case of

5   International Code Council, Inc. v. UpCodes, Inc.;

6   Docket #17CV6261 was prepared using digital

7   transcription software and is a true and accurate

8   record of the proceedings.

9

10

11   Signature  *Adrienne M. Mignano*
                 _____

12               ADRIENNE M. MIGNANO, RPR

13

14   Date:      August 11, 2023

15

16

17

18

19

20

21

22

23

24

25

AMM TRANSCRIPTION SERVICE - 631.334.1445