```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK

In re:                              :
                                             Docket #17cv6261
 INTERNATIONAL CODE COUNCIL, INC.,  :
 et al.,
                                    :

                    Plaintiffs,
                                    :

   - against -
                                    :

 UPCODES, INC., et al.,                   New York, New York
                                    : January 29, 2024
                    Defendants.
------------------------------------ :


                    PROCEEDINGS BEFORE
               THE HONORABLE VALERIE FIGUEREDO,
                UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For Plaintiffs:          DLA PIPER LLP
                         BY:  J. KEVIN FEE, ESQ.
                              JANE WISE, ESQ.
                              GABRIELLE VELKES, ESQ.
                         500 Eighth Street, N.W.
                         Washington, D.C.  20004


For Defendants:          MORRISON & FOERSTER LLP
                         BY:  HANNAH JIAM, ESQ.
                         425 Market Street
                         San Francisco, California 94105
```

Transcription Service:  Carole Ludwig, *Transcription Services*
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Email:  Transcription420@aol.com

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

<u>**INDEX**</u>

**E X A M I N A T I O N S**

| <u>**Witness**</u> | <u>**Direct**</u> | <u>**Cross**</u> | <u>**Re-Direct**</u> | <u>**Re-Cross**</u> |
|---|---|---|---|---|
| None | | | | |

**E X H I B I T S**

| <u>**Exhibit Number**</u> | <u>**Description**</u> | <u>**ID**</u> | <u>**In**</u> | <u>**Voir Dire**</u> |
|---|---|---|---|---|
| None | | | | |

```
 1                          PROCEEDINGS                  3
 2             THE CLERK:  -- International Code Council Group,
 3  et al. v. Upcodes, Inc., et al., case number 17cv6261.
 4  The Honorable Valerie Figueredo presiding.  Counsel, can
 5  you please make your appearances for the record starting
 6  with plaintiffs' counsel.
 7             MR. KEVIN FEE:  Good morning, Your Honor, it's
 8  Kevin Fee on behalf of International Code Council.  I'm
 9  joined by Jane Wise and Gabi Velkes.
10             THE CLERK:  Defense.
11             MS. HANNAH JIAM:  Good morning, Your Honor,
12  Hannah Jiam on behalf of defendants Upcodes, Garrett
13  Reynolds, and Scott Reynolds, and I'm from Morrison &
14  Foerster.
15             THE COURT:  Good morning, everyone, this is
16  Judge Figueredo.  I apologize for being late.  I don't
17  have a good excuse other than I completely miscalculated
18  the amount of time it would take me to get in.  But I do
19  appreciate your patience.
20             I have your letters regarding the current
21  discovery dispute.  So I have at ECF 191 the letter from
22  December 5 from ICC, and then I have, excuse me, at ECF
23  196 from January 4 the letter from Upcodes.  I'm happy to
24  hear from anyone, but I did have a couple of questions,
25  so I thought it might make more sense just for purposes
```

```
 1                            PROCEEDINGS                    4
 2   of me understanding exactly what the information that is
 3   being sought is, just to ask what might be basic
 4   questions, but it just wasn't clear to me.  And, you
 5   know, I think this question goes to Upcodes, but I'm
 6   happy to hear from anyone.
 7          And so I've had prior cases where websites have
 8   been at issue, and in some instances the prior versions,
 9   the old versions are cached somewhere or stored
10   somewhere, saved somewhere.  And I just want to confirm
11   that that's not the case here.
12          MS. JIAM:  That's right, Your Honor, that's not
13   the case here.  We've explained to ICC that these aren't
14   cached and that we would actually have to reconform the
15   website.
16          THE COURT:  And then so are you talking – when
17   you say you'd have to recreate the website, are you
18   basically saying you have to recreate the portion of the
19   website that has the various code provisions or is there
20   more to recreate than that?
21          MS. JIAM:  Well, ICC has asked for every, like
22   the entire website, not just the portions with the
23   relevant code sections that they care about, and notably
24   they haven't actually identified portions that they care
25   about.  And so that's correct, we would – any of our page
```

1

2  in terms of actually like providing a screenshot of that,

3  we would have to recreate it because we just don't have

4  the same like software libraries or even tools that we

5  previously had, and that's all outlined in Mr. Reynolds'

6  declaration that we submitted.

7        We have offered to provide textual history, a

8  history text snapshot which is a different thing.  It's

9  just actually trying to reconstruct the history of the

10  text (indiscernible) specific code section, and the

11  reason why that is it's because we have millions of

12  section of code on Upcodes website, and so it would be

13  just much less burdensome if ICC identifies, you know,

14  those particular code sections that they believe have

15  been displayed inaccurately, and at that point we can

16  provide that snapshot to them.

17        THE COURT:  So just so I understand that last

18  portion, you would be able to, if they were identified,

19  if they were able to identify certain code provisions

20  that they were interested in over the relevant time

21  period, you'd be able to recreate any historical changes

22  to those code provisions that were posted online, and

23  you'd be able to give them those?

