```
              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF NEW YORK
-------------------------------:

INTERNATIONAL CODE COUNCIL,    : Case No.: 17-CV-6261

INC.,                          :

                  Plaintiff, :

     v.                        :

UPCODES, INC., et al.,         : New York, New York

                  Defendant. : September 4, 2025

-------------------------------:
```

TRANSCRIPT OF STATUS CONFERENCE HEARING

BEFORE THE HONORABLE VALERIE FIGUEREDO

UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

```
For Plaintiff:          DLA PIPER LLP US
                        BY:  Staci J. Trager, Esq.
                             J. Kevin Fee, Esq.
                             Jordan Chisek, Esq.
                        2000 Avenue of the Stars
                        Los Angeles, California 90067

For Defendant:          MORRISON & FOERSTER LLP
                        BY:  Joseph C. Gratz, Esq.
                        425 Market Street
                        San Francisco, CA 94105
```

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

AMM TRANSCRIPTION SERVICE - 631.334.1445

THE DEPUTY CLERK:  Good morning.  This is the matter of International Code Council v. Upcodes; Case Number: 17-cv-6261.  The Honorable Valerie Figueredo presiding.

Would the attorneys who will be speaking today please make their appearances for the record, starting with plaintiff.

MS. TRAGER:  Good morning.  This is Staci Trager for International Code Council.  And my colleagues, Kevin Fee and Jordan Chisek, are here but not speaking today.

MR. GRATZ:  Good morning, your Honor.  This is Joe Gratz for defendants.

THE COURT:  Good morning, everyone.  This is Judge Figueredo.

Before we get started, can everyone hear me?

MR. GRATZ:  Yes, your Honor.

MS. TRAGER:  Yes, your Honor.

THE COURT:  Okay.  Great.

If, at any point -- we've had various technical issues with the phone, so, if at any point you can't hear me, just chime in.

I asked to try to move up our conference in order to try to get this resolved, given the more

recent dispute about the extension, the deadline request, the request -- excuse me -- by ICC, to extend the deadlines.

So the issue I think we were -- I wanted to discuss this morning was the third-party subpoenas. And that came in in a letter on August 4th at ECF 229. And then there was another response from Upcodes at ECF 233 on August 12th.

I'm trying to understand -- I'm happy to hear from anyone. I guess the first thing I, sort of, wanted to understand was the timing. It sounds like -- and this also really goes to the question about whether there's good cause to extend the deadlines.

It sounds like ICC had been trying to seek this information, or had at least identified this category of information back in March of 2024, and so I'm just trying to figure out why this issue hadn't been addressed earlier.

MS. TRAGER: Yes, your Honor. This is Staci for ICC, for plaintiff. I can address that.

The information was actually sought much earlier than that, as you point out. We started seeking the information actually in 2023 when we subpoenaed third parties in this case, and we were

met with objections.  And if you recall, we had to eventually move to compel on that subpoena.

And while we were doing that, we compelled the customer list, so that was set for hearing first.  That was set for hearing in January of 2024.  And as a result of that IDC, you compelled Upcodes to produce the customer list.  And during that hearing, we agreed that we would not subpoena further customers without speaking with Upcodes, meeting and conferring, or coming back to the Court for an order.

And we started that process.  And moving on 'til March of 2024, we were meeting and conferring on our Skidmore subpoena.  And when that reached impasse, we filed a motion to enforce that subpoena, which was heard on May 2025 at a conference.  And you granted that motion to compel in July, this July, July 15, 2025.

So as soon as we got that order, we thought that it would be -- we had these other third-party subpoenas, and we didn't want to move on the other ones until -- given the resistance to the first one, so we used the first one, similar to a test case, and that had to go through to a motion to compel -- motion to enforce, which was granted.

And then we move forward immediately on the rest of them. And we thought, well, now that we have an order and you found that the subpoena was reasonable and that the documents we thought were relevant, there wouldn't be a problem seeking the remaining third-party discovery, but we were met with severe resistance from Upcodes, which then made us turn around and immediately follow -- file -- sorry -- this IDC with you. It was only two, maybe three weeks between your order of July 15th and us filing this motion on August 4th to try to move this process forward.

Comparatively, the documents and further responses that you ordered on July 15th to the Skidmore subpoena, we haven't even received those yet from Upcodes. And it's our position that we have been moving with as much diligence and speed as possible, given the circumstances.

MR. GRATZ: For Upcodes on those points, I can understand that with respect to Skidmore, Owings & Merrill, but none of that says anything about why they need to subpoena more people than the 22 customers they've already subpoenaed and why they can't get the information they need either from Upcodes, from their distributors, or from the

more -- almost two dozen customers who have already received subpoenas.

