UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK


INTERNATIONAL CODE COUNCIL,
INC., et al.,                              : Docket #17-cv-06261

                        Plaintiffs,   :

      -against-                       :

UPCODES, INC.,                             : New York, New York
                                             February 10, 2026

                        Defendant.    :

---------------------------------:

                    PROCEEDINGS BEFORE
              THE HONORABLE VALERIE FIGUEREDO
              UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:        MORGAN LEWIS & BOCKIUS LLP
                      BY:  JANE W. WISE, ESQ.
                           EMILY RADIN, ESQ.
                      1111 Pennsylvania Avenue, NW
                      Washington, DC 20004



For Defendant:        MORRISON & FOERSTER, LLP
                      BY:  SARAH DOUDAR, ESQ.
                           ADITYA KAMDAR, ESQ.
                           HANNAH JIAM, ESQ.
                      425 Market Street
                      San Francisco, California 94105

Transcription Service: Marissa Lewandowski
                       Phone:  (631) 813-9335
                       E-mail:marissamignano@gmail.com


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

THE DEPUTY CLERK:  Good morning.  This is the matter of International Code Council, Inc., et al., vs. UpCodes, Inc., et al., case number 17-cv-6261.  The Honorable Valerie Figueredo presiding.

Counselors, can you please make your appearances for the record, starting with plaintiffs' counsel?

MS. WISE:  Good morning, Your Honor.  This is Jane Wise, and I'm joined by Emily Radin, both for Plaintiff ICC.

THE DEPUTY CLERK:  Defense.

MS. DOUDAR:  Good morning, Your Honor. This is Sara Doudar for Defendants UpCodes.  I'm joined by Adi Kamdar, and I think Hannah Jiam is on the line, too.

THE COURT:  Good afternoon, everyone.  This is Judge Figueredo.  The last time we spoke in early January, we had addressed an issue with these RFAs. At that time, the parties had -- there was arguments, at least, that the parties hadn't potentially had an opportunity to meet and confer and discuss the 42 requests.  It was numbers 273 to 314.

I'm just wondering if, since that time,

there have been any discussions or if the issue is still open?

MS. WISE:  No, Your Honor, we haven't had further meet and confers concerning the RFAs.  I think our position -- ICC's position with respect to the RFAs is that we've already provided responses and that no further response is necessary.

THE COURT:  Okay.  So -- and I know we tackled this the last time, and as I understood it from the last conference, the responses for the, you know, I think it was, like, over 3,000 RFAs were predominantly, you know -- I'll say boilerplate on objections.  And then I know that there was these 42 that -- I think there was an argument that they might potentially be exemplary, which I understand ICC had objected to.

MS. WISE:  Right.

THE COURT:  And then we had a discussion about whether there could be, you know, some type of response that was either an admit in part or a deny in part, some type of qualification.

So what I'd like to do is the parties haven't had additional -- so, you know, I don't know, from your discussions, whether you think there's a way to reach a compromise given that, you

know, the rules do permit for qualifications to the RFAs. But I think -- I do think, given the prior responses, that there needs to be -- given the boilerplate or the nature of the prior responses to all the 3,000 or so RFAs, that there has to be, you know, some discussion about providing responses to these 42 in particular.

MS. WISE: So, Your Honor, I think our position with respect to that is that we had offered to do that before the close of discovery in lieu of responding to the -- I think it's 3,200. I don't remember the exact number, but we received information from UpCodes that that was only a conditional offer conditioned upon two things: One, our acceptance of those being identified as exemplary, and, two, us providing substantive responses, which to us sounds more like an interrogatory. So we didn't agree to do that.

And so the motion before the Court, I believe, was a protective order, and UpCodes has not since moved and I think time has expired to move to compel responses to those.

MR. KAMDAR: Your Honor, this is Adi Kamdar for defendants. Can I respond?

THE COURT: Yeah, go ahead. Go ahead.

MR. KAMDAR:  I think we hashed out most of these on our last hearing, most of these issues. Our understanding is that we were awaiting an order from the Court coming out of the last hearing.  We haven't since met and conferred with the other side about these issues.  But our understanding coming out of the hearing was that -- and -- and going into the hearing was that we have limited our request to just those 42.  And we tried to make clear that the condition was not for substantive responses, it was just for responses and responses beyond what we received, which was, essentially, "We're not going to respond because there's a motion for protective order in place."

So I think we discussed all of this at the last hearing.  If Your Honor wants us to meet and confer further, we're happy to do so.  But it appears that ICC has taken its position that it thinks its responses are complete, and I think our position is that the responses are not complete or adequate.  It's all on the table.  So I think if you want us to re-brief this, we can, but --

THE COURT:  No, you certainly don't have to --

MR. KAMDAR:  -- I think --

THE COURT:  You don't have to re-brief it. I had -- I was wondering if perhaps, given that the posture of the last conference was somewhat odd, right, because the answers to the RFAs were filed at the same time as the letter motions.  And I understand the parties hadn't had time to meet and confer, and I wasn't sure if you had in the meantime.