24        MS. JIAM:  Right, that's correct.  It's

25  different from actually like recreating a website because

```
 1                         PROCEEDINGS                    6
 2   they're not like screenshots, but we can provide the
 3   historic, like the history of that text and how that's
 4   changed, if they identify those specific code section and
 5   the time periods that they're interested in, that's
 6   correct.
 7            THE COURT:  Okay, I guess I'd like to ask ICC
 8   this question because I'm curious as to why you need the
 9   full snapshot of the website and not just the, like the
10   historical (indiscernible) just to the code provisions.
11            MR. FEE:  Sure, Your Honor, this is Kevin Fee.
12   Two points on that, I mean, first, Your Honor, I think if
13   it's all right I'd like to address your first question to
14   defendants.  You asked if they had a cached version of
15   the website.  You know, they had an obligation to
16   preserve any relevant information related to this case,
17   and they, therefore, should have cached versions of this
18   website.  If they elected for whatever reason not to
19   preserve those websites in the cache, that really should
20   be their burden to bear, not ICC's.
21            Second, getting to your point about just getting
22   the revisions to certain provisions of the code, what
23   they've offered to do is not offered to provide all
24   changes that were made to each of the codes that contain
25   ICC's copyright materials.  If you looked at their
```

```
 1                          PROCEEDINGS                        7
 2  letter, they say that they'll provide select versions of
 3  excerpts that were changes to the codes, and that's
 4  insufficient for many reasons, one of which is it won't
 5  allow us to determine all of the mistakes that they made
 6  in posting the codes.  And that's particularly
 7  problematic in this case because Upcodes has argued
 8  already in connection with their motion to dismiss that
 9  the mistakes that they made were immaterial because
10  they're such a small portion of the total codes that are
11  posted.
12          So if they only hand us over bits and pieces of
13  small parts of the codes, then they're going to continue
14  to make arguments that we've only identified 42 mistakes
15  out of the hundreds of thousands of codes that they have
16  online.  So unless they're going to waive any materiality
17  defenses like that and agree never to make an argument
18  like that, giving us anything less than the full, you
19  know, set of ICC codes that they posted online is going
20  to be inadequate and is also going to be unfair to
21  Upcodes or, I'm sorry, to ICC because they're not going
22  to be able to rebut this argument that the mistakes that
23  Upcodes has made were immaterial because they're so small
24  in comparison to the full code set.
25          THE COURT:  Can I just backtrack a minute
```

```
 1                        PROCEEDINGS                    8
 2  because you had started with this obligation to preserve
 3  argument.
 4          MR. FEE:  Yes.
 5          THE COURT:  Was there I guess a litigation hold
 6  or something sent at the beginning of the litigation that
 7  would've outlined specifically what ICC thought should be
 8  preserved?
 9          MR. FEE:  Well, I think for what's relevant
10  here, Your Honor, we filed these document requests in
11  connection with the second and third case.  As you're
12  probably aware, there's three pending cases here.  By the
13  time we had served these document requests that are the
14  subject of this motion, Judge Marrero already
15  specifically said in his order that he thought it was imp
16  for the parties to have a static version of the website
17  to be working off of.  And, of course, are claims are all
18  about false adverting related to the accuracy of the I
19  codes and the state and local codes that are based on the
20  I codes.  So it should've been abundantly clear to
21  Upcodes before we even filed, they were served these
22  document requests that a static version of the website
23  should've been available.
24          MS. JIAM:  Your Honor, just to make one comment
25  on his Judge Marrero statement.  Judge Marrero's
```

```
 1                        PROCEEDINGS                    9
 2   statement is based on his motion for summary judgment
 3   order with respect to the copyright case where he stated
 4   that Upcodes needed to provide a, meaning one static
 5   version of current Upcodes, and not only in the context
 6   of what could infringe copyright, not in the context of
 7   whether, in ICC's words, Upcodes content is accurate as
 8   advertised.  And notably we have fulfilled our discovery
 9   obligations and our need for the litigation hold in that
10   we actually have, you know, records of the historical
11   text of what is on our site.  But to actually say that we
12   need to like reconstruct our website for all these
13   various points in time that arbitrarily (indiscernible)
14   ICC is just unreasonable.
15            THE COURT:  Can you –
16            (interposing)
17            MR. FEE:  Sorry --
18            THE COURT:  No, no, go ahead.  Go ahead.
19            MR. FEE:  I was just going to say, look, Your
20   Honor, the other thing I think is worth pointing out is
21   they had already done this once, right, they did it in
22   connection with the historical Upcodes website in
23   connection with the first copyright case.  And I think it
24   is, you know, I don't think it makes a difference whether
25   or not our discovery requests in connection with this
```

1                        PROCEEDINGS                    10

2    dispute or in the false advertising case or it could be

3    in the third copyright or the third case, the copyright

4    case.  If some reason the Court felt like that mattered,

5    we would serve document requests in the copyright case

6    that's still open for discovery asking for the same stuff

7    tomorrow.  So I mean I think that's really form over

8    function to the extent we even believed that it was

9    relevant at all.  Like the idea that the copy of the I

10   codes are on their website is irrelevant to our false

11   advertising claim is I think had to believe in any event.

12           THE COURT:  Can I just ask, it sounds like a – I

13   could have misheard, but with regard to the document

14   request for the copyright case, it sounds like there's

15   already been a production of historical snapshots of the

16   website?

17           MR. FEE:  There is one produced prior to the,

18   you know, there was a version of the website that was in

19   place prior to, just after we filed the first lawsuit.  I

20   think that was in 2016 or '18, I'm sorry, I forgot which.

21   But only one version has ever been produced.  And as

22   Judge Marrero noted in his decision on the first summary

23   judgment motion in the copyright case, that was

24   inadequate to even address the copyright infringement

25   issues in copyright case number 1, let alone address the

```
 1                        PROCEEDINGS              11
 2  copyright and false advertising issues in cases 2 and 3.
 3          THE COURT:  Okay --
 4          (interposing)
 5          MS. JIAM:  Right, and, Your Honor, that is why
 6  Upcodes has, you know, offered to try to reconstruct its
 7  website for one historical data byte that he's choosing,
 8  but notably, when we did produce that prior snapshot,
 9  that was years ago back before, you know, all these
10  changes then went to the website, and at this point it's
11  just extremely difficult to recreate the website over all
12  these (indiscernible) substantiations of time.
13          THE COURT:  Well, let me just ask then, if
14  you're able to provide the historical text, I guess why
15  would that be insufficient for ICC?  I mean this is a
16  question I guess for ICC.
17          MR. FEE:  Sure.  So, Your Honor, if they
18  provided us with the historical text for all of the codes
19  that contain any ICC copyrighted materials two times a
20  year, I think that would probably be okay if we also
21  included, you know, the advertising claims that they made
22  twice a year as well.  But that's not what they've
23  offered to do.  They've offered to provide us, like if we
24  say we want, you know, Idaho building code section 1
25  through 5 on July 1, they'll give us that section.  But
```

1                          PROCEEDINGS                    12

2  we can't just --

3          MS. JIAM:  Your Honor, that --

4          (interposing)

5          MS. JIAM:  Go ahead, Mr. Fee.

6          THE COURT:  -- just because we're on a phone

7  con, it's hard, if we just want to – I'm happy to give

8  everyone ample time.  I generally don't cut people off.

9  So we just want to wait for folks to finish, and then

10 I'll hear from everyone.  I'm not sure if counsel was

11 finished though with his answer.

12         MR. FEE:  I think I was essentially finished,

13 Your Honor.  I was just trying to say we can't just have

14 bits and pieces or, you know, excerpts of their code on

15 particular dates.  We have to have the full set of the I

16 code portions of their website and things that are based

17 on the I codes on particular days.  And I do – and maybe

18 I should also say this because I believe opposing counsel

19 suggested otherwise, we have said that they do have a few

20 very limited number of other codes on their website, like

21 some from NFPA.  We have told them that they we don't

22 need those.  We're only interested in the advertising

23 claims and the codes that are based on ICC's materials.

24         THE COURT:  And if you had to estimate, and

25 maybe this is a question that Upcodes can answer, but

1                          PROCEEDINGS                    13

2  what portion of the codes would be I code copyrighted

3  material?