MS. TRAGER:  Your Honor, I'd be happy to address that "more" argument that opposing counsel just made.

We have -- it's been clear in our meetings with you and our meet and confers with each other that our first set of subpoenas was only a test batch, and we always had the intention of serving more.  And given that there are 9,000 customers on the customer list, the idea that 22 is just a de minimis amount, it's not enough to give us enough of an understanding of their reaction.  And to the extent where that is a key part of our defense, where we are arguing, you know, our loss of license fees, the commercial harm, it goes to fair use -- all of those different things, we need a larger sample of people.

And we thought that that, you know, dispute had been heard.  We discussed it with you in January at that hearing.  We discussed it with you in May in that hearing.  And the same objections that it's too much, it's not reasonable, you can find this information other places.  Those arguments have been made by Upcodes throughout this litigation.  And one

after another, you have overruled those and found that the discovery that we're seeking is reasonable, relevant and proportionate and not an undue burden. And we would ask that you find the same thing today so we could move forward with the third-party discovery, which is the last remaining bit of discovery in this case.

THE COURT:  Can I ask -- so, for instance, if you're looking for -- it sounds like one of the categories is the purchases of codes -- am I reading this right -- from ICC?

MS. TRAGER:  Yes, your Honor, because we don't have complete -- it's purchases of ICC's codes, and those codes are not always purchased from ICC.  Sometimes they're purchased from our licensees.  Sometimes they're purchased on Amazon. Sometimes -- I don't know.  Sometimes they're found on the black market.  We're not sure where people get them.  They also now get them from Upcodes.

So we're looking to see where various customers purchase the codes or obtain the codes so we can see if there's harm to us and loss of sales and loss of licensees.

THE COURT:  And you can't get that information from the licensees themselves?

AMM TRANSCRIPTION SERVICE - 631.334.1445

MS. TRAGER: Well, they're also third parties, so we don't have the right to that information from them, and we would have to subpoena them just as we have to subpoena customers.

MR. GRATZ: And that's what they should do, your Honor. Sorry.

THE COURT: Well, that's what I'm trying to understand. If part of Upcodes' argument is that, you know, this potentially interferes or harasses one of their customers in the relationship, I wonder if, at least for some of this information, there's not some other source.

So I think it sounds like, for this, maybe the licensees who aren't Upcodes' customers could be a source of the information. And then it sounds like, for some of the other categories -- which I think Upcodes identifies as Topics 2 and 3 -- this was information that you got potentially already from Upcodes itself.

MS. TRAGER: So two things on that. So, one, they're saying agreements with their customers, they've already produced. And while they have given us discovery responses that say that they will produce those agreements, they have, in fact, not produced those agreements.

We got an e-mail last night, right before this hearing, saying that they will finally produce them, but those have been a product of meet and confers for the past -- I don't know -- several months.

And with respect to the licensees, my understanding is we talked about this in January at the IDC then.  They don't have that information.  And they don't track the information, so going to them would be futile, and we would be just back here in three months saying they don't have that and they can't provide us that.

THE COURT:  So the licensees -- and I might be misunderstanding, but the licensees aren't the ones purchasing the ICC codes?

MS. TRAGER:  No.  They license it from us and then put them up on their website or they sell books or however, you know, they offer them for sale.  So we would actually need their customers --

THE COURT:  And the licensees --

MS. TRAGER:  -- which is two steps removed.

THE COURT:  Well, you're saying the licensees don't know who their customers are?

MS. TRAGER:  That's my understanding, your Honor.  Most of these, they -- they sell them and

they're not tracked in a way that we could get a list.

MR. GRATZ:  And, your Honor, if I may, on that point -- this is Joe Gratz for Upcodes.

That's inconsistent with at least some of the information we've received from some of those licensees.  And so if the contention here is that, for example, MADCAD (phonetic), which is a large licensee of ICC's, doesn't know who its customers are or what its revenues are or who has started or stopped being a customer at what time for which of MADCAD's products, that's something that's at least inconsistent with the facts as we understand them from those third parties.

And if that's a contention here, that's something that I think would be the subject of some evidentiary -- some kind of declaration or inquiry from the business partners of the plaintiff who actually have this information, we think, about what sales were made at what times and maybe what sales weren't made to what people at what times.

THE COURT:  What about Topics 4 and 5?

It sounds like Upcodes might have already produced the customer communications they have in their possession; is that true?

MR. GRATZ:  That's right, your Honor.  And with respect to the agreements, as counsel said, those are, sort of, on the way out the door.

MS. TRAGER:  Your Honor, for the communications, again, to this point, we are really looking for internal communications about Upcodes. For example, it's not just the communications where we have a customer writing to Upcodes and they're saying, hey, we want to purchase your codes, or, hey, do you have this code?