I will enter a written order today resolving the 42 RFAs.  We can just -- we can go ahead and turn to the issues that were raised in the most recent submission.  The letter came in at ECF280, and then there was a response at ECF283-1. I'm trying to understand, though, what exactly UpCodes is looking for when it says like that, for instance, some of the -- it's requesting supplementation for some of the outdated and incomplete financial metrics.  Can you all be more specific?

MS. DOUDAR:  Yes, Your Honor.  So what UpCodes is looking for is there is a bunch of financial and metrics documents, specifically documents related to ICC's revenue, profits, budgets, costs, metrics about user view count, things of that nature, that ICC has produced some

versions of, like, for example, a 2015-2016 version of, but we are asking for the 2017 and beyond versions. So basically making their current production up to date.

They've already produced some documents of the nature. They just haven't produced a complete production that gives us a lay of the land across all of the relevant years. So, for that section, there's two main categories of disputes that UpCodes has. But with the supplementation of the outdated docs, that's -- that's really what we're looking for.

And we put in our motion the list of Bates numbers of documents that are outdated and UpCodes is asking for more recent versions -- or more -- more complete over the span of the years that are relevant.

THE COURT: So it sounds like you were given up to a certain time period, but weren't given after that time period?

MS. DOUDAR: That's -- for most of the docs, that's correct, Your Honor. There's a few docs where we were only given, for example, things starting in 2022, and we need backdated versions of them as well. So there are -- there are a few of

those docs where it goes backwards, but -- and I think almost for all of them, it also goes forward to current dates.

MS. WISE:  I'm happy to respond, if that would be helpful.

THE COURT:  Yes.

MS. WISE:  So I think that level of generality is exactly what we saw in Upcodes' motion, and it's not helpful.  ICC has produced through, as far as they are available, its sales cost data.  We address this in our letter.  We've updated our sale and cost data, we've updated our consolidated financial data up until the point it exists.  That has the royalty report information in it.

So, for example, I think in copyright one, there was an Excel spreadsheet that had information on ICC's royalties, but that information is in a different form in its consolidated financial report, but it's current.  So what we tried to make clear in our response was that for the category of documents that Ms. Doudar just listed, we believe we've supplemented those, with the exception of documents that are not supplemental, and those are things like attachments to emails.

So there are a handful -- like, I think Ms. Doudar referred to a 2014 budget estimate. That was an attachment to an email that was produced in copyright 1. If they wanted that information, they should have moved on it in copyright 1. We're not going to go back and give, you know -- first of all, I don't know how you supplement an email. But setting that aside, there's not a basis for saying that you have to supplement documents that hit on keyword searches and return email attachments. They're just two totally different categories of information.

So I still don't understand what specific information has not been supplemented that UpCodes wants. And I didn't see in their letter what version they think is backdated and the basis for us to go backwards in time.

MS. DOUDAR: Your Honor, can I respond?

THE COURT: Yes, but it might be helpful for purposes of the discussion --

MS. DOUDAR: Yeah.

THE COURT: -- if we just maybe provide examples of documents that you think -- you know, spreadsheets or financial data that have not been supplemented that should be.

MS. DOUDAR:  Of course.  So Ms. Wise mentioned that they have supplemented sales and cost of goods data, but I don't think that's actually the case.  UpCodes looked through ICC's supplementation and through their production, and the latest version of sales and cost data is through September of 2023. So that's one example of data that needs to be supplemented.  There are also metrics data that needs to be -- for example, the backdated that Ms. Wise was talking about.  ICC has produced user visits data from 2023 to 2025, but UpCodes needs data that backdates it from 2017 to 2022.  And ICC has repeatedly produced data from 2017, so I think it recognizes the relevance.

But just to make it very clear, the relevance is, of course, we need pre-alleged infringement data so that way we can compare and we can test out ICC's theory of harm, saying that it was because of UpCodes.  In order to know whether or not it actually was because of UpCodes, we have to look at things that predate the alleged harm that ICC says that it has from UpCodes.

So those are two types of examples.  And then, also, like Ms. Wise mentioned, the budget -- budget documents, we're obviously not asking for

supplementation of emails.  The budget document that was produced is an official financial document.  We want the 2015, 2016, 2017 versions of that same budget document.  And ICC has not told us through the several emails that we've sent them that these documents don't exist.  They keep referring back to Ms. Wise's objection over budget -- the email not being able to be supplemented.  But we're not asking about the email, we're asking about a financial document.

And it seems unlikely that a budget document would not continue to be created for subsequent years, but -- and ICC has not said that that's the case either.

THE COURT:  Okay.  So can we start with the sales and cost of goods sales data?

MS. DOUDAR:  Yeah.

THE COURT:  I thought I saw, in their letter, ICC says it supplemented its sales and cost data post 2023.  But you just indicated that I think you only got through 2023.

MS. DOUDAR:  Right.  That's correct.

THE COURT:  So, Ms. Wise, do you know -- do you know what you meant by the post 2023?

MS. WISE:  I think the easiest thing would

be for us to just provide Bates numbers for those, because my understanding is we've supplemented that through 2025, or to the extent available.  So we noted in our letter that, for example, the consolidated financial report for 2025 isn't yet out.  We understand our obligation to supplement is ongoing, so -- but we don't have one to supplement yet.