4          MR. FEE:  Well, initially it was I think very

5  close to a hundred percent.  I don't know the exact

6  number now, Your Honor, but I will say it's probably the

7  vast majority still.  Again, maybe opposing counsel has a

8  better sense of that, I'd say at least 75 percent of the

9  codes that they posted are probably based on an I code.

10          THE COURT:  And let me just ask one follow-up

11 question.  If your concern is that they only provide you

12 historical text for a handful or only a portion of the

13 codes on the site and then they can make this materiality

14 argument, is there a way that perhaps this can be done so

15 that they can produce more than, you know, a small

16 portion that would effectively not allow them to make the

17 materiality argument?

18          MR. FEE:  Not that I'm really aware of, Your

19 Honor.  I mean I guess there's probably some statistical

20 method that we could use, but I'm not aware of that.

21 Look, frankly, I don't think that their suggestion was

22 they would, you know, they'll produce 45 or 50 percent of

23 the codes or something like that.  I think what they were

24 proposing was, you know, us identifying specific code

25 provisions where we think there was already a mistake and

 1
 2  that they were only going to produce those very small

 3  number of code provisions.

 4          Look, if we really believe that they didn't have

 5  an obligation to preserve this stuff and that the burden

 6  is just too, you know, is too much for them to bear, then

 7  I think they should have to live with no making any

 8  materiality argument based on the proportion of the code

 9  mistakes in their website.  If they're willing to do

10  that, then I think maybe we could have another discussion

11  about what makes sense in that circumstance, but I've not

12  heard that in the past.

13          THE COURT:  Okay.  I think – I'm happy to hear

14  from Upcodes' counsel if you wanted to respond to

15  anything that was said.

16          MS. JIAM:  Yes, Your Honor.  The reason why

17  we're offering to construct the historical text of a

18  reasonable number of specific code sections is because we

19  have millions of code sections on our website.  And so if

20  we're asked to produce the full historical text of every

21  single code section, even if we're discussing just the

22  laws that are adopting ICC code, that's an astronomical

23  number of code sections.  And since, for example, the

24  things that we change on our website are not necessarily

25  errors, we also change (indiscernible) because

1

2   jurisdictions frequently like make amendments to their

3   codes, it'd just be asking us to create an incredible

4   like volume of data and information and would be just an

5   incredible burden and expense on Upcodes.  And that's why

6   we've offered a reasonable number of specific code

7   sections and ICC has just refused to entertain this

8   option.

9        And so perhaps we could have a conversation and

10  discuss what is a reasonable number of code sections

11  that, you know, I think it is ICC's burden, this is a

12  lawsuit that they're bringing, to identify what they

13  actually think is inaccurate on Upcode's website.  It's

14  been at this point four years since they filed this false

15  advertising suit.  So we do think the obligation is on

16  them to identify what is actually they think an error on

17  the site, particularly since discovery has to be

18  proportional to the needs of the case.

19        THE COURT:  So let me just ask, because you talk

20  about their burden to identify what's false, but I guess

21  I'm going back to this obligation to preserve.  So I'm

22  not entirely sure why there wasn't an obligation to

23  preserve these old versions of the website in light of

24  the false advertising claim.

25        MS. JIAM:  Well, Your Honor, we can, as we said,

1

2    we can produce, we can reconstruct the history of the

3    text, and so we have preserved all of that information.

4    It's just – it's extremely burdensome to have to

5    reconstruct like the history of all the text from all

6    these websites and webpages that aren't even relevant to

7    the case.  It's going to require an incredible amount of

8    engineering time.

9            And so we're not saying that the history of the

10   text doesn't exist, it does exist, it's just incredibly

11   burdensome and is actually going to, if we have to, if

12   we're ordered to do this as ICC wants, we're going to

13   have to push back like months of, you know, our deadlines

14   because we don't have the engineering like staffing

15   capacity to be able to do what ICC wants.

16            THE COURT:  But I guess you keep talking about

17   reconstructing, and I'm just – and maybe this, again, I'm

18   not a technology person, but maybe there – why was there

19   no obligation in the first instance to I guess take a

20   picture, prints, whatever the case may be for caching or

21   whatever, however you store websites in the first

22   instance, so you didn't now have to be in a position that

23   you had to reconstruct it.

24            MS. JIAM:  Well, I don't think that, you know,

25   ICC's allegation that the need for website captures twice

2   a year, you know, since the first false advertising claim

3   was made is actually something that's apparent that they

4   would need.  I think that Upcodes (indiscernible) having

5   the history of the text and what's on our website is

6   perfectly sufficient and so that's what we have.  And

7   notable, if this is what ICC really wanted was having

8   like website captures, they could've easily done that for

9   themselves with their own vendor.  At this point it's

10  been four years, and now to actually like demand that

11  Upcodes take on all that cost and kind of go back and try

12  to get all this information that they could've tried to

13  attempted to get on their own because the website is

14  publicly available I think is very unreasonable.

15          THE COURT:  But I guess it still doesn't – I

16  hear your argument that they could've potentially

17  captured it, but by the same token I guess I'm trying to

18  figure out why Upcodes didn't capture it itself.

19          MS. JIAM:  So, Your Honor, I didn't catch that

20  last point.

21          THE COURT:  Let me frame it a different way.  It

22  sounds to me like you're saying you kept the historical

23  text, you kept that for the relevant period.  I don't

24  hear you disputing that there was an obligation to

25  preserve the old versions of the text for the code

1                              PROCEEDINGS                    18

2   provision.  What's your argument for not producing all of

3   the historical text for the relevant period?  Not just

4   for a handful of provisions but for all of them.

5           MS. JIAM:  Well, Your Honor, as we've explains,

6   there are millions of reductions of code on the website,

7   and since this site, I'm sorry, since this lawsuit is

8   about the actual portions of Upcodes' website that are

9   erroneous based on the false advertising claim, that it

10  doesn't make sense to have to produce millions, like

11  version histories of millions of sections of code which

12  are not even at issue in this case or may not be at issue

13  in this case there are no errors.  It only makes sense in

14  our opinion to only have to produce sections, version

15  histories of sections of code that actually have errors

16  because, I mean this is a proportionality demand, and

17  asking Upcodes to produce version histories of millions

18  of sections of code is going to be a massive endeavor.

19          THE COURT:  I guess I'm trying to also figure

20  out – I hear the argument that you should really only be

21  focused on the portions that have errors, but since you

22  said yourself there's millions of code provisions, for

23  how many years is the period that we're talking about?