We're looking for communications internally where they debate, say, should we work with them? Is this a free site?  Is this site legal?  Is there risk involved here?  Is this a better use of our money?  Should we cancel our subscription?

I'm making these things up as hypothetical communications, but those are the type of internal communications that we're looking for.

And just back to the licensee part, we would have to subpoena the licensees, and we would have to get their customer list, and then we would have to go and subpoena those customers to seek the information that we are trying to seek, which goes to damages, lost licenses and the commercial competitiveness of us and Upcodes, which is Fair Use

AMM TRANSCRIPTION SERVICE - 631.334.1445

Factor 4.

MR. GRATZ:  And if I can respond briefly on each of those two points.

With respect to the first point, the internal communications about Upcodes, the deliberations within a company on what vendor to use -- I agree, Upcodes doesn't have those documents, and neither do the licensees, but two observations about them; one, the 22 customers that they have already subpoenaed do as to those 22 customers.

And we're happy to -- I mean, there's no reason that those 22 aren't enough.  And we aren't going to be arguing that those 22 might have said things, but everybody else didn't.  We're happy to stipulate for those documents that those 22 are representative of the whole group.  So there's no need for more than 22 customers on those.

And, again, with respect to licensees, you actually won't need to subpoena the licensees' customers.  The information you're looking for is about sales made or not made by the licensees to particular customers.  They can match that up with the Upcodes customer list that they already have to see whether, if somebody stopped buying it from

MADCAD, whether they start -- whether or not they started buying it from Upcodes without asking the customer.  They don't need any information from the customer with respect to those categories of information.

THE COURT:  So can I just ask, in terms of, like, potentially trying to find a way to either limit or reduce the burden on these third parties, is it fair to say that once Upcodes produces the agreements, the Topics 2 and 3, as identified in Upcodes' letter at ECF 233, might potentially be information that no longer needs to be sought from these third parties?

MR. GRATZ:  I think that's right.

MS. TRAGER:  Your Honor?

MR. GRATZ:  I -- my --

MS. TRAGER:  Go ahead, Joe.  I'll go after you.

MR. GRATZ:  My answer is just, yes, your Honor.  So you can go ahead.

MS. TRAGER:  Your Honor, we're -- so our first subpoena to Skidmore had, you know -- I don't know -- 30-some-odd categories of information that we sought, and we moved to compel on 10 to 12 of those, if I recall correctly.  And here, we are

proposing five categories of documents, which is a subset of those that you already found relevant and reasonable.

So we feel that we've already taken something that's been, you know, deemed relevant and deemed reasonable, and we are doing a smaller version of that, and that those five categories of documents that you're looking at are really the ones that we're seeking.

And if we can't -- if we were able to obtain them from Upcodes, and even though they're saying today that, yes, we can do this or we'll do that, we haven't received them yet, and we've been fighting this long to get them. And the point of discovery is to see if it's relevant so we can explore this area because it's key to the claims and defenses in this case.

So we're already compromising by taking a universe and shrinking it to the smallest possible ones, which are five categories compared to the 20-plus, 30-plus that we thought originally. And we don't know if what we're going to get from Upcodes can satisfy that or not because we haven't received it yet, and it's taken this long. Discovery is closing in two and a half, three weeks, and we still

haven't gotten it.  And if they're making these claims that our customers -- that they are not competitive with us, they are not taking our share of the marketplace, then we need to investigate that, and we have the right to explore whether that's true or not.

And, you know, otherwise, they can concede Factor 4 of the Fair Use, saying we are competitors and they are taking our share of the marketplace and they are taking our customers, but they haven't.  So to this point, that's why we need this information.

And it's already a very small subset of the information that we really would like to seek.  And that was our compromise with them, and we have not gotten any movement on that or agreement on that.  So we feel that the five categories we're asking for is already greatly reduced and reasonable and proportionate and not an undue burden on their customers.

MR. GRATZ:  So to respond briefly, with respect to the idea that there is some inappropriate delay in getting this set of customer contracts to them, that's responsive to an RFP that they served July 11th of this year.  So we're actually getting them out quite quickly, relative to when that RFP

was served and when the meet and confer first occurred on that RFP.

With respect to the need to investigate these facts if we're not going to concede that they are right, they have the ability to investigate these facts.  They have 22 customers, almost two dozen, with whom to investigate these facts as fully as they would like.  And they have presented no reason why more than 22 is proportional to the needs of the case.  They have not said, well, we've worked on these 22 and they're different somehow, and these other people we need to subpoena are different than these 22 are not cumulative of these 22.

In fact -- and I'm happy to talk about this more -- they haven't even said who else they want to subpoena.  They just want to subpoena a lot of them. And that goes back, your Honor, to our concern about burden and proportionality.