But I don't -- you know, if they can't find it, that's an easy solution to point them to what we've produced.  And I thought we identified certain documents where those had been supplemented in the letter.  But, look, we, our position is not that they only get through 2023.  We agree that the financial information needs to be made current, and I believe we've already done that.

The backdating of information, I think that was to do with view data.  I don't know that that was ever asked for, but I think that's something we can accommodate to the end of -- I think, to 2018, not to discovery in copyright 1.  So copyright 1 discovery ended in 2018.  So with the rest of discovery in copyright 2 and the false advertising case, we've agreed to a timeframe that would be sort of after the end of discovery in copyright 1.

And to the extent we haven't already, which I think we have, we're happy to provide the view data from 2018 to 2022.  I think there may be a gap between what UpCodes is seeing in the form of data. I know ICC changed its metric database for, like, the background of information on its website.  So I think there have been produced documents, but they don't necessarily look identical.  So, again, I think pointing to that Bates number is probably the easiest.

And then the budget information, I haven't heard an explanation for why UpCodes thinks it's entitled to go back on discovery in copyright 1 and get budgets from 2020 -- or 2015, 2016, 2017. That's, you know, over a decade ago.  What are -- what's the 2015 budget relevant to in this case? There was no showing of that in this document.

And for all of the emails that have been exchanged over this, they've just said you need to update this Bates numbered document, which is an attachment to an email.  So that's why we're -- we've been at an impasse on this, because we don't understand what the basis is for this untimely request for outdated budget information.

MS. DOUDAR:  Your Honor, can I respond to

that?

THE COURT:  Why don't we do this?  So it sounds like with the sales and cost data and cost of goods sold data that they can -- they claim they've given you through the end of 2025 or what they have through 2025, and they're going to identify Bates numbers for that.  It sounds like for the user visit data, they're willing to give you through 2018, but not 2017.

Is there -- do we need to talk about 2017, or would that resolve the issue?

MS. DOUDAR:  No.  Yes, Your Honor, I think we would need to talk about 2017.  I mean, all of the other data that we've been given and asked for have gone back to 2017.  So 2017 is relevant to this case to see what was happening with ICC pre-UpCodes.

And just one thing that I want to mention is Ms. Wise keeps mentioning that when we reached out to them and we're at an impasse, but we have actually not received any response from them.  We've asked them to meet and confer on these exact issues five times, and they have not responded to our requests once.  So we have had no way to have these discussions, and ICC has never presented its position until we got the responsive letter.

MS. WISE:  I disagree with that characterization.  I know that there was a meet and confer before this letter happened.  There was a period of time when the parties were in depositions.  And I agree, we didn't timely respond to some emails while the parties were, you know, finishing up discovery.  But I disagree that you didn't have an answer on these.  I know they were discussed.

MS. DOUDAR:  Your Honor, this is actually an exhibit to Upcodes' letter.  It's the string of emails of us asking them to meet and confer.  And you can tell from that string of emails that there was no meet and confer.  And ICC never attached its own exhibit indicating there was a meet and confer.  So Upcodes' position is actually ICC has never met and conferred with us, despite our repeated request to meet and confer.

THE COURT:  Well, since we're here and we want to try to resolve the dispute, let me just ask:  The 2017 data for the user visit -- the user visit data that we're talking about is relevant to this case why?

MS. DOUDAR:  Because it will show -- it can help us see whether ICC's user views were always going down, whether -- whether it actually is the

case, like ICC is claiming, that UpCodes is causing the user views to go down.  But the data that we have, if it predates UpCodes, it can help show what has been a trend at ICC the entire time, and that helps UpCodes develop its damages theories and its rebuttal to ICC's damages theories.

MS. WISE:  User view data was produced in copyright 1 and was part of the expert report, so you're welcome to use that information.  But for copyright 2, I don't understand why you should get a second bite at the apple on additional, you know, cuts of views.  There is data that was presented.

THE COURT:  It sounds like that data only went to 2018.  Was there some agreement that you wouldn't -- that, I guess, what was obtained in copyright 1 was sufficient and there wouldn't be additional information sought?

MS. DOUDAR:  No, there was no such agreement, Your Honor.  And we served RFPs in copyright 2 that were specific to things like user views, metrics, analytics, and ICC agreed to produce those documents.

THE COURT:  But with the RFPs that you served went -- asked for 2017.

MS. DOUDAR:  They were -- they were general

RFPs.  They -- I don't think they specifically asked for 2017, but there was -- there was no agreement between the parties that we could not ask for documents that predated copyright 2018.

MS. WISE:  I believe ICC submitted an objection.  I don't have the docket number in front of me, but ICC's objections were always time limited.

MS. DOUDAR:  Actually, Your Honor, I do have the request for production in front of me, and all of the requests actually do ask from January 2017 onwards for all of the documents at issue in Upcodes' letters.

THE COURT:  And there was an objection based on the time limit from ICC?

MS. DOUDAR:  No, actually, their -- well, their response says that they will produce it on a monthly basis since January of 2017.