24          MS. JIAM:  I think that ICC is interested in

25  code provisions since at least 2018 but Mr. Fee can

PROCEEDINGS                    19

1  correct me if I'm wrong.

2        MR. FEE:  Yeah, I think the false advertising

3  case was filed in 2020 if my memory's correct.  So I

4  think as of now for the false advertising case, it would

5  be 2020 forward.

6        THE COURT:  So 2018 you said to 2024?

7        MR. FEE:  I think it would be 2020 to 2024 for

8  the false advertising claim, Your Honor.

9        THE COURT:  Okay.

10       MR. FEE:  And we propose twice a year because we

11  didn't ask for every day, obviously, Your Honor, and

12  we're trying to be respectful of some burden argument,

13  although I will say, you know, we've got some evidence in

14  the record that it would be burdensome to recreate the

15  website.  I haven't seen any evidence that it would be

16  burdensome to produce the already preserved library of

17  codes, and I'm not really sure why that would be

18  burdensome.

19       MS. JIAM:  If what Mr. Fee is suggesting is the

20  textual history of the codes, I'm happy to go back to my

21  client and discuss that.  It sounds like we could just

22  further meet and confer on this issue.

23       THE COURT:  I was just looking at the

24  declaration for Mr. Reynolds, and I think he was focused

```
 1                          PROCEEDINGS                    20
 2   on the cost and burden of having to reproduce the website
 3   and then alternatively hiring an outside vendor.  So I
 4   don't think he goes into the burden of producing the
 5   textual history.  I think it might make sense, so it
 6   sounds like what ICC really wants is the textual history,
 7   and it seems like perhaps there could be a discussion
 8   between the parties to try to reach a middle ground.
 9          What I guess I'm happy to maybe have the parties
10   meet and confer, and you can come back to me if you don't
11   get a resolution.  But there should be perhaps like, only
12   because I've seen this in another case where perhaps the
13   parties can come up with some type of random sampling of
14   the provisions.  So maybe perhaps, depending on what the
15   burden is of producing the entire library, if that's too
16   burdensome, perhaps it could be some middle ground where
17   you randomly sample provisions over the four-year period
18   and produce a certain percentage of those.
19          I mean I think that's really just me talking off
20   the top of my head.  Obviously, the parties are more
21   familiar with the nature of this production and the
22   burden.  I'm happy to, again, table this discussion.  If
23   you want to come back to me if you can't reach a
24   resolution.
25          MR. FEE:  Okay, Your Honor, we could try to do
```

1
2   that.  I mean I will say that the random sampling, if
3   they're going to continue to make materiality arguments,
4   I think that'll be a tough way for us, it's going to be
5   hard for us to resolve it along those lines if they're
6   going to claim both that they're not giving us everything
7   and that there's (indiscernible) and basically everything
8   that we didn't give to them, that we're happy to give
9   this another shot and see if there really is any burden
10  associated with producing the libraries because as of now
11  I don't think there's any evidence (indiscernible).

12          THE COURT:  Although I just wonder, and, again,
13  this is, again, me thinking out loud, but if they were to
14  make this materiality argument and they only produced,
15  you know, 60, 70 percent of the website, I mean I would
16  imagine you could just respond that you didn't get the
17  full sampling, you know, based on the parties' like
18  agreement on this dispute.  But, again, I haven't I
19  think, we don't really have a good sense of what the
20  burden would be to produce the entire textual history for
21  the relevant period for all the provisions.  So that's
22  why I thought perhaps it might make sense to table the
23  discussion so the parties have a chance to iron out
24  exactly what the burden would be as to the textual
25  history and not the snapshots.

```
 1                         PROCEEDINGS              22

 2              MR. FEE:  Understood, Your Honor.

 3              MS. JIAM:  Your Honor, that sounds right to us.

 4              THE COURT:  Okay.  Then there's still the issue

 5   of the customer list.

 6              MR. FEE:  Yes.

 7              THE COURT:  And so here I guess I'm just

 8   curious, I would think that in order to get the list,

 9   there'd have to be some indication that they were

10   previously an ICC customer.  And so it sounded like there

11   might be a compromise where ICC could identify people who

12   have left them, cancelled subscriptions, stopped using

13   ICC, and then Upcodes can see if they came over to them.

14              MR. FEE:  Yeah, there's several reasons why that

15   won't work here, Your Honor.  One is there's only for ICC

16   to know how customers are accessing authorized versions

17   of their codes.  For example, customers could be buying

18   versions of the code from amazon.com.  They could be

19   getting access to authorized versions of the codes by

20   coming to ICC's free website where they don't require a

21   log-in, so we won't know if the customers were, you know,

22   ICC customers before they started using Upcodes.  They

23   could be getting authorized copies of the codes through

24   third-party authorizes licenses like Madcad who offer

25   access to ICC's copyrighted materials.
```

PROCEEDINGS                      23

1

2          So the mere fact that some persons may have

3   cancelled their paid subscriptions to ICC's website, it

4   is only likely to be a tiny fraction of the ICC customers

5   in the universe and the ICC customers who may have moved

6   from ICC to Upcodes once Upcodes started making the

7   (indiscernible) available for free that historically ICC

8   would charge for.

9          So just giving a list of cancelled subscribers

10   to our subscription service is really only going to

11   scratch the surface of the potential customers who moved

12   over from ICC's authorized versions of codes.

13          THE COURT:  And, again, they've made in their

14   objections, they said, for example, they said it wasn't

15   relevant.  I don't think that they're seriously arguing

16   that at this point.  They also made a confidentiality

17   objection which, of course, the protective order should

18   address.  So really the only issue is whether or not

19   they've proven that this is disproportionate, and unlike

20   with respect to producing the Upcodes' historical

21   website, they've not produced any evidence of any burden

22   associated with producing these materials to us and

23   they're indisputably relevant.

24          So, frankly, this one to me was a bit of a head

25   scratcher.  I don't understand why they wouldn't be

PROCEEDINGS                    24

1     required to produce information that's undoubtedly

2     relevant and there hasn't been a burden argument made.

3

4          MS. JIAM:  Your Honor, if I may.

5          THE COURT:  Yes, please.

6          MS. JIAM:  So with respect to Mr. Fee's first

7     response to your question, I'm at this point a little bit

8     confused now as to why they need Upcodes full customer

9     list.  It seems like he said that ICC customer list isn't

10    going to give them an idea of what customers may have

11    subscribed with ICC.  And so it seems confusing when they

12    in their briefing they argue that the reason why they

13    need Upcodes' list is to do a cross-reference to see who

14    was lost if they don't actually think that that is going

15    to be, ICC's own list is going to be representative of

16    the people that they need.