THE COURT:  Can --

MS. TRAGER:  Your Honor, just one quick -- oh, sorry.  Go ahead.  I'm sorry.  Yes.

THE COURT:  My first one's just, Mr. Gratz, you had indicated that Upcodes was going to produce the customer contracts.  Can we just get a deadline by when those will be produced?

MR. GRATZ:  Yes.  I am happy to confirm --

THE COURT:  How much more time do you need?

MR. GRATZ:  Sorry.  Say again, your Honor.

THE COURT:  I was just going to say, how much more time do you need?

MR. GRATZ:  My team -- I understand that they are going out in the next week, your Honor, so I'm happy to set a deadline of a week from today.

THE COURT:  I think that's September 11th.

And have you already produced the communications with regards to those agreements?

MR. GRATZ:  I believe we have, your Honor. We have produced customer communications, sort of, subject to our objections in meeting and conferring.

THE COURT:  And then I did, sort of, want to touch on this issue of why we need more than the 22 customers that have already been subpoenaed.  So I'm happy to hear from ICC on that.

MS. TRAGER:  Yes, your Honor.

So those first -- first, those 22 were customers that we were able to figure out from doing research.  So we looked at their website, we looked at marketing materials, we looked at quotes, and figured out that here are some customers.

Then we -- and at the same time we asked

them for their customer list, which they refused to produce, which we had to go through the IDC process. That was finally compelled.  They were compelled to produce that in January.

And once we got their customer list, we did further research to identify people on that list. There are 9,000 people on that list.  So while the number 22 or a number 60 may seem large, it's not even 10 percent of the customers on the list.  You know, the proportion that we are seeking information from is reasonable in context of the entire people on that list.

MR. GRATZ:  And --

THE COURT:  And what's the entire number on the list?

MS. TRAGER:  9,000, your Honor.

THE COURT:  Sorry, Mr. Gratz, you were going to add?

MR. GRATZ:  Yes, your Honor, I was going to add that the question -- what we haven't heard is we need these additional people because they are going to have particular, noncumulative information that the 22 just don't have.  The 22 don't have it, and these other one, two, five have that information. We have a reason to think they've got it when the 22

don't.

We haven't heard that because we don't think there is one. We understand the desire for more discovery. Obviously, more discovery is always, you know -- obviously, one wants more rather than less, but that's why we look at proportionality and burden. And one of the things we look at is is this information going to add something that justifies the burden and expense, or is it going to be cumulative of what we already have?

And there is no -- there is nothing on the table here indicating that anybody else is any different than these 22. And one reason we think that's especially true is they haven't even said who the other people are.

MS. TRAGER: Your Honor, I find it interesting that they're saying that we have this information already when you compelled them to further supplement the information from Skidmore, for example, and that was July 15th, and we still don't have that information. So that was six weeks ago, and we don't have the third-party information that they're saying that we have.

And to the extent we may have responses from some of them, yes, we do have responses from

some of them, but the responses -- in proportionate, they're going to say, well, if one customer said that we canceled our subscription because of X, Y and Z or -- that's not representative.  So you have a de minimis argument that we haven't talked to enough people.  And if Upcodes wants to waive the fact that they're not going to argue that it's not representative or it's not de minimis or it's not something like that, then maybe the number can be less.  But so far, they've refused to agree to forego an argument like that.

So we need to talk to more than just 20 people in scope of -- in relation to or context of the 9,000 people on the list.

MR. GRATZ:  And to respond to that directly, we are happy to stipulate that these 22 people are representative, period.

THE COURT:  But that doesn't -- that wouldn't necessarily address their concern that you could turn around and say, you know, the damages are minimal or de minimis.

MR. GRATZ:  Well --

MS. TRAGER:  Correct, your Honor.

MR. GRATZ:  So, your Honor, I think we are going to say the damages are de minimis, but we're

going to say that based on their revenue numbers, which have gone up, not down, and the fact that the customers they've presented either still buy their products as well or -- or whatever.

So that is -- we may be arguing that they weren't harmed very much, but we're not going to say they weren't harmed very much because they can't point -- because these 22, let's say -- for example, let's say all 22, right, turn out to have left ICC and are just -- have dropped all of their ICC products and just buying Upcodes products, right? Let's say that's true. By the way, I don't think it is, but let's say that's true.

If that's true and they argue, well, look, these 22 dropped theirs, and that means everybody else on their customer list also dropped their ICC subscriptions, we're happy to say, yeah, that's -- we're happy to say that's what that would mean. And that's because there isn't anything differentiating these 22 from anybody else that we can see.

I also want to respond briefly to the point that that opposing counsel made with respect to, sort of, having difficulty getting information or having objections that these third parties they've already subpoenaed -- these third parties they've

already subpoenaed have interposed objections and not produced information they want.