MS. WISE:  I think there's a relevant time period objection in the introductory objections that -- like I said, I don't have it in front of me; I'm trying to pull it up -- that usually says something along the lines, "Unless otherwise stated, we interpret the relevant timeframe to be, you know, 2018 forward."  And that was based on the close of

discovery, because we've maintained a consistent position throughout discovery that 2017 discovery is over.  I'll try and pull it up.

MS. DOUDAR:  Your Honor, I understand what Ms. Wise is saying, but that does not negate the fact that their actual response to the RFP states that they will produce documents on a monthly basis since January of 2017.  So that's what's relevant here, is the response to the specific RFP, not a general objection they may have lodged.

THE COURT:  What's the RFP number?

MS. DOUDAR:  There's -- one of the relevant ones is RFP number 23.  It's within Exhibit 2 to Upcodes' letter.

MS. WISE:  I see that.  We -- if that's what we said, then we'll do it.

THE COURT:  Okay.  So then it sounds like for the user data you're going to get from January 2017, so that should resolve that dispute.

MS. WISE:  And, again, I think that may be something that has already been produced.

MS. DOUDAR:  I don't think it has, Your Honor, and --

MS. WISE:  If it's been produced, then we'll give you a Bates number.  If it hasn't been

produced, then we're happy to supplement it.

MS. DOUDAR:  Okay.  I think that resolves the user visits dispute and the sales and cost of goods document.  But going back to the beginning to -- importantly, UpCodes' footnotes, like, about 20 documents that we're asking for updated versions of, and we narrowly tailored those 20 documents.  We worked with our experts to figure out what our expert would need and came up with this list that directly falls within the RFP responses that ICC gave.

And so I just want to make sure that we're not just narrowing it much further to a couple documents.  All of those documents are important to supplement, and they're all directly responsive to the agreements that ICC gave us in their RFP responses.  So I just want to make sure that we will get updated versions of all of those -- those specific Bates numbers that UpCodes pointed out in its letter.

THE COURT:  Are you referring to footnote one?

MS. DOUDAR:  Sorry, Your Honor.  I couldn't hear that.

THE COURT:  No worries.  Are you referring

to, I guess, footnotes one through four?

MS. DOUDAR:  Yes.  Yes.

THE COURT:  All right.  At least footnote one for this current issue?

MS. DOUDAR:  Yes, exactly.  Footnote one for this current issue.

MS. WISE:  So we responded to this in our letter, and like I said, a number of these documents do include those attachments to emails.  The others, we're -- I want to be clear so that there's not an accusation that we did something other than we agreed to do.

ICC supplemented the sales, costs, and other financial documents through 2025.  We did not represent that they are going to be in the same form as they were in the identified documents.  So we will point them to documents where the information can be found.  But, for example, ICC doesn't track its royalty information the same way that it did in 2014 anymore.  So that is now in the consolidated financial report.

So we're not agreeing to go on a document-by-document number, which I think Ms. Doudar has been a little inconsistent about saying.  She said, "We aren't asking you to

supplement emails, but we want you to supplement the identified Bates numbers, which include attachments to emails."  So we're not going to supplement things that ICC has already produced to make it in a form identical to what it did in copyright 1.

We have agreed to produce documents sufficient to show the relevant financial information.  And to the extent that there's a time gap from 2023 to 2025, I believe we've provided that information and will agree to do so.  But I do not want to be ambiguous about it may not match information that was previously produced.

MS. DOUDAR:  Your Honor, can I respond to that?

THE COURT:  Yes, go ahead.  Yeah.

MS. DOUDAR:  So one thing that's just been a little bit hard for me to understand is that ICC has still not given us a statement that it does not have updated versions of the documents that we cited in our footnote number one.  Even in its letter, actually, it says that no further responsive documents exist within the search terms previously agreed upon.

But that's -- that's not the issue here.  And, importantly, that statement is not saying that

the documents we seek do not exist.  And ICC is not limited to just producing documents that hit on search terms.  They are obligated to collect and produce any responsive documents that exist.  So I just -- I'm confused at Ms. Wise's position because it seems to me that a lot of the documents that they're calling standalone, like a budget document, don't seem like the kind of document a company would not continuously make newer versions of, like a 2015 and onwards version.  And I haven't actually heard Ms. Wise say that they do not make newer versions of this, and it's not in their letter.  So we -- we -- they are obligated to produce them if they exist.

MS. WISE:  I actually don't think that's our obligation.  We agreed to produce documents sufficient to show our revenues, costs, the things that are traditionally produced in a lawsuit.  And we are not taking the position that we are not going to produce those things.  We're taking the position we have done that.

The budget data, I haven't heard why you think the budget data from 2016 is relevant.  I don't know if a 2016 budget document exists, to be frank with you.  I'm not saying that it didn't exist in 2016.  I just don't know why ICC should go

through the burden of producing a decade-old budget document when you have the actual sales and the actual costs for ICC's entire consolidated business.

So that's a separate issue.  But the --

MS. DOUDAR:  I can -- I can explain why the budget data is relevant.

MS. WISE:  From 2016?

MS. DOUDAR:  Yes.