17          Second of all, Mr. Fee doesn't meet the meet and

18    confer that we had where we explained why we didn't think

19    the customer list was relevant.  We explained, first of

20    all, that we don't actually track who accessed Upcodes'

21    website for free because they don't need to make an

22    account and because they don't need an account to view

23    (indiscernible) for free.  Most of them don't.  And so

24    any list that we have would be approved subscription

25    service and, therefore, not even accurate for the

1

2  purposes of making any sort of helpful damages or market

3  impact analysis.

4        But I think the main reason why (indiscernible)

5  significant concern about producing a list that we think

6  wouldn't even be helpful for a damages or market impact

7  analysis is based on ICC's current subpoena campaign

8  against Upcodes' customers.  We've provided an

9  explanation in our letter briefing as to how this has

10 gone about, but at this point I mean I think ICC has

11 subpoenaed already at least 18 subpoenas on Upcodes'

12 customers.  It indiscriminately demanded all kinds of

13 different communications about things just generally

14 about Upcodes including just any communications on their

15 social media accounts, as well as documents that could've

16 been easily obtained from the parties in this case such

17 as contracts between the customer and ICC, contracts

18 between the customer and Upcodes, communications between

19 the customer and ICC.

20       And I mean this these are the types of requests

21 that this Court has previously quashed because they don't

22 (indiscernible) the interests or (indiscernible)

23 compliance with the subpoena.  In one instance ICC sent a

24 follow-up letter to a subpoenaed Upcodes' customer,

25 saying that they didn't receive any documents, and then

2  threatening court intervention after the customer had

3  already produced responsive documents almost a month

4  earlier.  And so we think that like this is just very

5  evident that ICC's interest in the customer wasn't

6  actually (indiscernible) damages analysis or market

7  impact analysis but to just weaponize the subpoena

8  process and has resulted in significant harm to Upcodes I

9  mean evidenced by the fact that we had an Upcodes'

10  customer who cancelled his subscription right after being

11  served with the subpoena.

12          MR. FEE:  Your Honor, with all due respect, how

13  are we supposed to know whether or not Upcodes' customers

14  were previously using authorized version of the I codes

15  without finding out who they are and asking them.  That's

16  all we're trying to do here.  If Upcodes wants to agree

17  that they're not going to argue that some of their, a

18  substantial number of their customers are using their

19  product as a substitution for ours, then we wouldn't have

20  to do this.  But that's, they're not going to admit that

21  because that would basically be admitting damages and

22  admitting their use.

23          But they can't have it both ways.  They can't

24  say that their customers aren't using their product as a

25  substitute for ours and say we're not allowed to ask them

```
 1                         PROCEEDINGS                    27
 2  if they do.
 3          MS. JIAM:  Your Honor, we've produced over
 4  20,000 documents in this case, including, of which 5,000
 5  are just pure customer communications between Upcodes and
 6  these customers.  And so to the extent that they think
 7  that there's some information they can get from an
 8  impartial (indiscernible) from Upcodes, that information
 9  can be gleaned from these thousands of customer
10  communications with Upcodes, and they can see why
11  Upcodes' customers chose Upcodes or why they need Upcodes
12  services.
13          THE COURT:  But the customer communications
14  would've required a customer to potentially reach out and
15  inquire in the first instance.  Is this like unsolicited
16  communications with customers or do the customers have to
17  actually write in and say like I'm having a billing
18  dispute or, I don't know why they would write in, but
19  they'd have to actually have an issue they wanted to
20  raise?
21          MS. JIAM:  I'm sorry, Your Honor, I don't know
22  if it's just me, but your audio is cutting out for me,
23  and I'm having difficulty understanding your questions.
24          THE COURT:  Oh, yes, it might be, it could be me
25  too.  I'm just curious, the customer communications
```

1

2  would've been generated in what context?  Like are these

3  unsolicited emails that Upcodes sends to its customers to

4  inquire about their satisfaction with the product or

5  reasons why they came to Upcodes?  Or are these like

6  emails where like, you know, a customer has to have had

7  an issue and that's why they're writing into Upcodes?

8          MS. JIAM:  I got everything but that last

9  question, Your Honor.  Is customers, pardon?

10         THE COURT:  Oh, sure.  I'm just – if this was

11  like a situation where customers aren't solicited by

12  Upcodes in any way through email and in order for these

13  emails to have been generated, it's because a customer

14  was having some problem, had a question, needed to write

15  in for some reason, and that's why these emails are

16  generated.

17         MS. JIAM:  Your Honor, it's for all sorts of

18  different reasons.  I mean it does capture that former

19  where, you know, like it's unsolicited and Upcodes'

20  customers have just written in.  It also captures

21  Upcodes' customers in response, sorry, customer response

22  in response to Upcodes correspondence, whether that's

23  marketing or promotional documents that they've been

24  sent.  And so it really is just all these customer

25  communications (indiscernible) various RFP's that ICC has

PROCEEDINGS                    29

1    propounded in this case.  And so it's a lot of different

2    context and I think gives a pretty good idea of what RFP

3    63, which is the RFP at issue which is documents

4    sufficient to identify Upcodes' customers, target

5    customers or prospective customers.

6         MR. FEE:  Your Honor, if I may say one more

7    thing.

8         THE COURT:  Sure.

9         MR. FEE:  I don't think opposing counsel is

10   suggesting that they've produced documents that are

11   sufficient for us to know each of Upcodes' subscription

12   customers were accessing ICC's materials prior to working

13   with Upcodes.  That's the information we want to get our

14   hands on, and we don't have that from Upcodes for at

15   least the vast, vast majority of customers.  Maybe one or

16   two, I mean there might be an email, I can't tell you off

17   the top of my head, that somebody said I used to get this

18   from ICC, but it's great, I get it for free from you now.

19   We don't have that type of, you know, feedback for each

20   of their customers.

21        THE COURT:  And, Mr. Fee, just to confirm that I

22   understood your argument correctly, the reason you

23   couldn't just do a cross-check where you identified lost

24   customers or customers that left and they gave you those,

2  and they then figured out whether these are now Upcodes

3  customers is because you also had customers who came

4  through third-party vendors like Amazon, and so you

5  wouldn't necessarily know if they stopped using Amazon to

6  get ICC codes in order to switch to Upcodes?

7           MR. FEE:  Yeah, that's one reason, Your Honor.

8  Another example is we have a free online reading room

9  where we didn't, similar to Upcodes, we don't track

10 whether prior registration particularly use our online

11 reading room.  So there would be no way for us to know if

12 Upcodes' customers used to use our website to access the

13 codes but are now using Upcodes if we just worked off our

14 subscription list.