Well, the remedy for that isn't to subpoena some more people and hope they won't object.  The remedy for that is meet and confer about those objections, and if they can't be resolved, bring them to the Court for resolution.

MS. TRAGER:  Which, to respond to, we are doing, and we have been meeting and conferring.

But based on our hearing in January, we agreed to forego a wider range of customers based on the customer list, which we didn't have when we issued the initial subpoenas, so we were guessing on which customers may or may not be current customers, might have information, might -- we just -- it was our best guess at the time.

And then we sought the customer list at that time.  It was ordered to be produced, which we had to move to compel to get it.  Now, we have the best benefit of it.  And now we've selected a handful of people from the 9,000 that we want further information from.

And it's -- you know, that is -- the customer list has been found to be relevant.  Our areas of inquiry have been found to be relevant.

And it is not out of proportion or an undue burden to have some of these customers talk about why they switched from ICC and its licensees to Upcodes, and what their discussions were and what incentive they had to do that.  And it goes to harm and not just lost revenue, but lost licensing fees -- lost revenue in form of lost licensing fees or direct revenue to ICC.

MR. GRATZ:  And we still haven't heard anything about why additional people would have answers that these 22 who are already subpoena recipients would not about those topics.

MS. TRAGER:  I feel like we've discussed that.  We've talked to a small subset of people that we investigated on our own.  The other people come directly from Upcodes' customer list and that we did not have at the time that we issued the original subpoenas.  And we need to talk to more than just the 22 to avoid a de minimis argument, as we were just talking about.

MR. GRATZ:  And I think I've addressed the de minimis argument, that is, we're not going to argue the 22 don't paint a complete picture and can't be extrapolated to others.  We're happy to stipulate that the 22 can be extrapolated to others.

MS. TRAGER:  And extrapolated, as we responded, is different than de minimis.

THE COURT:  Can I just ask -- it sounded like -- and I may have misheard, but it sounded like Mr. Gratz had said they weren't going to argue with de minimis based on numbers, they were going to argue it based on, like, monetary figures because revenues have gone up.

If that's the case, then is his representation today not sufficient?

MS. TRAGER:  I think it's two different arguments, your Honor.  One is, you know, the amount that is charged from any individual customer, right? This isn't a high spend per customer, and the licensing fees isn't a high spend per customer.  So it could be true that a customer spend is low, but, in the aggregate, it is not.

So is a customer -- and my understanding from what he said is that the revenues were diminished, not that our selection of people wasn't representative of it.

MR. GRATZ:  I think I may need to clarify, sort of, my -- I may need to clarify and maybe broaden my offered stipulation here because I really do think -- I mean, it's intended to cut off the

argument that the Council is worried that we're going to make if they don't get more people, right?

It sounds like the Council is worried that if they don't get more people, we're going to say, well, you only had these ones and that's not very many, and you can't show anything about the other people on the list because that's not a representative sample, it was cherrypicked. Like, you paint this bad picture based on these 22, but the real picture is different, if you had gotten -- if you had talked to more customers.

We're not going to argue that, right? And that's what I mean by we're happy to stipulate that the 22 they've got are representative and that you can, sort of, treat the whole group as if -- you know, like these 22, right?

If they all did X, we're happy to assume for these purposes that everybody did X. If half of them did X, we're happy to assume that half of all people did X, right? That keeps us from arguing things that would necessitate them going out to, you know, gather more information from those other customers.

MS. TRAGER: Your Honor, the problem with that is the customers that we're able to identify

with the first 22 were individual customers.  And now that we have the customer list, we have what they call their enterprise customers, which are their businesses compared to individual users.

And what we anticipate to find in our new batch of subpoenas compared to the first ones is a different level -- a different type of customer. It's a company that will have multiple users compared to just, you know, Joe Smith in his office using Upcodes services.

So to answer your earlier question, the difference in our new batch compared to the 22 is one target -- namely, individuals that we're able to investigate on their website -- compared to, now, we're trying to get information from their largest customers, which we think will be more representative to Mr. Gratz's point.  But we were not -- we did not have the benefit of talking to the company or the enterprise customers because we didn't know who they were until we got the customer list.  So we --

MR. GRATZ:  I'm sure -- I'm sorry.  Go ahead.  I didn't realize you weren't finished.

MS. TRAGER:  No, it's okay.  Go ahead.

MR. GRATZ:  I'm sure that my opposing

counsel didn't mean to misstate this, but that is false, and that is the -- and the reason everyone on this call knows that's false is we just had a motion -- the last time we talked was a motion to compel about Skidmore, Owings & Merrill, one of the largest architecture firms in the world.