So ICC claims that Upcodes' actions have harmed ICC -- have harmed ICC.  We want to test out that claim by looking to see whether ICC has always expected its current costs and revenues to be that way, and the best way to do that is by looking at ICC's budgets and forecasts.  So if we look at the 2016 budget and forecast, and it -- and it tells us that they were expecting a certain thing, and that thing, let's say, did not occur, they did worse than they expected, and that was pre-UpCodes' impact -- alleged impact -- then that would be important to rebut the narrative that UpCodes is the one causing ICC harm.

And as I mentioned previously, ICC has agreed to produce these relevant financial documents since January 2017.  And it's not that ICC gets to pick and choose what they consider relevant.

They've produced these documents before.  That's even implicit understanding that these documents are relevant.  But beyond that, I've also explained my explanation of why the budget documents are relevant.

And Ms. Furman, in her 30(b)(6) deposition testimony, also stated that ICC does prepare budget documents at least yearly.  So we have it on good authority that ICC does have these documents.

MS. WISE:  Your Honor, I'm happy to respond, but I only want to do so if it's helpful to you.

THE COURT:  Just to make sure I'm following this discussion, the budget document should be some of the Bates numbers referenced at footnote one; is that correct?

MS. DOUDAR:  Yes, that's correct, Your Honor.

THE COURT:  And we're not talking about -- we're talking about budget documents that you understand were updated yearly, and we're not just referring to attachments to an email?

MS. DOUDAR:  That's correct, Your Honor.

THE COURT:  And it sounds like they -- like ICC had agreed to produce these documents going back

to January of 2017.

MS. DOUDAR:  We actually -- for these documents, I think we have the older versions.  We need the updated versions through 2025.  So we have the first dates.  We just don't have the latter.

MS. WISE:  Would you mind actually pointing to the RFP that you think asks for budgets in the attachment or Exhibit 2 to your letter?  Because I'm not seeing it.

MS. DOUDAR:  Okay.  You'll have to give me a second, Ms. Wise.

I think it falls within the RFPs that talk about costs and revenues and documents that relate to damages, the last RFP, 27.  I think budgets are subsumed within that.  And ICC has produced its budget documents in the past in response to these RFPs.

MS. WISE:  Cost information or actual costs, it says documents sufficient to determine all costs incurred in developing and distributing your codes.  We've produced that.  The sales information or actual sales -- and there is no way that Request 27 that says all documents which relate to, support, or refute any claim of damages, injury, or harm incurred by you as a result of conduct by

UpCodes, align -- or sorry, alleged in your complaint, including any calculation of damages, is asking for budget information.

MS. DOUDAR:  I do want to point out that it does not say "actual costs."  It says "costs."  And budget data does show costs, and same with the sales.  Budget data shows the expected sales, expected revenue.  And the RFPs were not limited and ICC's responses to these RFPs were not limited to actuals, and I --

MS. WISE:  They are limited.  They're documents sufficient to show.  They don't ask for budgets.

MS. DOUDAR:  They are not limited to actual costs.

MS. WISE:  We've produced documents sufficient to show those costs.

MS. DOUDAR:  We -- we would -- I think the point is that we would disagree, Ms. Wise, that you've produced documents sufficient to show.

MS. WISE:  That's fine.  And I agree with you that there were a handful and, to my count, two or three that in the 20 -- sorry, in copyright 1, certain emails hit on search terms and budget data was produced in connection with those.  I don't see

a request making any specified request for budget or forecasting information in what you moved on.  And I don't agree that it's relevant.

The notion that you could look at budget information and see what harm was caused by UpCodes is crazy.  In 2019 and 2020, the budget could not have been accurate, given that the entire world went through a pandemic.  How are you going to suss out the difference between UpCodes and a natural disaster like that?  It just isn't logical.

MS. DOUDAR:  Ms. Wise, I do want to point out a few things.  One, sussing out what the cause of the harm is is up to the experts.  But, two, we're not just asking for COVID budget documents. These budget documents are -- the ones you produced are 2014.  You've produced some version of it in 2015.  There's also 2016, 2017, 2018, 2019.  This all predates COVID, and it predates any alleged harm by UpCodes.

So it's actually -- it's very relevant. And you can -- you can definitely use a budget document in order to determine whether there was -- the expectations had prior -- had previously been met by ICC and whether those expectations or lack of meeting those expectations had to do with UpCodes or

something else.  And that's exactly what the budget data can show.  And our expert agrees that this data is relevant and is incredibly necessary to a damages analysis.

MS. WISE:  Your expert didn't have it in copyright 1, so it wasn't necessary to his analysis.  You didn't move on it in copyright 1, and you didn't ask for it in copyright 2.  So I'm struggling to see why that information should be produced here.

MS. DOUDAR:  I will say -- I have heard you go back to copyright 1 a few times, but I do want to note that what we strategically decided to do in copyright 1 should not have any bearing on whether we need these documents in this case for our damages in this case.  So I don't think it's relevant --

MS. WISE:  It does when you ask us to go back over a decade.  You're saying, "Okay, we know discovery closed, but we see no reason to pay any attention to the close of discovery and copyright 1.  Please go back and redo those financial productions."  And that's burdensome.

THE COURT:  For the --

MS. WISE:  That's why there are discovery cutoffs.

MS. DOUDAR:  Ms. Wise, is it burdensome?

Because Ms. Furman mentioned that they are readily available documents.