15          THE COURT:  Okay, and so your idea is to get the

16 customer list and then contact these individuals if they

17 previously used ICC?

18          MR. FEE:  Yeah, that's the point of this request

19 is we want to know where they were getting their codes

20 before, and we believe, I mean there aren't many other

21 sources, frankly, Your Honor.  Most of them were probably

22 getting them from authorized ICC outlets until they

23 started using Upcodes.

24          THE COURT:  And then let just ask if the concern

25 is potentially, you know, putting – I'm going to use the

1                           PROCEEDINGS                    31

2   word harass but I don't mean it in a negative way – if

3   the concern is to try to minimize the impact on these

4   individuals who aren't parties to the suit, is there no

5   way that the parties can come to some agreement as to

6   what the nature of the communication will be by ICC to

7   these individuals to try to get the information about

8   whether they previously used ICC?

9              MR. FEE:  Well, Your Honor, actually that may

10  get resolved, I think we're probably going to have a

11  fight about the third-party subpoenas coming in the near

12  future, and maybe it would make sense to hold off on us

13  issuing any third-party subpoenas after we receive their

14  customer list until, I don't know if it would go to Your

15  Honor or it might wind up with some other court that has

16  to chime in on whether or not our request, you know, of

17  the first customers that we subpoenaed were overly broad

18  or appropriate.  We'd be happy to, you know, use a test

19  case, you know, either before Your Honor or whatever

20  jurisdiction make sense before issuing subpoenas if that,

21  you know, that should resolve any concerns about us being

22  overly aggressive with our subpoenas.

23             MS. JIAM:  I mean, Your Honor, we would just

24  respond and say that we just don't think that Upcodes

25  should be ordered to produce a customer list before the

```
 1                           PROCEEDINGS                  32

 2   subpoena issue is addressed.  I mean like I think that

 3   both sides are not going to dispute that there are

 4   customers that, you know, were with ICC and had

 5   (indiscernible) product and then cancelled their

 6   subscription and then came to Upcodes or perhaps vice

 7   versa.  I mean I think that there's no issue that there's

 8   probably some overlap in those customers in terms of

 9   whether or not they were satisfied with ICC's products.

10           I mean the issue I think that both parties seem

11   to be admit is that these lists are not actually

12   comprehensive, and so I'm not quite sure what ICC is

13   going to get out of subpoenaing more customers if that's

14   not even a comprehensive set.  And so I don't really know

15   what more they're going to get from just subpoenaing more

16   Upcode's customers, and as we've explained, this is

17   causing harm to Upcodes.

18           THE COURT:  Well, let me --

19           (interposing)

20           MR. FEE:  But --

21           THE COURT:  Sure, go ahead.

22           MR. FEE:  I was just going to say, Your Honor,

23   if Upcodes wants to stipulate that all of their customers

24   were previously using authorized versions of ICC's

25   materials, we don't have to do this anymore.  I assume
```

PROCEEDINGS                                33

1

2   they're going to take a different position, I think they

3   have in the past, and if they're going to claim that

4   their customers weren't using our materials in the past,

5   we have to have the ability to test that.

6          THE COURT:  Okay, so --

7          (interposing)

8          MS. JIAM:  Your Honor, like ICC's not going to

9   be able to prove that because as they admitted

10  themselves, they don't know all of the customers who used

11  ICC's website because they have a reading room, they also

12  have Madcad and Amazon.  We aren't Madcad or Amazon, we

13  don't have that information.  And similarly we also don't

14  track the customers who view our codes for free on our

15  website and we don't force them to make an account.

16         THE COURT:  Okay, so I was just going to say I

17  agree with Mr. Fee that the information is certainly

18  relevant to ICC's damages and harm argument, and to the

19  extent no one tracks the free customers, there's still

20  some population of paid people who were either using paid

21  subscriptions through ICC or some license through some

22  third parties under like Amazon for which at least for

23  that universe of customers they can at least probe as to

24  whether these people previously used ICC's codes.

25         It sounds though like the real concern is a

2  potential, you know, harm or burden on these individuals

3  based on the information requested and how that request

4  was made.  And so that's why I was sort of trying to

5  figure out if we could potentially just reach some

6  resolution as to how these people will be contacted and

7  what information will be sought so that there is no,

8  again, I'll use the word harassment, but like so that

9  these people don't get frustrated and, you know, leave

10 Upcodes and cause harm to Upcodes' business by losing

11 clients through these communications.

12         And so, you know, I think if -- I'm happy to,

13 again, if the parties want to meet and confer and figure

14 out what information needs to be specifically requested

15 from these people and maybe you could reach a resolution

16 as to what that will be and you can then, if you don't

17 reach a resolution, you can come back to me or go back to

18 someone else.

19         MS. JIAM:  That sounds fair to us, and we'd be

20 willing to check internally to discuss if there's a way

21 that we can minimize the burden on our customers in terms

22 of getting the answers that ICC wants.

23         THE COURT:  I think hopefully with this issue

24 and the other one perhaps there could be some, you know,

25 middle ground, and if you want to meet and confer on both

PROCEEDINGS                35

1  of those and then send me a letter updating me, and then

2  I can always give you another conference.

3       MR. FEE:  Your Honor, just so I'm clear, does

4  that mean that they should produce the customer list, but

5  we're going to confer about what the subpoena or

6  information request should be?

7       THE COURT:  Yeah, Mr. Fee, I agree that the

8  customer list is relevant and you're entitled to it.  I

9  think – and it sounded like the real concern was, you

10  know, trying to limit the burden on these people so that

11  they don't, you know, drop Upcodes' products and

12  services.  And so I thought on that, you know, that could

13  be something the parties can try to negotiate, and if you

14  don't reach agreement as to how, excuse me, what

15  information and how these people will be contacted and

16  what you will seek from them, then you can come back to

17  me.  But to answer your question, I agree that they have

18  to produce the customer list.

19       MS. JIAM:  Your Honor, I would just like to jump

20  in on this.  We really don't think that ICC needs the

21  list.  We are very uncomfortable with having a list of

22  all of Upcodes' customers in view of how they just sent

23  subpoenas.  We were thinking that it might be more

24  reasonable, for example, for us to create perhaps a

PROCEEDINGS                    36

survey or something like that in which Upcodes can send

this to all of its users about it's coming from an

aggressive other party in the context of a litigation,

and we can provide questions perhaps that ICC would be

interested in receiving answers to.  And then in that

context we can send it out.  But to just hand over ICC

this list we think is very dangerous.