Other people they have already subpoenaed are Ennead Architects, one of the other largest architecture firms in the world.  Arup Group Limited, the largest engineering firm in the world. ARCO National Construction, IDI Group, TestFit, SAA interiors + architecture, FXCollaborative.

Now, it is true that they have subpoenaed some individuals, but most of the people they have already subpoenaed are companies.

Also, I am hearing for the first time that they -- anything about who they want to subpoena. All we have heard so far is we want it to be lots and lots of people, and we won't tell you who.

And I think this all just leads into the feeling that this is a desire for more.  And wanting more is always understandable, but the question is, is this "more" justified and proportional based on what's available from existing sources who have already been subpoenaed, who are parties in the

case, or who are business partners of the plaintiff who the plaintiff simply hasn't subpoenaed?

MS. TRAGER:  Your Honor, to just respond to that, while some of the companies that we may have subpoenaed the first time are large companies, we do not believe that those are enterprise users, which are the group of users that Upcodes classifies as their bigger users.  So they may be businesses and based in businesses, but they are not the group of customers that Upcodes calls enterprise users, which are their larger revenues, their larger customer groups.

And to date, in our meet and confer process, we've been focusing on getting agreement on the attachments to the subpoena, which has led to the five topics you see before you today compared to the much broader topics that were at issue in the Skidmore subpoena and their responses.

We've only -- they keep saying, well, we'll only let you talk to five -- I'm sorry -- we'll only allow five subpoenas.  And that's been their position.  So up and to this point, there's no point in saying, these are our list of people we're trying to subpoena, because they wouldn't even agree to the attachment, let alone a selection of people more

than five.

THE COURT:  Can I just ask a question about the number then?

It sounds like you're seeking 70, and they would all be these enterprise entities?

MS. TRAGER:  Yes, your Honor, that is our objective.

THE COURT:  And why do you need 70 of the enterprise entities?

MS. TRAGER:  It seems like a fair number in context of the 9,000.  It's not -- you know, it's not a full 10 percent -- I'm sorry.  It's not a full 1 percent.  I can't do math this morning.  I apologize.  But it's enough.

We're trying to find a number -- we would like to do more, but we're trying to meet and confer and compromise and work -- I mean, we'd be happy to do 90 or 100 or 120, but we looked at the customers and was like, okay, what's the smallest amount that we could do, you know, to try to meet and confer and work this out amongst ourselves?

MR. GRATZ:  They're making up numbers, your Honor; that is, they haven't told you what percentage of our enterprise customers they are. And they've never in meet and confers suggested they

AMM TRANSCRIPTION SERVICE - 631.334.1445

were going to limit this to enterprise customers instead of subpoenaing individual humans who just happen to have an Upcodes account, which is what they did in round one.

And so, you know, I'm happy to try and process this live, but there is no reason why they need more than the 22, given that several of them are enterprise customers, the, like, several that I named. Dattner as well is a very large architecture firm who is an enterprise customer who has already received a subpoena.

With the enterprise customers they've already got, why that has turned out not to be sufficient, and why, in light of what they have learned, they still need more.

Again, we're just hearing, well, but, you know, we want more. And that's not an argument for, sort of, this  -- that overcomes an objection based on proportionality and cumulativeness.

MS. TRAGER:  Your Honor, to respond to that, again, the idea of "more" is not more for the sake of more.  There's 9,000 people on the list, so we are trying to find a number that we can meet and confer and agree on.  We're not going to both agree that it's reasonable, but we're trying to compromise

and find a number that everyone can live with.

Does the number have to be 90?  Does it have to be 70?  I don't know.  But it needs to be more than five, which is what they offered.

And we can even agree on the attachment to the subpoena, which has led us back to today.  And we have been talking about the attachment and all of these different things with them not only since July 15th, when the order in Skidmore came out, but we started meeting and conferring well before that in, I would say, March of 2025.

So it's been a process to try to get this information.  It's not more for the sake of more.  We're trying to engage in discovery in a streamlined and productive manner, and we have been frustrated, and Upcodes has rejected every step of the way, leading us back here to you again discussing this issue.

MR. GRATZ:  And a few quick items in response, your Honor.  The parties have been trying to work together on meet and confer, and I don't think it's particularly productive that we're hearing for the first time now that they intend to limit themselves to enterprise customers.

The most recent number that I have in the

total universe of enterprise customers is that there are only about 120.  And so, if we're shooting for 10 percent, like, you may already have them among the enterprise customers they've already subpoenaed, but you don't have to go very far to get it.

And this is information that I think is apparent from the customer list, but if it's not, this is something that would have been great to meet and confer about, that they didn't want to just subpoena, like, dozens more individuals like they did the last round.

MS. TRAGER:  And, again, we subpoenaed people who -- oh, sorry.

THE COURT:  No.  No worries.