MS. WISE:  Ms. Furman said that ICC conducts a budget process every year, and Ms. Furman testified that there's information in the GL.  That doesn't mean that you've requested it, and it doesn't mean that it's necessary to meet our documents sufficient to show requests.

MS. DOUDAR:  I'm just going to pause right now, because I think I heard the judge make a comment, and I don't want to talk over her.

THE COURT:  I just want to confirm, for the missing budget documents, it sounded like you were given information through 2019, but you're looking for information through the present?

MS. DOUDAR:  No.  For the budget documents, Your Honor.

THE COURT:  That's what I thought I heard at some point that you had -- they had produced -- ICC had produced information through 2019, but you were looking for 2019 onward.  Or are you looking for pre-2019?

MS. DOUDAR:  I think ICC may have represented that, but the only budget documents that we have are 2014, and so we want ones that, like,

are after 2014, 2015 to 2025.  There are some versions of their budget document that we have through 2017, but we still don't have anything that postdates that.  So we would want everything afterwards.  We don't have 2018 or 2019.

THE COURT:  And the RFP that asked for this is which one?

MS. DOUDAR:  It would be subsumed within RFPs 26, which talk about all costs, and budget documents do talk about costs; 27, which are documents that would help support or refute any claims of damages or harm incurred by ICC as a result of Upcodes' actions; and there was one more on -- it would also fit within RFP 22, which is about their unit sales, and so this would be their expected unit sales; and 21, their revenues, and so this would be the expected revenues.  And notably, none of those RFPs are limited to actuals.

MS. WISE:  Those document requests are limited, however, to documents sufficient to show, for 22 and 26 and 27, which does not call for budget.

MS. DOUDAR:  And, your Honor, I think Upcodes' position here would be that if they do not produce these documents, then they have not

sufficiently shown this information.

THE COURT:  Thanks.  Can I just ask, was this all raised and discussed prior to the close of fact discovery?

MS. DOUDAR:  Yes, it was.

MS. WISE:  No.

MS. DOUDAR:  Your Honor, you can take a look at the -- at Exhibit 1.  It's in the emails that are in the attachment to our letter.  It's -- we have a December 8th email on this.

MS. WISE:  Yes.  The --

MS. DOUDAR:  And a December 2nd email.

MS. WISE:  I'll clarify -- I'll clarify my position with respect to this, Your Honor.  The parties did discuss budgets prior to the close of fact discovery, but they did not discuss what appears to be Upcodes' morphed position, which is not that it wants attachments to emails to be supplemented, which is what is asked for in the email.  They gave us a list of Bates numbers and said, "Update these."  And we said, "We can't update those.  Those are standalone documents that were hit on by search terms."

And now they're saying, separate and apart, "We don't want you to update those Bates numbers,

even though that's what you said."  Now they're saying that, in the ether of request 27, they've asked for budget, which they absolutely haven't.

And we have not discussed their request for budgets being responsive to 22, 24, or 27, including in the email that Ms. Doudar pointed to.

MS. DOUDAR:  Your Honor, that's actually, that's not correct, because in our December 8th email -- we had a December 2nd email where we listed the Bates numbers, a lot of them being the same ones as the Bates numbers in footnote one, and we asked for an update.  And then ICC responded with this statement of they cannot supplement a -- they actually did not mention the fact that it's an attachment.  They just said they cannot supplement a budget from a single year ago.

We responded on December 8th saying exactly what we're saying now, which is, "To the extent that ICC has any versions" -- and I'm reading directly from the email -- "To the extent that ICC has any versions of the documents identified in Upcodes' list that have since been updated for later years -- there exists 2017, 2018, et cetera -- version of the 2014 budget identified in" -- and then list Bates number -- "ICC should produce it."  That was on

December 8th, and since then, ICC has not responded to that. And I think we followed up about five or six times after that.

THE COURT: Are there any additional documents in this category that we need to discuss?

MS. DOUDAR: Just -- I don't know if there's specific documents. We would just say that all the documents in footnote one, we want updated versions of. I don't know if Ms. Wise is worried about a particular document.

MS. WISE: I'm concerned about saying that we're going to update -- I feel like we've been around this particular argument several times. We're not going to update Bates numbered documents. We've produced documents in the form that they're maintained by ICC subject to our objections. And we believe that what we've produced is sufficient. But I've explained why we aren't going to do this on a Bates number by Bates number document.

MS. DOUDAR: Your Honor, unfortunately, I'm still not hearing from ICC that they do not have updated versions of the Bates numbered documents. And I did hear from Ms. Furman that they do have updated versions of at least some of these Bates numbers, including the budget documents.

So I just -- I don't think Ms. Wise is really addressing the issue, which is, do they have updated versions of these documents?  And I think I heard from -- her mention earlier that she's not sure.  So -- and these look like very standard financial documents.  So the presumption would be there would be an updated version.

MS. WISE:  I'll provide an example. ICC00039340 is a document listed in one of the footnotes.  That is an attachment to an email for a budget estimate for 2014.  We've talked in detail about why the budget estimates, as a general category that might be pulled like you pull other reports, were not requested.  And as an attachment to an email, you can't update an attachment to an email.  So either way, that's not going to be updated by Bates number.