THE COURT:  So is your compromise that you would

contact all of these people on your list after some

discussion with counsel as to what information will be

sought and how that information will be sought?

MS. JIAM:  I mean I'd have to speak with my

client first, but I mean that's what comes to my head,

and it seems a lot more reasonable than just handing a

list over.  I think that's correct.

MR. FEE:  Your Honor, with all due respect, they

don't get to decide what questions we're going to ask

within the scope of what you determine to be a reasonable

area of inquiry.  We should be allowed to ask our own

questions, not have them ask questions that they want to

ask.

THE COURT:  No, and I hear you on that.  I

thought maybe potentially folks can compromise on what

questions to be asked.

1

2          MR. FEE:  Yeah --

3          MS. JIAM:  Right, that's correct, Your Honor.

4          MR. FEE:  We've had – we've already done a lot

5   of meeting and conferring, Your Honor, just so you know,

6   about the scope of these third-party subpoenas, and I

7   think as I already suggested, we're happy to give it

8   another go, but I think there's a pretty good chance that

9   we're going to be filing a motion to compel with respect

10  to those sometime in the very near future.  And then

11  trying to conduct a whole survey is, you know, I just

12  think it's going to make this thing much more

13  complicated.  And, frankly, you just told us we're not

14  going to issue any subpoenas or reach out to these third

15  parties until we either had an order from you or we reach

16  an agreement with the other side.  I don't understand why

17  they wouldn't produce a customer list that's clearly

18  relevant, and this protective order says we can't share

19  it with ICC, and we're not going to be issuing any

20  subpoenas until you say we can or we reach an agreement

21  with the other side.

22         MS. JIAM:  Your Honor, I think we, I think ICC's

23  prior history is just pretty clear that the way that it's

24  been pursuing these third-party subpoenas has been fairly

25  aggressive, and in some ways they don't even check to see

1                          PROCEEDINGS                    38

2    what documents they've received from those customers

3    before sending threatening letters to them.  And so we

4    have good reason to be protective with respect to our

5    customers and how they've responded, especially with

6    respect to the fact that we've had to reassure these

7    customers who've been subpoenaed, you know, that, you

8    know, this is not litigious action them.  I mean

9    obviously receiving a threatening letter via like outside

10   counsel is very scary for people who don't really, aren't

11   like large companies.  A lot of Upcodes' customers are

12   individual users.

13            And so we just really believe that the way that

14   ICC has pursued these third-party subpoenas gives us very

15   good reason to be cautious, and that's why we, again, we

16   think a process where, for example, ICC tells us what

17   questions they want to ask, we can discuss them, and if

18   there's a dispute with them, we could bring it with Your

19   Honor, but we're willing to reason, we want to be

20   reasonable.  We just don't want them to be receiving

21   these demand letters from outside counsel, and that's why

22   we don't want to hand them over a list of just all of our

23   customers, and instead we would prefer that outreach and

24   those questions to be sent from Upcodes account and not

25   from, you know, ICC in the context of litigation.

```
 1                        PROCEEDINGS                    39
 2            THE COURT:  And let me just ask why is that
 3   concern not addressed by the compromise that I indicated
 4   which is we're not going to reach out, if you turn over
 5   the customer list, they're not going to reach out until
 6   there's some compromise as to what exactly that
 7   communications going to look like and what's going to be
 8   asked.  So you're going to have an opportunity to, you
 9   know, essentially screen or, you know, make arguments
10   about the communication either being too burdensome, too
11   aggressive, whatever the argument may be.  So it's not
12   going to be the case, as you've indicated in your letter,
13   may have been what previously occurred with the 18
14   subpoenas which is that they won't be indiscriminately
15   demanding documents and sending these long letters
16   threatening litigation because we're going to try to
17   reach some agreement as to what the communication's going
18   to be.
19            MS. JIAM:  Your Honor, I think our concern is
20   what's going to happen is, you know, ICC proposes
21   something that we think is overly unreasonable or
22   aggressive, and then at that point they say, well, we've
23   got the list, and then they just, you know, they just
24   say, Your Honor, we would just (indiscernible) if we
25   can't come to an agreement with Upcodes, we're just going
```

PROCEEDINGS                    40

to go ahead and subpoena all of them.  We have thousands
of, you know, premium subscribers, and we don't want a
lot of these who are just individuals suddenly getting
what looks like a scary legal form from ICC.  We think
that it would be much better and we can minimize the harm
to Upcodes in terms of losing customers if we can put it
in like a friendly Upcodes' format and not just trust ICC
with our list to not behave in a way that we think is
highly we think aggressive and has been so far.

        Just based on previous behavior, I think we just
don't trust how ICC has acted, and we also would prefer
to be able to have that information with Upcodes, and we
think that ICC, I mean we're willing to meet and confer,
and Upcodes can then send it to their own customers and
not make this seem like a very scary thing.

        THE COURT:  Mr. Fee, let me just ask you, and,
you know, you can tell me why this might be wrong, but in
terms of getting the information you want, you know, I've
already agreed that the customer lists are relevant, but
perhaps it might be more effective to reach these people
through I guess what was described as a friendly
communication coming from Upcodes as long as you get a
chance to ask what you want and get the information you
seek.  But it might be the case that they might, are more

PROCEEDINGS                    41

1    likely to respond via some type of communication that's

2    not a subpoena.

3

4              MR. FEE:  Well, a couple of things on that

5    point.  I think, first of all, the vast majority of

6    people who receive unsolicited surveys from Upcodes are

7    going to ignore them.  And so I don't think that's going

8    to work anyway.  And even if they do send a,

9    quote/unquote, "friendly" solicitation from Upcodes,

10   we're still going to have the right to depose these

11   people.  Like, you know, the idea that they're just not

12   going to know that this is the subject of a dispute

13   doesn't make sense.  You know, there's no worry about us

14   threatening their customers before we talk to you again.

15   I've told you now that we won't subpoena anybody on that

16   customer list until either we reach an agreement with the

17   other side or we have the Court decide what is a

18   reasonable scope of inquiry with respect to subpoenas to

19   their customers.  So there's no harm to producing the

20   customer list right now.

21             And it'll just delay things further if we have

22   to meet and confer and go through those processes, then

23   they produce the list to us, then we got to go through

24   the whole process of trying to subpoena them.  And we are

25   getting, you know, sort of toward the end of the fact

2  discovery period here.  So like if it's relevant, we're

3  not going to do anything that Your Honor or another judge

4  doesn't tell us is permissible or the other side agrees

5  to.  I just can't understand why they wouldn't be ordered

6  to produce something that's clearly so relevant.