I just want to confirm, Mr. Gratz, did you say that you only have 120 enterprise customers?

MR. GRATZ:  The most recent number I have at my fingertips is 120.  And I want to be careful to note the limits of that because the limitation of enterprise customers is something that has just been introduced into this discussion for the first time during this phone call, and so I haven't had an opportunity to fully research that, but the most recent number that I have is 120.

MS. TRAGER:  And, your Honor, we haven't

gotten that number before right now.  The customer list just has lists of customers on it with e-mail addresses and phone numbers.  And we are left to try to figure out from -- you know, like, my e-mail is staci.trager@us.dlapiper.com, so you would think I work at DLA Piper.  But the only indication on the customer list would be that e-mail address of whether it's a business customer, an individual user or an enterprise customer.

And we have propounded discovery that has been requesting these agreements, so why today is the first time that opposing counsel says that he is aware that we want to know who their enterprise customers are -- we have been asking for agreements with them, and it's not a new thing that we've been asking.

MR. GRATZ:  Well, that --

MS. TRAGER:  And the idea that we want to talk to the biggest customers because that -- again, for proportionality, wouldn't that make sense? Right?

If we're going to take a selection of people, and there's 120 enterprise customers out of the 9,000, we could get the -- the ability to extrapolate from a big user that has a license for

their organization is very different than someone, say, that might have signed up for their website for free and not paid anything to do so.

And the real harm to the business is, really, we're all fighting for these business customers, right? We're not looking for the person who might be remodeling their house. We're looking for the organizations that are making wholesale switches from one company to another, and that's really where you're going to find the harm. And those are the people that buy, you know, licenses from us, and they have the codes on their desktops, and now we're losing that business.

MR. GRATZ: And that's a limitation that plaintiffs have never been willing to make at all to the scope of who they were looking to talk to and information that they have not asked for in the context of this meet and confer at all.

And so I'm happy to do what we can on this call to provide information and find a path forward, but what we have been hearing so far is, well, we need a lot because we need a representative sample of all 9,000. It's like, well, that sounds like you're going to be going after a lot of individuals. And now I'm hearing, well, no, we're not going after

individuals.

And I think part of this is just, like, they're asking for a number without telling us who. And it sounds like maybe they don't even know who, which it strikes me that's premature to figure out what the number should be.

MS. TRAGER:  Your Honor, we know who.  We could issue these subpoenas tomorrow, if you allowed us to do so.

MR. GRATZ:  Will you tell us?

MS. TRAGER:  Yeah.  We have the list.  We can send you a list when we hang up of all the people.  The subpoenas are ready to go.

MR. GRATZ:  Why haven't you done that in the meet and confer when we've asked?

MS. TRAGER:  My understanding is we've never reached that far in the meet and confers because you haven't agreed to the subpoenas, you haven't agreed to the attachment, and where -- I misspoke earlier.  It wasn't five customers that we could subpoena.  It was five customers that you would give us declarations from.

So we haven't even gotten there, which ends -- as soon as we realized we were at impasse, we brought it before the Court because discovery is

currently set to end at the end of this month.  So if we go back, we're happy to meet and confer. We're happy to share -- you need another week on your Skidmore documents, but we have until the 30th, which is why we made the motion to continue because we're going to all run out of time here.

Plus, as you know, Joe, we have all these depositions to finish this month and with scheduling and the calendar, I'm not sure how this is all going to work, especially when we still need to provide each other further information.

MR. GRATZ:  And I just -- I don't want to get deep into the meet and confer history, but in March of 2024, we asked who you wanted to subpoena, and we didn't get an answer.  We asked, who do you want to subpoena?  And that helps us understand the burdens and alternative to subpoenas.

And then there was silence for 15 months. And we thought this issue was dead.  And now, here we are.  So the idea that we -- that "who do you want to subpoena" is a new ask, I think, is not quite accurate.

MS. TRAGER:  In March of 2024, we had just received your customer list a week or two prior. And at that point, we didn't know yet because we did

not have time to go through the 9,000 customers and figure out who we wanted to subpoena because, as mentioned, the 120 enterprise customers were not identified, and all we had were e-mail addresses to try to figure that out.

So, as you can imagine, that process took some time, but we have -- and then we had the issues with Skidmore, and we agreed that that would be our test case. And that order was granted, and that subpoena was found relevant and reasonable. And here we are with the rest of them. We don't want to serve another 60 of them and then have the same thing and have 60 motions to enforce subpoenas. That's not efficient, and that's not a good use of the Court's time or either of our clients' money.

MR. GRATZ: We provided the customer list in February of 2024, and we still, as of right now, don't know who you want to secure. Maybe you do.