We also discussed ICC00069239, royalty and licensing information.  I explained that ICC changed the way it maintains some of that royalty information so now it is in the consolidated financial report.  So it won't be updating that Bates number, but it is providing the same information in a different form.  That's why I don't want to say that we're going to update each Bates

number, because we're not.  But I do believe we've produced documents sufficient to meet our obligations.

MS. DOUDAR:  Just to address this attachment argument just one last time.  If a document is created in the ordinary course and then you decide to attach it to an email and send it off, that doesn't make the attachment not still updatable in its original form.  So obviously we're not asking for an updated email.  We're asking for the actual source of that attachment.  It was created. Ms. Furman stated that there were updated versions of it.

So that's really -- that's what we're asking for.  And I think -- I think it's been noted now that they do have updated versions of the budget documents.

And one thing I neglected to mention earlier is that, contrary to what Ms. Wise was saying, in our December 8th email, we also referenced the exact same RFP numbers that this budget document was relevant to.

And to go towards the royalty payments, if -- if Ms. Wise wants to put it in writing that they do not have updated versions of the same

document for royalties past 2017, then we're happy to see that admission and have them point to us where they think this updated information has been given to us.  I will say that the royalty document, the one ending in 239, has -- has an issue that relates to the second category of the letter, namely that there is additional information that was not provided.  And specifically here, it's the underlying payments, which Ms. Furman testified ICC does have and are readily available.

I won't go too far into that, because I know that's a separate argument.  It's the second category of Upcodes' letter, but I just want to point that out.

THE COURT:  Why don't we turn to the second category, then?

MS. DOUDAR:  Okay.  Would -- would you like me to give a little bit of an overview?

THE COURT:  I think -- well, is there -- it sounded -- I think it sounded to me from when I read the letter that there might be some overlap in the types of documents we're talking about here.  But am I wrong on that?  We were just previously talking about updates to budgets and the cost and sales.

MS. DOUDAR:  It is a good point,

Your Honor.  There is some overlap.  Some of these documents are -- in fact, some of them have the exact same Bates number.  The issue with category 2 is not so much that we need the updated versions; although, that might be the case, and that would be addressed in section one.  But in section two, we specify about -- well, really, I guess in my letter, it's section three, but the second category of documents, is more about the fact that the current form that they're in is -- makes it impossible for UpCodes to interpret the documents.

And we know that to be the case because when we questioned Ms. Furman, ICC CFO, on these documents at her deposition, she herself testified that she would need additional information to interpret them or that she was not prepared to talk about basic elements of the document, such as column headings.  And like we -- like I was just discussing, she also testified about the availability of important related documents, such as the payment records that underlie ICC's ledgers, the royalty payments that we were talking about earlier.

MS. WISE:  I'm happy to respond.  There's no request that I can see that asks for specific royalty payments, like who paid what to whom, nor do

I think that that is relevant, even if ICC maintains that information.  The royalty information that we provided has been described as unusable because one field doesn't exist, and that is a field that was not present in the same document that was produced in copyright 1.  So they haven't explained to us why it's unworkable and why, when we updated it in the exact same form as copyright 1, it's now unreadable. It just doesn't make sense.

I will say that Ms. Furman is ICC CFO, but she was designated -- UpCodes was unhappy with the discussion of certain website analytics for which another witness, Mr. Mark Johnson, ICC's Chief Operating Officer, was designated to testify about, so we had Ms. Furman speak to an individual in IT and prepare to testify about that, which she did in detail.

The questions that she wasn't able to answer were questions about what -- how does Google Analytics define page views.  That's not something ICC knows.  They can look up in Google Analytics what the term "page view" means, but there's no basis for getting more time from a senior executive of ICC to ask a question about what -- how Google defines terms.

So I just don't think we understand what is really being requested in the second bucket of information.

MS. DOUDAR:  I can address Ms. Wise's points, from the last point back to the first point. As to the last point, what's being requested: Really what's being requested is what we asked for in our email right after Ms. Furman's deposition, which is a supplemental deposition of a 30(b)(6) witness who is actually prepared to testify on the topics, because as Your Honor can see in Exhibit 4 to Upcodes' letter, we attached the email thread in which ICC agreed that Ms. Furman would be prepared to talk about the documents that she was then not prepared to talk about.

And to get into that a little bit -- so really, what we want is a supplemental deposition.

And to get into the lack of preparedness, Ms. Wise talks about the Google headers.  I do want to mention that Ms. Furman was not the first person to be asked these questions.  We asked the same questions to Mr. Johnson, ICC's COO, and he was not able to talk about them.  And so this second round of questioning did not come as a surprise to ICC. And namely, another important note is that we're not

just asking how does Google define page views.  We are asking how ICC uses this data.  What does it interpret it to mean?  It -- it's not sufficient for ICC to tell us, "Go figure out what Google says."  Because, for example, let's say we get to trial and we -- we just took them at their word and assumed whatever Google says is what's accurate and they tell us, "Well, actually, no, we apply this differently," that would be a problem.

So when we ask ICC's witnesses, who should be prepared to talk about these documents -- and I want to note that these four metrics documents that had these column headers, they are very limited-in-scope documents in that there's only a few things on those documents.  There's maybe a possibility of five different column headers.  And we asked about those, and Ms. Furman didn't know them.