7        MS. JIAM:  Your Honor, I think that Mr. Fee's

8  response here just clearly identifies Upcodes' concern.

9  I mean ICC (indiscernible) they intend on subpoena, not

10  just subpoenaing but also deposing all these customers.

11  Upcodes has already lost a customer as a result of ICC's

12  subpoena campaign, and so now saying to the customer not

13  only are we going to depose, we're subpoenaing you and

14  make you answer all these questions, we're going to

15  depose you.  There's already evidence that this has

16  resulted in harm to Upcodes.  If our customers are going

17  to be deposed for a subscription that they paid, you

18  know, $20 a month for, I actually don't know the exact

19  amount, I can look it up, but it's clear that this is

20  going to result in significant harm to Upcodes.

21        MR. FEE:  Your Honor, they have relevant

22  information.  Of course, they're going to be deposed.  I

23  mean this, I never heard of an idea that we're not

24  allowed to depose witnesses who have clearly relevant

25  information.  And I don't know what the basis for such an

1

2  argument is.

3          MS. JIAM:  Your Honor, again, as we've

4  discussed, if this is just about ICC trying to prove that

5  some customers have originally went to ICC and are now

6  with Upcodes, I mean they can get that information by

7  looking at their own lists and then comparing it to

8  whatever, (indiscernible) identify whatever individuals

9  have subscriptions with Upcodes.  But to ask questions of

10 like, you know, you were with Upcodes before and, ICC

11 before and now you're with Upcodes, I mean I think that

12 there's nothing, identifying that one individual is not

13 going to change the fact that there's communications

14 between both sides (indiscernible) I've been with ICC

15 before and now I'm with Upcodes.  And so I think that – I

16 don't understand like why a deposition is needed to

17 establish the fact that there were some customers with

18 ICC and now with Upcodes.

19          And I think certainly that there's going to be

20 evidence and probably like in these 5,000 email

21 communications that have already been produced that there

22 were some customers were not originally with ICC and now

23 are with Upcodes and some customers that you're not going

24 to be able to even identify at all because, as we

25 mentioned, neither side tracks who looks at their free

1

2  website that doesn't make an account.  And so it just

3  seems like this really is to just cause harm to Upcodes.

4          THE COURT:  I'm just going to interject a minute

5  because I do think we might be getting a little far

6  afield, but should these communications with these third

7  parties via either the subpoena or the survey or whatever

8  format ultimately is used, I do agree with Mr. Fee again,

9  if there are some customers that they want to dig deeper

10  as to why they made the switch, that's certainly within

11  their prerogative, and any burden or argument on that

12  front should be made by the individual that's subpoenaed.

13  And I think that is a little premature at this point.

14          So I think given everything that we've

15  discussed, I hear Upcodes' concerns as to the potential

16  that these customers might be solicited in a way that

17  leads them to change, drop the service, but I think that

18  harm can potentially be mitigated or addressed on the

19  front end in terms of either limiting the type of

20  communications that's issued or the type, the number of

21  questions asked.  So for all the reasons we've discussed,

22  I am going to require Upcodes to produce the customer

23  code, but I will require ICC - ICC's not allowed to

24  communicate with any of these individuals on the customer

25  list until either there's been some agreement with

1                              PROCEEDINGS                    45

2  counsel for Upcodes as to what that communication will

3  look like and what will be asked or you come to me and

4  gotten an order from me or another court.

5          MS. JIAM:  And, Your Honor, just for

6  clarification, is this just a list of all customer, all

7  customers that have subscribed to Upcodes' premium

8  service regardless of whether or not, you know, we

9  understand that they have looked at ICC codes or not?

10         THE COURT:  Right, it's the comprehensive

11 customer list.

12         MS. JIAM:  Okay, Your Honor, with the

13 understanding that there is, there's an order from the

14 Court that they cannot contact these customers without

15 meeting and conferring or an order from this Court

16 regarding how they would contact these customers, is that

17 correct?

18         THE COURT:  Yeah, so just to be abundantly

19 clear, Mr. Fee, ICC's not allowed to contact these

20 customers until either, one, you have met and conferred

21 with Upcodes' counsel and reached some agreement as to

22 the nature of the communication, the substance of the

23 communication, or if you don't reach an agreement with

24 them, you come to me and I've given you an order allowing

25 you to contact these people.

| 1 | PROCEEDINGS | 46 |

2      MR. FEE:  Okay, I understood that, Your Honor,

3  that's fine.  I mean the one thing I will say, but I'll

4  leave this up to your discretion, some of these, you

5  know, if we have to go through the process of moving to

6  compel some of the other third-parties, it probably

7  wouldn't be at least initially filed this Court, the

8  Southern District.  Do you want us to come back to you if

9  we get an order compelling production of documents

10  related to this matter from a customer in, you know, just

11  say Delaware and the court says this is reasonable, this

12  is not, we still should come back to you and get you to

13  sort of bless what the Delaware judge said in that

14  example?

15      THE COURT:  Well, you should – before you even

16  serve that subpoena on that Delaware individual, you'd

17  have to come to me to get permission --

18      MR. FEE:  No, I understood.

19      THE COURT:  Okay.

20      MR. FEE:  I'm sorry, Your Honor, I understood

21  that.  I was talking about the subpoenas that have

22  already been served and that we've already done a lot of

23  meeting and conferring on.

24      THE COURT:  No, no --

25      (interposing)

```
 1                    PROCEEDINGS                47
 2          THE COURT:  I'm sorry, I don't mean to keep
 3  cutting you off, Mr. Fee.  But this is just specifically
 4  limited to the customers on the customer list that you
 5  have not previously communicated with.  I haven't at all
 6  addressed the 18 subpoenas that were previously sent
 7  because that happened and I was not involved.
 8          MR. FEE:  Okay, understood, Your Honor.  Thank
 9  you.
10          THE COURT:  And then the parties are going to
11  come back to me on the status of the first issue with
12  regards to the historical text.
13          MS. JIAM:  Thank you, Your Honor.
14          THE COURT:  Thank you very much, everyone.
15          MR. FEE:  Thank you, bye.
16          MS. JIAM:  Bye bye.
17          (Whereupon the matter is adjourned.)
18
19
20
21
22
23
24
25
```

48

C E R T I F I C A T E

    I, Carole Ludwig, certify that the foregoing

transcript of proceedings in the case of ICC v. UPCODES,

Docket #17cv6261, was prepared using digital

transcription software and is a true and accurate record

of the proceedings.




Signature_____*Carole Ludwig*_____

                    Carole Ludwig

Date:  February 5, 2024