But it seems like that ought to be an important step in figuring out whether it is justified in subpoenaing those people in addition to the 22, including the half dozen or so enterprise customers that have already been subpoenaed.

THE COURT: Ms. Trager, I just want to ask if -- it sounds like you have approximately 22

customers right now that you've subpoenaed.  It sounds like some were businesses, some were individuals, maybe, you know, a handful were enterprise customers.

If, in fact, there's only 120 enterprise customers out of the 9,000, what if the third-party subpoenas were dropped to somewhere along the lines of another, you know, 20 to 30 or so, which would give you about 50 third-party customers, and the chunk of this next batch would be these enterprise customers, for which it sounds like you don't have that many already?

MS. TRAGER:  Your Honor, 30 of them -- we could compromise and agree to 30, provided that our five categories of information that we're seeking are also deemed acceptable.

And, again, those five categories are in a footnote of our letter, and they are a subset of those categories that you already found relevant and reasonable in the Skidmore subpoena, which I believe are 20 or 30 categories in that letter.

So we've, one, narrowed what we're seeking from the people, and we would agree to 30 additional customers, your Honor.

THE COURT:  And the footnote you're

referencing is Footnote 1 of ECF --

MS. TRAGER:  Yes, your Honor.  Yes.

THE COURT:  If you were to get those, it still doesn't seem like this would get done, you know, reasonably by September 30th.  And you have proposed a deadline of December 12th, which is, like, roughly a little under three months.

Is all that time necessary, or could this be done quicker?

MS. TRAGER:  We would hope it could be done quicker, but we think December 12th is realistic in light of the time that it takes -- you know, we need to file -- we can finalize the subpoenas.  Say we got them out tomorrow.  We need to give the parties, the opposing parties at least ten days to comply.

In my experience with third parties, that's generally not enough.  They'll come back to us at the end of the ten days and say, we're working on it.  We need another 30 days to produce those documents.

So then we get the documents, and then we can review them, and then we have any follow-up, which is why we think it will take an additional -- until December to get that completed.

THE COURT:  Mr. Gratz, anything you want to

AMM TRANSCRIPTION SERVICE - 631.334.1445

add?

MR. GRATZ: Yes, your Honor.

20 or 30 enterprise customers is, based on the numbers that I have, quite a large percentage of our enterprise customers. And we still, sort of, don't have a reason why that many is not cumulative of information they would receive from the enterprise customers they have already subpoenaed nor why they need all of the categories of documents.

As your Honor noted, many of these documents are things that are not exclusively in their possession. Only one category of these documents, the information about the decision to use Upcodes, is something that would be exclusively in their possession.

And, obviously, this is not -- none of this is to prejudge -- like, these are third parties, many of whom are using their own counsel, and so this is not to prejudge whatever objections they may interpose.

But in order to focus this on, sort of, getting this done in a reasonable amount of time, my -- one way of making that happen is to limit these to the fifth category that was identified, the

only category of information that is exclusively in the possession of customers; that is, communications regarding the decision to use Upcodes.

MS. TRAGER:  Your Honor, I can respond to that, if you want.  I feel like we've discussed it already.

These categories are seeking relevant information.  It is not overbroad.  It is reasonable.  It is not the 30 -- 25 to 30 that we asked the first time, so it is already a compromise.

In conducting discovery, we're entitled to inquire in all of these areas.  There is no argument that it's not seeking relevant information.  And we can't say if it's a burden or not a burden on these customers because we haven't even talked to them yet, so that's all subjective.

And to the extent that they want to raise that argument, I feel that that's an argument for another day.  But five categories compared to 30, 30 subpoenas compared to 70 or 90, it's a much smaller amount.  And we're trying to compromise to get this done, but we still need the ability to conduct discovery and explore these arguments in order to prosecute our claims and defend against their defenses.

THE COURT:  Okay.  So I'm going to -- I think what I'm going to do is just give you a short written order.  If it doesn't go out today, I'll issue it certainly no later than tomorrow.  And that should resolve both this issue and then the question about the extension of time.

Is there anything else anyone wants to discuss or add?

MR. GRATZ:  Nothing here, your Honor.

MS. TRAGER:  Nothing from us, your Honor. Thank you for your time this morning.

THE COURT:  Okay.  Thanks so much, everyone.  Have a good one.

MR. GRATZ:  Thank you, your Honor.

0o0

                    C E R T I F I C A T E


     I, Adrienne M. Mignano, certify that the
foregoing transcript of proceedings in the case of
International Code Council, Inc. et al., v. Upcodes,
Inc., et al.; Docket #17CV6261 was prepared using
digital transcription software and is a true and
accurate record of the proceedings.


Signature  *Adrienne M. Mignano*
           _____
                ADRIENNE M. MIGNANO, RPR


Date:      December 4, 2025