So really, I'm not -- I don't understand how they could have presented to us that Ms. Furman would be prepared on these documents, but yet not know what the column headers mean, especially given that they've been asked these same questions in a prior deposition.

And now going to the category of the sales

document that had missing a column, which was the item class code, Ms. Wise again goes back to, "Well, you have these in copyright 1.  That should be sufficient."  But that's -- that's -- again, that's not sufficient for the same reasons that I mentioned before.

And for a further example, since copyright 1, ICC has taken certain actions that could make whether a sale is print or electronic more important.  For example, ICC has reduced its pushing and marketing of sale of print copies of documents.  So if we get more information which is the item class code, which will tell us whether the sale was a print copy or an electronic copy -- if we find that the sales of the print copies are the only ones going down, that could clearly be linked to something other than Upcodes' alleged harm.

So that's important in this case; whereas, in copyright 1, it wasn't the same issue.  And regardless, again, like I mentioned, our strategies for copyright 1 shouldn't have any bearing on whether we need these documents now.

And lastly, Ms. Furman also testified -- going to the first point that Ms. Wise made about royalty income, Ms. Furman testified that royalty

income can be exported from their reporting software.  So we're also unsure as to why they can't supplement additional royalties past 2017.

MS. WISE:  So I think there are a lot of things going on there.  ICC has produced royalty information.  What you asked for in your email is the identity of each royalty payment, like what did Licensee A pay.  And while that information is maintained, it was not requested, and it is not relevant.  "Requested," meaning you served an RFP during the course of discovery in copyright 2.  So we never agreed to produce that granularity level.

However, UpCodes does have our royalty information at the level that we produced it in copyright 1 through 2025.

With respect to the preparation of Ms. Furman, I think it's absolutely ridiculous to suggest that she was unprepared.  She testified for a full seven hours in great detail, including providing a summary of what each of the column headings for the subject about user views was.  It was said that she wasn't able to ask about how ICC views this data, but that's not true.  What she was asked is, "What does the page views table represent?"

She said, "Those are monthly page views as defined by Google."

Question, "And what do you understand the definition of Google Analytics to be?"

And then she said to me, "This is the number of pages that were viewed."

She was asked how Google Analytics defines that term. She wasn't asked how does ICC interpret the data. That's on page 214 of her transcript in Exhibit 3. So they could have asked her a different question. What they asked her was how Google defines the page view term. They don't get --

MS. DOUDAR: Your Honor --

MS. WISE: -- an additional deposition because they don't like the question they asked.

And as we said in our letter, ICC put up four senior executives, including an individual who's responsible for ICC's digital team, ICC's CEO, CFO, and chief operating officer, who all provided detailed testimony and were well prepared for their depositions.

The law on this is clear that the inability to memorize, you know, documents or to forget something is not the standard. A 30(b)(6) deposition is not a memory test, and we heard that

from their witnesses as well, that they didn't remember something.  And that's okay, because UpCodes isn't held to the level of memorizing every single document.

We asked, you know, questions that had happened pretty recently to Upcodes' witnesses, and it's amazing that they're able to function with the level of amnesia that goes on from Upcodes' witnesses.

They expect a different standard from ICC, and it's not what Rule 30 expects.

MS. DOUDAR:  Your Honor, I can -- I can respond to Ms. Wise, if you would like.

THE COURT:  I'm not sure -- unless there's, like, something new to add, I'm not sure we -- we need to go further on this, but if you want to respond, you're -- you're welcome to.

MS. DOUDAR:  I'll just keep it brief.  I will say that, as for licensing revenues, the RFP27 is relevant to this.  They've alleged that Upcodes' conduct resulted in lost profits, including damage to their licensing revenue, and licensee payments is relevant to that to see whether it was really just one licensor that left or really what was the extent of the harm across licensees.

And as to the second portion, we stand by the questions we asked Ms. Furman in her deposition. She was not able to answer those questions. And, again, the document was incredibly short, incredibly limited. So the fact that she didn't know this one -- these few headings, it's not like this document was, like, hundreds of pages. It was, like, a couple sheets with just a few column headings. So really, she didn't know any of the information -- most of the information on the document, even though, as stated in Exhibit 4, ICC promised to prepare her on these exact documents.

MS. WISE: I would just say that that's not borne out by the testimony, and I have nothing else to add.

THE COURT: Okay. So I'll issue an order today resolving the RFA issue, and then I'll issue a separate order resolving the issues raised in ECF 280.

Is there anything else the parties need to raise?

MS. WISE: No, Your Honor.

MS. DOUDAR: No, Your Honor. Not from the defense. Thank you.

THE COURT: Thank you.

C E R T I F I C A T E

     I, Marissa Lewandowski, certify that the foregoing transcript of proceedings in the case of International Code Council, Inc. et al v. UpCodes, Inc. et al, Docket #1:17-cv-06261-VM-VF, was prepared using digital transcription software and is a true and accurate record of the proceedings.


Signature  *Marissa Lewandowski*
                   Marissa Lewandowski


Date:        February 11, 2026